IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

CASE NO. 7:08 CV 21


OPHELIA MUNN-GOINS,                     )
                                        )
                    Plaintiff,          )
                                        )
        vs.                             )    D E P O S I T I O N
                                        )
Board of Trustees of BLADEN             )
COMMUNITY COLLEGE, DARRELL PAGE,        )
in his individual and official          )
capacity, and DR. KATHRYN GEISEN, in)
her individual and official capacity,   )
                                        )
                                        )
                    Defendants.         )
                                        )
---------------------------------------



OPHELIA MUNN-GOINS - VOLUME I




TAKEN AT THE LAW OFFICES OF:
FERGUSON STEIN CHAMBERS GRESHAM & SUMTER, PA
312 West Franklin Street
Chapel Hill, NC  27516


                    11-05-08
               02:03 O'CLOCK P.M.

                 Dale L. Ring
                Court Reporter


             Chaplin & Associates
                                        P. O. Box
407
                                    Kernersville, NC
27285-0407
                                        (336)
992-1954

1

1    part, were you in the military during this entire
2    time from high school until --
3         A.   From college.
4         Q.   From college, okay.  So when you lived
5    in Winston-Salem you were not in the military yet?
6         A.   No.
7         Q.   Okay.  And then you retired from the
8    military immediately before going to work at
9    Bladen Community College?
10        A.   While I worked -- I worked there part
11   time while I was still on active duty.
12        Q.   Okay.
13        A.   I was on leave.
14        Q.   When did you first start?
15        A.   January 2002.
16        Q.   Okay.  So you were hired as a part-time
17   instructor at that time?
18        A.   Yes.
19        Q.   And when did you retire from the
20   military?
21        A.   February 1, 2002.
22        Q.   And I guess if you were at Fort Sam
23   Houston, you were in the Army, right?
24        A.   Yes.
25        Q.   Okay.  And you were a lieutenant

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 2 of 39   52db6708-3e26-4e14-a77b-749f8dd79998

1    colonel?

2         A.    Retired as a lieutenant colonel.

3         Q.    You -- that was your rank when you

4    retired, right?

5         A.    Yes.

6         Q.    Are you currently employed?

7         A.    No.

8         Q.    In addition to your involvement as a

9    member of the school board, are you active in

10   politics at this time in any way?

11        A.    Do you mean do I support other

12   candidates?  Do I work with the candidates?  Do

13   I ---

14        Q.    Yes, do you -- I mean, not just do you

15   vote, or are you rooting for someone to win an

16   election.  But do you work for candidates, or do

17   you campaign, or do you do any community activism?

18   Anything like that?

19        A.    Well, I'm a community activist, yes.

20        Q.    Okay.  Can you describe your community

21   activist activities?

22        A.    I help senior citizens get medicine. I

23   help them with housing issues.  Help students try

24   to find money for college.

25        Q.    All right.  Do you -- well, let me ask

1    you about the work you do with senior citizens, is
2    that as part of an organization?
3         A.    No.
4         Q.    You just do that ---
5         A.    Oh, yeah, for senior citizens?  Yes, it
6    is.
7         Q.    Oh, okay.  What's the organization?
8         A.    The Lumber River Counsel of Government
9    Aging Advisory.
10        Q.    The Lumber River Counsel of Government?
11        A.    Aging Advisory Committee on Board.
12        Q.    Agent, a-g-e-n-t?
13        A.    A-g-i-n-g, Aging.
14        Q.    Oh, Aging.  I'm sorry.  Okay.
15        A.    For housing, I help them do that.
16        Q.    And do you have a position -- do you
17   have a position title with that organization?
18        A.    No.
19        Q.    Are you a volunteer?
20        A.    Yeah.
21        Q.    You don't get paid for what you do?
22        A.    No.
23        Q.    Okay.  And all your work that you've
24   described with senior citizens is through this
25   organization?

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 4 of 39   52db6708-3e26-4e14-a77b-749f8dd79998

1    A.    Yes.

2    Q.    The medicine and the housing?

3    A.    Yes.

4    Q.    Okay.  And what exactly do you do in

5    trying to find senior citizens medicine and

6    housing?  Do you go through governmental agencies?

7    A.    I did.  I don't now.  Now, I'm not doing

8    that much.  I was.

9    Q.    Oh okay.  When were you doing it?

10   A.    From 2002 until maybe 2006-2000 -- early

11   2007.

12   Q.    And was there a reason you stopped doing

13   it?

14   A.    I haven't gotten any calls.

15   Q.    Oh, so they call you and ask you.  They

16   call you if they need you?  Okay.

17   A.    Yes.

18   Q.    Yes.

19   (Off-record comments)

20   Q.    And then as far as helping students find

21   money for college, is that for an organization?

22   A.    Yes.

23   Q.    And whose -- what's the organization?

24   A.    Charles and Eva Munn Foundation.

25   Q.    And is that foundation named for your

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 5 of 39

1  father?

2        A.   Yes, and mother.

3        Q    Oh, okay.  I thought you said Charles E.

4  Munn?

5        A.   Charles and Eva Munn Foundation.

6        Q.   Okay.  And does that -- were you a

7  founder of that foundation?

8        A.   Yes.

9        Q.   Did you found it with anybody else?

10       A.   Community -- couple community members,

11  cousins ---

12       Q.   Who ---

13       A.   --- siblings.

14       Q.   --- were they?

15       A.   Lanna Carter, Kathleen Munn, Dr. Blanks

16  -- Delilah Blanks.

17            MS. SHEA:  Off the record.

18  (Off record)

19       Q.   (Ms. Shea)  Okay, Lanna Carter, is she a

20  relative of yours?

21       A.   Cousin.

22       Q.   And Kathleen Munn?

23       A.   Sister.

24       Q.   And is it Ms. Blanks or Dr. Blanks?

25       A.   Doctor.

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 6 of 39   52db6708-3e26-4e14-a77b-749f8dd79998

1      Q.   Okay.  What is she?

2      A.   Commission.  Commission, county

3  commissioner.

4      Q.  County commissioner?  Okay.  Anybody

5  else?

6      A.   I'm sure, but I can't think of them now.

7      Q.   Is there a board of directors for

8  that ---

9      A.   There is.

10     Q.   I'm sorry.  I probably should've told

11  you this before we started, but I can tell you

12  talk a lot faster than I do, and you're probably

13  going to have to wait for me to finish my

14  question, so the court reporter can get down what

15  I'm asking you and what you're answering.  Okay.

16  It'll probably drive you crazy because I talk

17  slow.  I'm from the Midwest.

18          Okay.  Who's on the board of directors

19  for this organization?

20     A.   I am.

21     Q.   Anybody else?

22     A.   Kathleen Munn.

23     Q.   Is her name spelled with a K or a C?

24     A.   K.  Wanda Daniels.

25     Q.   Is Wanda Daniels a family member?

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 7 of 39   52db6708-3e26-4e14-a77b-749f8dd79998

1    A.    No.

2    Q.    What's your relationship to her, if any?

3    A.    None.

4    Q.    No relationship?

5    A.    No.

6    Q.    How did she get on the board?

7    A.    She was in the community and willing to

8    work or assist.

9    Q.    Did you ask her to be ---

10   A.    Yes.

11   Q.    --- on the board?

12   A.    I did ask her.

13   Q.    Was she a volunteer before you asked

14   her ---

15   A.    Yes.

16   Q.    -- to join the board?  So you were all

17   were doing this work before you incorporated, is

18   that ---

19   A.    Yeah.  When we start to incorporate, we

20   started working together.  So once it was

21   incorporated and I explained to her what we were

22   doing and she started working with us, and then

23   she agreed to be a member of the board.

24   Q.    Okay.  So would it be fair to say she

25   joined the board a little later than some of the

1    others?  You were a founding member, right, so you
2    were on the board from the beginning?
3          A.    Yes.
4          Q.    And would the same be true of Kathleen?
5          A.    Yes.
6          Q.    Did Wanda join at a later time?
7          A.    The answer would have to be yes, but she
8    was on the board when the initial board was
9    established, she was a member.
10         Q.    Okay.  So she was on the board from the
11   very beginning?
12         A.    Yes.
13         Q.    Okay.  So you all -- before you formally
14   created a board, you were doing work.  Is that
15   right?  You were doing this service work through
16   the ---
17         A.    No.
18         Q.    Okay.  Well, how did you know Ms.
19   Daniels?
20         A.    Oh, she was in my neighborhood.  She's a
21   friend.
22         Q.    A friend?  Okay.
23         A.    Yeah.  She's in the neighborhood.
24   Everyone's from the neighborhood except one person
25   now.

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 9 of 39   52db6708-3e26-4e14-a77b-749f8dd79998

1    A.    I grew up with her in the area so.

2    Q.    Do you all go to the same church?

3    A.    No.

4    Q.    Okay.  And she is no longer on the

5    board, is that right?

6    A.    That's correct.

7    Q.    Do you know why she left the board?

8    A.    No.

9    Q.    Do you have terms for board members?

10   A.    Yes.

11   Q.    What's the term?

12   A.    Three years unless you're appointed.

13   Q.    Did she leave at the end of her

14   three-year term?

15   A.    No.

16   Q.    Did -- she left before the end of her

17   three-year term?

18   A.    She did a second term.  I mean, she --

19   somewhere in the midst she left, and I can't tell

20   you

21   when nor why.

22   Q.    Okay.  She had two terms but left before

23   the end of her second term?

24   A.    Yes.

25   Q.    Okay.  And that was her decision as far

1    A.    None that I can think of at the moment.

2    Q.    Okay.  And if you think of something

3  later on, feel free to jump in with that even if

4  we're talking about something else because I would

5  like to get everything you're involved in.  But it

6  sounds like it's plenty.  Now, you were working at

7  one time on your PhD, right?

8    A.    Yes.

9    Q.    Did you ever get that?

10   A.    No.

11   Q.    How far along are you on your PhD?

12   A.    My dissertation.

13   Q.    You've taken your comps?

14   A.    Yes.

15   Q.    And is that at Fayetteville State?

16   A.    Yes.

17   Q.    And what is the program you're in?

18   A.    Educational leadership.

19   Q.    Is that the same or similar to

20  educational administration?

21   A.    I don't know.

22   Q.    Okay.  What is educational leadership?

23   A.    It prepares you to be, I guess, an

24  executive or VP or president of a -- of an

25  institution whether it's a community college,

1    colonel?

2          A.    Yes.

3          Q.    Okay.  How were you first attracted to

4    Bladen Community College as a place to work?

5          A.    Dr. Page talking to him.

6          Q.    So you already knew Dr. Page?

7          A.    Yes.

8          Q.    And how did you know Dr. Page?

9          A.    My father was a member of the Board of

10   Trustees, and I met him through him.

11         Q.    Did you and Dr. Page get along well?

12         A.    Yes.

13         Q.    Did you consider him a friend?

14         A.    Yes.

15         Q.    And so he recommended that you apply for

16   a teaching job?

17         A.    Yes.

18         Q.    Now, at that time Kay Geisen was not

19   there yet, right?

20         A.    Correct.

21         Q.    Okay.  Did you know Lloyd Horne?

22         A.    No.

23         Q.    So you applied for a job?

24         A.    Yes.

25         Q.    And the job you applied for was

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 12 of 39

1    information technology?

2        A.    Isn't it information systems, computer

3    science.

4        Q.    Computer science.  Okay.  And would you

5    have gotten that background through your degree

6    through the University of Pittsburgh?

7        A.    Yes.

8        Q.    Now, did Dr. Page just tell you put in

9    an application.  We'd like to consider you, or did

10   he tell you, we'll hire you.  We need a teacher,

11   you've got the job?

12       A.    I don't remember.

13       Q.    Okay.  Was it your impression that you

14   were probably going to get it, or did you know?

15       A.    Didn't know.

16       Q.    Did you have to go through any kind of

17   application process or anything?

18       A.    I was part time at first.

19       Q.    Right.

20       A.    And that's what he encouraged me to do,

21   part time.

22       Q.    But to start the part-time work, do you

23   remember having to go through any process other

24   than talking to Dr. Page?

25       A.    Talk to Dr. Garner.

11-05-08    Munn-Goins vs. Bladen\7:08CV21          COPY

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 13 of 39   52db6708-3e26-4e44-a77b-749f8dd79998

1     Q.   Okay.  So the only thing -- we're not

2  sure ---

3     A.   It doesn't look right though.  It's just

4  missing a lot in between.

5     Q.   I think it does appear to be missing

6  some pages.

7     A.   Okay.

8     Q.   Yeah.  But at least what you see does

9  look like your handwriting ---

10     A.   Yes.

11     Q.   --- your employment history, and your

12  education?

13     A.   Yes.

14     Q.   Okay.  So you were hired part time and

15  taught part time for how long?

16     A.   Four months -- four-and-a-half months.

17     Q.   And would that be to the end of the

18  spring 2002 semester?

19     A.   Yes.

20     Q.   Okay.  And then at some point had you

21  talked to Dr. Page or Dr. Garner or anybody about

22  going to a full-time position?

23     A.   Dr. Garner called me and talked to me

24  about it.

25     Q.   Okay.  And did she make an offer to you?

Case 7:08-cv-00021-D  Document 18-2  Filed 12/12/08  Page 14 of 39

1      A.    Yes.

2      Q.    And about when was that done, if you

3   remember, in 2002?

4      A.    The summer 2002.

5      Q.    Had you told her before that you would

6   be interested in working full time?

7      A.    Yes.

8      Q.    And those full-time positions I guess

9   can be either nine-month positions, ten-month

10  positions or twelve-month positions, is that

11  right?

12     A.    Yes.

13     Q.    And do twelve-month employees make more

14  money than nine-month employees?

15     A.    No.

16     Q.    They all make the same amount of money?

17     A.    No.

18     Q.    Well, let me take that back.  The months

19  out of the year that they teach do not affect

20  their salary?

21     A.    Correct.

22     Q.    Okay.  Is it just that the same salary

23  gets stretched out over 12 months?

24     A.    No.

25     Q.    What's the difference between a

11-05-08      Munn-Goins vs. Bladen\7:08CV21        COPY

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 15 of 39

1    Q.   All right.  But if you are a
2  twelve-month employee, and you're actually
3  working, you know ---
4    A.   I don't know anything about ---
5    Q.   --- August through ---
6    A.   --- the other employees.
7    Q.   --- July?
8    A.   I have no clue.
9    Q.   You have no idea.  Okay.  That's fine.
10  Fair enough.
11    A.   Okay.
12    Q.   Okay.  You do know there are the three
13  types, right?
14    A.   I did know that.
15    Q.   Okay.  And is it also your understanding
16  that faculty, full-time faculty at community
17  colleges are under a contract?  They're not
18  tenured?
19    A.   Yes.
20    Q.   As they would be at a university, right?
21    A.   Yes.
22    Q.   And each year the faculty member has to
23  sign a contract ---
24    A.   Yes.
25    Q.   --- with the school?  And it's for the

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 16 of 39

1    conversation?

2         A.    Yes.

3         Q.    Okay.  And have we covered everybody, or

4    is there --

5         A.    I'm sure there are others.

6         Q.    Okay, but those were the people you had

7    identified, weren't they?

8         A.    Yes.

9         Q.    Okay.  So your recollection is that all

10   the conversations you had at Bladen about going

11   back for your doctorate degree were positive and

12   supportive?

13        A.    Yes.

14        Q.    Okay.  Nobody told you, well, gosh, if

15   you do this, you're not going to have time to

16   teach here.  We don't like that.

17        A.    No.

18        Q.    Okay.  Did Bladen pay for you to go

19   back?

20        A.    They provided $200, 200-some dollars for

21   tuition and books.

22        Q.    Was that per semester or just ---

23        A.    It might ---

24        Q.    --- total?

25        A.    --- have been a hundred and ninety

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 17 of 39

1    dollars.  One semester I got 100-and-some dollars,
2    one semester I got 200-some dollars.
3         Q.   And would you have gotten that through
4    Mr. Horne?  Would ---
5         A.   Yes.
6         Q.   Is that how you would've applied for it?
7         A.   I went through the department chair.
8         Q.   Okay.  So Ms. McCoy would've gone to Mr.
9    Horne ---
10        A.   Should have gone ---
11        Q.   --- with the request?
12        A.   Yes.
13   (Off-record comments)
14        A.   It would have been gone from Cynthia
15   McCoy to Kay Geisen to Lloyd Horne.
16        Q.   Okay.  That would -- so you didn't talk
17   directly to Mr. Horne about that?
18        A.   I'm sure I did because I didn't get my
19   money.  I didn't get it.  Oh, you just apply.  I
20   don't know.  I talked to him about money for
21   school, yes.
22        Q.   Did you get your money?
23        A.   Yes.
24        Q.   Okay.  You always got it?
25        A.   Yes.

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 18 of 39

1    Q.   Okay.

2    A.   I got something.  They had a committee

3    that would approve the funds.

4    Q.   Okay.  Do you remember ever telling Dr.

5    Geisen that you were going back to school because

6    you wanted her job?

7    A.   No.

8    Q.   You never said that, or you don't

9    remember?

10    A.   I want a VP job, not her job.  Not at

11    Bladen. a VP job.

12    Q.   Wasn't ---

13    A.   I don't want ---

14    Q.   --- she a ---

15    A.   --- her job.

16    Q.   --- VP?

17    A.   Yeah, but not her job specifically, a VP

18    job.

19    Q.   You told her you wanted a VP job?

20    A.   A VP job.

21    Q.   Okay.

22    A.   So like -- if I said her job, it's like

23    VP.

24    Q.   Right.

25    A.   Not at Bladen.

11-05-08     Munn-Goins vs. Bladen\7:08CV21          COPY

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 19 of 39   52db6708-3e26-4e14-a77b-749f8dd79998

1    faculty pay information is publicly available,

2    right?

3         A.    Yes.

4         Q.    Okay.  And you can request that

5    information from the school, right?

6         A.    Yes.

7         Q.    And it's your understanding you have the

8    right to that information, correct?

9         A.    Correct.

10        Q.    Okay.  And you requested that several

11   years, is that right?

12        A.    Correct.

13        Q.    Did you request it every year that you

14   taught at Bladen Community College?

15        A.    Yes.

16        Q.    Starting in 2002?

17        A.    Yes.

18        Q.    Okay.  And was it given to you every

19   year?

20        A.    Yes.

21        Q.    And you paid a fairly small fee to the

22   school, and then they would give you the

23   information?

24        A.    Yes.

25        Q.    Okay.  In 2002 who did you make that

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 20 of 39   52db6708-3e26-4e44-a77b-749f8dd79998

1   request to?

2       A.   Rosemary Crumb.

3       Q.   Crumb or Crump?

4       A.   C-r-u-m-b.

5       Q.   Crumb.  Okay, and what was her position

6   at the time if you know?

7       A.   She worked in personnel.  I mean, I

8   don't know.

9       Q.   So she was an HR person?

10      A.   Yes.

11      Q.   Okay.  And did you -- what you pay her a

12  dollar that year?

13      A.   Yes.

14      Q.   And then she gave you the information?

15      A.   Yes.

16      Q.   Okay.  What did you do with that

17  information when you got it?

18      A.   Shared it with others who wanted it.

19      Q.   Okay.  And who were the people you

20  shared it with?

21      A.   Lee Anne Bryan and that year I think she

22  was the only one.

23      Q.   Do you have any idea why Lee Anne Bryan

24  wouldn't have gotten it herself the way you did?

25      A.   No.

1    Q.    Okay.  She didn't give you a reason for
2  that?
3    A.    No.
4    Q.    Did she ask to see it, or did you offer
5  it to her?
6    A.    I don't remember.
7    Q.    Okay.  And then in 2002 you did it
8  again?
9            MR. GRESHAM:  2002 or ---
10           MS. SHEA:  Or I'm sorry.  Thank
11 you.
12   Q.    (Ms. Shea)  2003?
13   A.    Yes.
14   Q.    You made the same request in -- was it
15 to Ms. Crumb again?
16   A.    Yes.
17   Q.    And was she still in the same position
18 as far as you know at that time?
19   A.    Yes.
20   Q.    Okay.  And she gave it to you?
21   A.    Yes.
22   Q.    You paid a dollar?
23   A.    I don't know how much I paid.  I paid.
24   Q.    That's the ballpark anyway?
25   A.    Yes.

Case 7:08-cv-00021-D  Document 18-2  Filed 12/12/08  Page 22 of 39

1    Q.   A dollar is in the ballpark?  Okay.  And
2  did you share it with other employees in 2003?
3    A.   Yes.
4    Q.   And do you remember who ---
5    A.   No.
6    Q.   Okay.
7    A.   I know I shared it, but I don't know
8  with whom.
9    Q.   Okay.  And if you don't remember who you
10 shared it with, I assume you also don't remember
11 why they didn't just go get it themselves?
12   A.   Correct.
13   Q.   Okay.  2004, you asked for it?
14   A.   I think I did.
15   Q.   Okay.  And I think, if I can find it
16 here, I have a copy of a request that I think
17 might have been your request in 2004.  Let me see
18 if I can find that.
19 (Ms. Shea examined document)
20              (DEPOSITION EXHIBIT
21              NUMBER FOUR WAS MARKED
22              FOR IDENTIFICATION)
23   Q.   Okay.  I'm going to hand you what's been
24 marked as Exhibit Four.  Do you recognize that
25 document?

Case 7:08-cv-00021-D  Document 18-2  Filed 12/12/08  Page 23 of 39
52db6708-3e26-4e44-a77b-749f8dd79998

1      A.   Yes.

2      Q.   Is that your handwriting?

3      A.   Yes.

4      Q.   And is that a 2004 request for salary

5  information?

6      A.   Yes.

7      Q.   Okay.  And I believe that was to

8  somebody else, wasn't it?

9      A.   It was Rosemary Crumb.

10     Q.   Okay.

11     A.   Pitkins is her last name.

12     Q.   Okay.  And again, you reference a one

13  dollar fee ---

14     A.   Yeah.

15     Q.   --- for the information?  Okay.

16          And in 2004 was Ms. Crumb still in human

17  resources ---

18     A.   I think so.

19     Q.   --- in the same job she'd been in?

20     A.   I think she was.

21     Q.   Okay.  And did you share that

22  information with somebody else in 2004?

23     A.   I'm sure I did.

24     Q.   Do you remember who?

25     A.   No.

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 24 of 39

1  Q.   Okay.  And I should -- in 2002, 2003,
2  2004, you shared it with other -- at least one
3  other individual, maybe multiple individuals?
4  A.   Not in 2002 because I didn't really no
5  anyone.  That's why I don't think I only shared it
6  with the one person ---
7  A.   Okay.
8  Q.   --- in 2002.
9  Q.   In 2003 and 2004, you did share it with
10 other people?
11 A.   Yes.
12 Q.   Plural?
13 A.   I -- I'm sure I did.
14 Q.   Okay.  And there was no uproar about
15 that, is that right?
16 A.   No.
17 Q.   Did you get in trouble for asking for
18 it?
19 A.   No.
20 Q.   Okay.  Then in 2005, did you ask for it
21 again?
22 A.   I'm probably sure I did.
23 Q.   Okay.  And would that have been from Ms.
24 Crumb?
25 A.   I can't tell you.  I don't know who was

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 25 of 39

1    there then.
2         Q.   Did she leave at some point around 2005
3    or 2006?
4         A.   Yes.
5         Q.   Okay.  And at some point did those
6    requests get referred to Mr. Horn?
7         A.   Yes.
8         Q.   Okay.  And that might have been 2005, or
9    it might have been 2006?  You just don't remember?
10        A.   Yes.
11        Q.   Okay.  But in any event in 2005, you did
12   ask for the information from somebody; you got it;
13   you might have shared it with some people.  No big
14   deal, right?
15        A.   Yes.
16        Q.   Okay.  And then in 2006 Ms. Crumb was
17   gone, right?
18        A.   I don't know.
19        Q.   You don't know?
20        A.   I don't know when she left.
21        Q.   Okay.
22        A.   It's probably six because I think that
23   -- yes.  Because I sent it to the other person.
24        Q.   Tiina Mundy?
25        A.   Yes.

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 26 of 39

1          MS. SHEA:  Presumably.  Presumably.

2     Yes.

3          MR. GRESHAM:  Okay.

4     Q.   (Ms. Shea)  Okay.  When you asked for

5     the information from Ms. Mundy whenever you asked

6     for it, do you recall that it was handled

7     differently from past occasions?

8     A.   Yes.

9     Q.   Okay, what was different?

10    A.   She sent an email telling me that I had

11    to -- that Lloyd Horne, she forwarded an email

12    from Lloyd Horne saying I had to talk to Dr. Page

13    to get --  before it could be released.

14    Q.   Okay.  Did you ask her or anybody else

15    why you had to go through Dr. Page?

16    A.   Yes.

17    Q.   And what were you told?

18    A.   That I had to ask Dr. Page.

19    Q.   That was ---

20    A.   That Lloyd Horne said I had to ask Dr.

21    Page.

22    Q.   Okay, so you asked, why do I have to do

23    it?  And they said because Lloyd ---

24    A.   Lloyd Horne ---

25    Q.   --- said so.

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 27 of 39
52db6708-3e26-4e14-a77b-749f8dd79998

1    A.    --- said to.

2    Q.    Okay.  And that was different from in

3    the past?

4    A.    Yes.

5    Q.    Okay.  And then did you make the request

6    through Mr. Horne -- or through Dr. Page I guess?

7    A.    Yes.

8    Q.    Okay.  Do you remember approximately

9    when you asked Dr. Page for that information?

10    A.    Sometime that year, no.

11    Q.    Okay.  You don't have an idea of how

12    much time elapsed between your first request to

13    Ms. Mundy and then when you went to Dr. Page?

14    A.    No.

15    Q.    Okay.  What happened when you went to

16    see Dr. Page about it?

17    A.    He asked me why, why I wanted it.

18    Q.    Okay.  And what did you tell him?

19    A.    For personal reasons.

20    Q.    Okay.  And what did you mean by that?

21    A.    For my personal use to do whatever I

22    choose to do with it.  It's personal.

23    Q.    Okay.

24    A.    And I explained to him that other people

25    were applying for jobs, and that way I could at

1   least give them a ballpark figure of what the
2   position would pay.
3          Q.   You told Dr. Page that?
4          A.   Yes.
5          Q.   And what was his response?
6          A.   He just said okay.  That's all I
7   remember.
8          Q.   He said okay?
9          A.   (Witness moved head up and down)
10         Q.   And then did you get the information?
11         A.   A long time later.  I had to keep asking
12  Lloyd Horne for it.
13         Q.   Okay, you had to ask Lloyd Horne for it?
14         A.   And eventually he gave me one sheet,
15  then a couple days later I found an envelope in my
16  box with another sheet.  But I never received it
17  all, no.
18         Q.   Okay.  Did you ever have a discuss --
19  did you have any other discussions with Dr. Page
20  about the information except for the one you've
21  already testified about?
22         A.   Yes.  When I got a reprimand for it.
23         Q.   Okay.  But not until then?
24         A.   Right.
25         Q.   Okay.  So let's hold off on talking

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 29 of 39   52db6708-3e26-4e14-a77b-749f8dd79998

1 about the reprimand for now.

2       Then you asked Dr. -- or you asked Mr.

3 Horne about it?

4     A. Yes.

5     Q. Okay. And do you remember every

6 conversation you had with Mr. Horne about it?

7     A. No, I don't remember every. But I

8 remember one or two.

9     Q. Okay.

10     A. When I went to his office and asked him

11 for it and he said, well, what do you need it for?

12 And I said it's for personal use, and I was going

13 to share it with Felicia Williams. He said, well,

14 why don't you charge her for it? And I said, no,

15 I'm

16 not going to charge her for it. I was going to

17 give her a copy. That was it.

18     Q. Okay. So you told him that you were

19 going to share the information with Felicia

20 Williams?

21     A. Yes.

22     Q. Okay. And that you were just going to

23 give her a copy of what you had?

24     A. Yes.

25     Q. Okay. And what was his response to

Case 7:08-cv-00021-D Document 18-2 Filed 12/12/08 Page 30 of 39

1    secretaries?

2          A.    None of theirs.

3          Q.    Or them?

4          A.    That's correct.

5          Q.    Not Mr. Horne's salary or Dr. Page's

6    salary or Dr. Geisen's salary?

7          A.    Correct.

8          Q.    So upper administration was not included

9    on this list at all?

10         A.    No staff, no executive management.

11         Q.    Okay.

12         A.    And no staff.

13         Q.    And no -- and con ed, you would include

14   in staff?

15         A.    Well, con ed is a separate department

16   basically, but then on the curriculum, on -- no

17   administrative staff were included at all.  The

18   secretary, the janitor, none of them were included

19   -- were included.

20         Q.    Okay.  And what were you planning to do

21   with that information besides share it with Ms.

22   Williams?

23         A.    Well, I always share it with Lee Anne

24   Bryan.  I use it -- Barbara Morrison was retiring.

25   There was a guy looking for a job.  So what I

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 31 of 39

1  would normally do when people look for a job is

2  look at the salary range. I would not tell them

3  exactly what the person makes, but I'll say you

4  could probably get about whatever.

5  Q.  Uh-huh (yes).

6  A.  There was someone looking for a job, and

7  I was going to tell him.

8  Q.  Who is the person looking for the job?

9  A.  I think it was Ronald Lloyd at that

10  time.

11  Q.  Ron Lloyd?

12  A.  Ronald Lloyd.

13  Q.  Ronald Lloyd. And was he a friend of

14  yours?

15  A.  Yes.

16  Q.  Okay. How did you know Mr. Lloyd?

17  A.  High school.

18  Q.  And the lady who was leaving, what was

19  her name?

20  A.  Barbara Morrison.

21  Q.  And what was her position?

22  A.  Political science instructor, history.

23  Q.  Okay, so Mr. Lloyd was interested in Ms.

24  Morrison's job?

25  A.  He was interested in a job.

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 32 of 39   52db6708-3e26-4e44-a77b-749f8dd79998

1    Q.   Any job?

2    A.   Yes.

3    Q.   Or any job within reason?

4    A.   Yes.

5    Q.   Okay.  And so you were going to share

6    this information with him so that he could decide

7    whether this was a job he could support himself

8    with and, you know, make a decent living at?

9    A.   No.  What I do is look at the scale and

10   then I was going to tell him about -- because,

11   see, she had years.  He couldn't get the same

12   amount because he didn't have 30 years, 25 years,

13   so there's no way.  But you can look at the scale

14   and see where someone has been there maybe two or

15   three years, like me and what he could qualify

16   for.

17   Q.   Okay.  But you knew what you made,

18   right?

19   A.   Yes.

20   Q.   So you needed the other people's

21   information, why?

22   A.   I didn't say I needed it.  I asked.

23   Q.   Well, you wanted it, why?

24   A.   For personal reasons.

25   Q.   But you were going to use it to share

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 33 of 39

1   with Mr. Lloyd?

2        A.   No, not like that.  No.

3        Q.   You were going ---

4        A.   I would never show that.

5        Q
         .   --- to share the range ---
6        A.   I would never show him the schedule.

7        Q.   Okay.  You were not going to show him

8   names and salaries, but you were going to show him

9   -- you were going to use that information to tell

10  him, you know, you could expect probably somewhere

11  in

12  the ballpark of X-thousand dollars a year --

13       A.   Yes.

14       Q.   -- teaching at Bladen County with your

15  experience and your background?

16       A.   Definitely.

17       Q.   Okay.  So the sheet Mr. Horne gave you,

18  wouldn't that have accomplished that purpose?

19       A.   Yes.

20       Q.   Because it was just faculty, and that's

21  what you were thinking Mr. Lloyd would want,

22  right?

23       A.   Possibly, yes.

24       Q.   Okay.  But you were thinking he might

25  also want another type of position?

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 34 of 39

1    A.    No.

2    Q.    As far as the staff in the upper

3    administration positions, why did you want that?

4    A.    Personal information, just personal to

5    know.

6    Q.    Just so you'd know?

7    A.    Yeah.

8    Q.    Okay.

9    A.    It was public.  That's why I wanted it

10    because it was public.

11    Q.    Okay.  So you had the second

12    conversation with Mr. Horne, he gave you the one

13    sheet.  Did you notice right then that it didn't

14    have everybody on it?

15    A.    Yes.

16    Q.    And did you tell him this isn't

17    complete?

18    A.    I don't remember if I did or not.

19    Q.    Okay.  Did you have any further

20    discussion at that time with Mr. Horne?

21    A.    I don't remember.

22    Q.    Okay.  May have, may not have?

23    A.    Yeah.

24    (Off-record comments)

25    A.    Yes.

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 35 of 39

1    Q.   And did you ever get any other sheets
2    than those two?
3    A.   No.
4    Q.   And when you got the second sheet, did
5    you get that sheet together with the first sheet
6    you had already received from Mr. Horne, the one
7    with the faculty information on it?  Did you get
8    those two pages together?
9    A.   No.
10   Q.   You never put them together?
11   A.   I didn't get them together, no.
12   Q.   I know you didn't -- excuse me.  Did you
13   put them together?
14   A.   You mean staple them together?
15   Q.   Or just have them side by --
16   A.   Oh, I'm sure I did.
17   Q.   Okay.
18   A.   I'm sure.
19   Q.   And then did you share those pages with
20   certain people?
21   A.   Yes.
22   Q.   Okay.  And who were the people you
23   shared them with?
24   A.   Felicia Williams, Lee Anne Bryan,
25   Kenneth Oxendine.

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 36 of 39   82db6708-3e28-4ad4-a77b-749f8dd79998

1    Q.   And nobody else?

2    A.   At the same time, Felicia Williams gave

3    a copy to Ella Joe Sellers.

4    Q.   Okay.

5    (Off-record comments)

6    Q.   Now, Felicia Williams, what is her

7    position?

8    A.   Instructor at the time.

9    Q.   Okay, what does she teach?

10   A.   English.  I think she's the chair.  I

11   don't know.

12   Q.   And I can't remember if you told me

13   this, what is Ms. Bryan's position?

14   A.   Accounting.

15   Q.   In what?

16   A.   Computer science.

17   (Off-record comments)

18   Q.   And Mr. Oxendine?

19   A.   He's one of the technical.  I don't know

20   which one.  He's technical.

21   Q.   Is he a faculty member?

22   A.   Yes.

23   Q.   Okay.  And how about Ms. Sellers?

24   A.   She's English faculty.

25   Q.   Okay.  Can you tell me about -- when you

11-05-08    Munn-Goins vs. Bladen\7:08CV21         COPY

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 37 of 39

1  shared this information with Ms. Williams, Ms.

2  Bryan, and Mr. Oxendine, were all four of you

3  together?

4       A.   Yes.

5       Q.   Where were you?

6       A.   In my office.

7       Q.   Okay.  Was this after hours?

8       A.   No -- well, yes, it was.  It was after

9  hours.

10      Q.   Okay.

11      A.   My work hours were over, yes.

12      Q.   Approximately, what time of day was it?

13      A.   3:15-3:30, I think.

14      Q.   Okay.  And did you call them in?

15      A.   I called Felicia.

16      Q.   Okay.  How did Ms. Bryan and Mr.

17 Oxendine join you?  How did they find out?

18      A.   Ms. Bryan had already had a copy -- had

19 already given her a copy earlier.

20      Q.   Okay.  And how about Mr. Oxendine?

21      A.   He said he overheard us talking in the

22 office, and he came back and asked for a copy.

23      Q.   Okay.

24      A.   His office is next door.

25      Q.   So he heard you all talking, he said?

Case 7:08-cv-00021-D   Document 18-2   Filed 12/12/08   Page 38 of 39   52db6708-3e26-4e44-a77b-749f8dd79998

1    A.    I think it was.

2    Q.    Did you give out copies to anybody else

3    at any time?

4    A.    Not that I can remember.

5    Q.    Okay, you might have?

6    A.    Could have.

7    Q.    Okay.

8    A.    But I doubt it.

9    Q.    Whenever you did give out copies, would

10   you have handed them directly to the person?

11   A.    Yes.

12   Q.    You didn't put them in people's

13   mailboxes or ---

14   A.    No.

15   Q.    --- on their desks, is that right?

16   A.    Yes.

17   Q.    Okay.  So if you gave it to more people

18   than just these people we've identified, you

19   would've handed it directly to them?

20   A.    I know I gave a copy to Felicia

21   Williams, Lee Anne Bryan, Kenneth Oxendine.  No

22   other person I gave a copy to.

23   Q.    Oh, okay.  You're sure of that?

24   A.    Yes.

25   Q.    Okay.