## SHEET 1  PAGE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

CASE NO. 7:08 CV 21

```
OPHELIA MUNN-GOINS,                    )
                                       )
              Plaintiff,               )
                                       )
    vs.                                )  D E P O S I T I O N
                                       )
Board of Trustees of BLADEN            )
COMMUNITY COLLEGE, DARRELL PAGE,       )
in his individual and official         )
capacity, and DR. KATHRYN GEISEN, in)
her individual and official capacity,  )
                                       )
              Defendants.              )
---------------------------------------)
```

OPHELIA MUNN-GOINS - VOLUME I

TAKEN AT THE LAW OFFICES OF:
FERGUSON STEIN CHAMBERS GRESHAM & SUMTER, PA
312 West Franklin Street
Chapel Hill, NC  27516

11-05-08
02:03 O'CLOCK P.M.

Dale L. Ring
Court Reporter

Chaplin & Associates

P. O. Box 407
Kernersville, NC 27285-0407
(336) 992-1954

## PAGE 2

Ophelia Munn-Goins - Volume I                    Page 2

ATTORNEY NOTES

PAGE LINE    SUBJECT MATTER    RELATES TO    ACTION

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

## PAGE 3

Ophelia Munn-Goins - Volume I                    Page 3

APPEARANCES OF COUNSEL

Robin E. Shea, Esquire
CONSTANGY, BROOKS & SMITH, LLC
100 North Cherry Street, Suite 300
Winston-Salem, NC 27101

John W. Gresham
FERGUSON STEIN CHAMBERS GRESHAM & SUMTER, PA
312 West Franklin Street
Chapel Hill, NC 27516

OTHER APPEARANCES

Kay Geisen
Darrell Page
Lloyd Horne

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

## PAGE 4

Ophelia Munn-Goins - Volume I                    Page 4

I N D E X

| | Page |
|---|---|
| STIPULATIONS | 5 |
| EXAMINATION | |
| By Ms. Shea | 8 |
| ADJOURNMENT | 254 |
| REPORTER CERTIFICATE | 255 |

E X H I B I T S

| Name | Offered By | Identified |
|---|---|---|
| Exhibit Number One (Witness' employee application to BBC) | Ms. Shea | 67 |
| Exhibit Number Two (BBC full-time employment contracts signed by Witness) | Ms. Shea | 75 |
| Exhibit Number Three (BBC part-time employment contracts signed by Witness) | Ms. Shea | 77 |
| Exhibit Number Four (2004 request for salary information) | Ms. Shea | 133 |
| Exhibit Number Five (2006 request to Tiina Mundy for pay information) | Ms. Shea | 137 |
| Exhibit Number Six (Spreadsheet showing faculty positions and salaries) | Ms. Shea | 193 |
| Exhibit Number Seven (Reprimand of Witness, 5-24-06) | Ms. Shea | 195 |
| Exhibit Number Eight (Email to Witness from Ms. Sellers) | Ms. Shea | 199 |

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

## PAGE 5

Ophelia Munn-Goins - Volume I                    Page 5

E X H I B I T S cont...

| Name | Offered By | Identified |
|------|-----------|-----------|
| Exhibit Number Nine (Email between Witness and Mr. Oxendine, 6-7-06) | Ms. Shea | 203 |
| Exhibit Number Ten (Email between Witness and Ms. Sellers) | Ms. Shea | 207 |
| Exhibit Number 11 (Letter from Sellers to Dr. Geisen, 5-30-06) | Ms. Shea | 209 |
| Exhibit Number 12 (Request for education leave) | Ms. Shea | 220 |
| Exhibit Number 13 (Variation of Exhibit 12) | Ms. Shea | 222 |
| Exhibit Number 14 (Request from Witness requesting Dr. Geisen to submit leave request to BOT) | Ms. Shea | 226 |
| Exhibit Number 15 (Email concerning education leave) | Ms. Shea | 226 |
| Exhibit Number 16 (Email concerning education leave) | Ms. Shea | 227 |
| Exhibit Number 17 (Denial of education leave request by Dr. Geisen) | Ms. Shea | 228 |
| Exhibit Number 18 (Detailed explanation of education leave denial) | Ms. Shea | 229 |
| Exhibit Number 19 (Letter to Dr. Page from Witness asking reconsideration) | Ms. Shea | 235 |
| Exhibit Number 20 (Summary of meeting with Dr. Page and Mr. Horne) | Ms. Shea | 238 |
| Exhibit Number 21 (Memo to Ophelia Munn-Goins from Dr. Geisen, dated March 28, 2007) | Ms. Shea | 240 |
| Exhibit Number 22 (Email with Barry Priest about education leave) | Ms. Shea | 241 |

## PAGE 6

Ophelia Munn-Goins - Volume I                    Page 6

E X H I B I T S cont...

| Name | Offered By | Identified |
|------|-----------|-----------|
| Exhibit Number 23 (Letter of reprimand to Witness, re: drop/add) | Ms. Shea | 246 |
| Exhibit Number 24 (Letter of reprimand to another employee, re: drop/add) | Ms. Shea | 249 |
| Exhibit Number 25 (Letter of reprimand to another employee, re: drop/add) | Ms. Shea | 251 |
| Exhibit Number 26 (Letter of reprimand to another employee, re: drop/add) | Ms. Shea | 252 |
| Exhibit Number 27 (Letter of reprimand to another employee, re: drop/add) | Ms. Shea | 252 |
| Exhibit Number 28 (Letter of reprimand to another employee, re: drop/add) | Ms. Shea | 252 |
| Exhibit Number 29 (Letter of reprimand to another employee, re: drop/add) | Ms. Shea | 253 |

## PAGE 7

Ophelia Munn-Goins - Volume I                    Page 7

STIPULATIONS

        Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Dale L. Ring, Notary Public in and for the County of Forsyth, State of North Carolina at Large.

        Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

        It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

        Reading and signing of the testimony was waived.

## PAGE 8

Ophelia Munn-Goins - Volume I                    Page 8

1    The witness, OPHELIA MUNN-GOINS, being
2  first duly sworn to state the truth, the whole
3  truth, and nothing but the truth, testified as
4  follows:
5       (02:03 p.m.)
6       EXAMINATION
7  BY MS. SHEA:
8       Q.  Hi, Ms. Munn-Goins.  My name is Robin
9  Shea, and we've met before.  And I represent the
10 defendants in the lawsuit that you filed against
11 the Bladen Community College Board of Trustees and
12 Kate Geisen and Darrell Page.  And I'm going to be
13 taking your deposition today.  Have you ever had
14 your deposition taken before?
15      A.  No.
16      Q.  Okay.  I'm sure Mr. Gresham has
17 explained to you some of the procedure, but I'll
18 be asking you some background questions and then
19 some questions more directly relevant to your
20 lawsuit.
21      And if you want to take a break at any
22 point today, please feel free to do that.  Just
23 say so.  If you don't understand a question that I
24 ask,
25 let me know, and I'll rephrase it so that you do

SHEET 2  PAGE 9

Ophelia Munn-Goins - Volume I                    Page 9

1  understand it.
2         I sometimes have a tendency to cut
3  people off when they're not finished answering.
4  And if I do that, I apologize.  I don't mean to be
5  doing that.  And if you will remind me that you
6  were still answering, I'll give you a chance to
7  give me a full answer.  Okay?
8         The court reporter will be taking down
9  everything that you say and that I say, and so if
10 you can answer yes or no out loud rather than
11 nodding or shaking your head, that would be
12 helpful to him.
13    A.   Okay.
14    Q.   Okay.  And you do understand you're
15 under oath today, right?
16    A.   Yes.
17    Q.   Okay.
18         MR. GRESHAM:  Speak a little louder
19 so that they can hear you.  There's a bad echo in
20 here.
21         MS. SHEA:  Okay.
22    Q.   (Ms. Shea)  Can you state your full name
23 for the record, please?
24    A.   Ophelia Munn-Goins.
25    Q.   No middle name?

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

PAGE 10

Ophelia Munn-Goins - Volume I                    Page 10

1     A.   That's my full name.
2     Q.   Okay.  Munn is -- is Munn your maiden
3  name?
4     A.   Yes.  And my last name.
5     Q.   And can you give me your current
6  address?
7     A.   927 Graham Road, Riegelwood.
8     Q.   And can you spell that ---
9     A.   R ---
10    Q.   --- town?
11    A.   R-i-e-g-e-l-w-o-o-d, North Carolina
12 28456.
13    Q.   Okay.  And what is your current
14 telephone number?
15    A.   Area code 910-655-1611.
16    Q.   You're married, right?
17    A.   Yes.
18    Q.   Okay.  And is your husband's last name
19 Goins?
20    A.   Yes.
21    Q.   Okay, what's his full name?
22    A.   Donell Goins.
23    Q.   And can you spell Donell?
24    A.   D-o-n-e-l-l.
25    Q.   Does he have a middle name?

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

PAGE 11

Ophelia Munn-Goins - Volume I                    Page 11

1     A.   That's his full name.
2     Q.   Okay.  And how long have you been
3  married to Mr. Goins?
4     A.   Eleven years.
5     Q.   Have you ever been married before?
6     A.   No.
7     Q.   And do you all have children?
8     A.   Yes.
9     Q.   How many?
10    A.   Two -- oh, excuse me, three.
11    Q.   And can you give me their names and
12 ages, please?
13    A.   He has a daughter.  Do you want our or
14 his?
15    Q.   Oh, his child, okay.  You have a
16 stepchild?
17    A.   Right.
18    Q.   Okay.  Yes, can you give me the
19 stepchild's name?
20    A.   Nidon, N-i-d-o-n, Goins.
21    Q.   And how old is Nidon?
22    A.   30.
23    Q.   And where does Nidon live?
24    A.   San Antonio, Texas.
25    Q.   Nidon is a male, right, a son?

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

PAGE 12

Ophelia Munn-Goins - Volume I                    Page 12

1     A.   Female.
2     Q.   Oh, female, I'm sorry.  And is Nidon
3  married?
4     A.   No.
5     Q.   Okay.  And then who's the next child?
6     A.   Tyrus Goins, T-y-r-u-s.
7     Q.   And is Tyrus your child?
8     A.   Our child.
9     Q.   Okay.  I meant you as a couple, you and
10 Mr. Goins?
11    A.   Yes.
12    Q.   Okay.  And how old is Tyrus?
13    A.   Eleven.
14    Q.   So he's living with the two of you now?
15 Okay, is he in the sixth grade?
16    A.   Fifth.
17    Q.   Fifth.  And who's the other child?
18    A.   Ashanti, A-s-h-a-n-t-i, Munn-Goins.
19    Q.   And is Ashanti a girl or a boy?
20    A.   Girl.
21    Q.   Tyrus I assume was a boy, right?
22    A.   Yeah.
23    Q.   Okay.  And how old is Ashanti?
24    A.   Six.
25    Q.   Is she in first grade?

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I         Page 13

1     A.   She is.
2     Q.   And she lives with you and Mr. Goins?
3     A.   Yes.
4     Q.   Okay. Now, were you elected to the
5 school board last night?
6     A.   Re-elected, second term.
7     Q.   Re-elected?
8     A.   Yeah.
9     Q.   Okay, congratulations.
10    A.   Thank you.
11    Q.   Is that a job? Do you get paid for
12 doing that?
13    A.   You get a stipend for gas and travel,
14 expenses like that.
15    Q.   So you're not paid for any of your
16 time ---
17    A.   No.
18    Q.   -- working on the school board?
19    A.   No.
20    Q.   And your father, is your father alive or
21 deceased?
22    A.   Deceased.
23    Q.   And was he fairly prominent in your
24 community?
25    A.   Yes.

Ophelia Munn-Goins - Volume I         Page 15

1     A.   In the county.
2     Q.   In government?
3     A.   In government.
4     Q.   Okay.
5     A.   Yes.
6     Q.   Okay. Is his role as the founder, is
7 that correct, call him the founder of that
8 organization?
9     A.   No.
10    Q.   Okay.
11    A.   I -- he ---
12    Q.   Then the president?
13    A.   He was president for -- back in the late
14 80s or early 90s.
15    Q.   Do you know for about how many years?
16    A.   No.
17    Q.   Okay. In that capacity, did he -- I'm
18 trying to think how to say this. Did he help
19 create publicity if he perceived or his
20 organization perceived ---
21    A.   I don't know.
22    Q.   --- that there -- you don't know?
23    A.   I wasn't here. I don't know.
24    Q.   Okay. Where were you?
25    A.   I -- it depends what time of the year,

Ophelia Munn-Goins - Volume I         Page 14

1     Q.   Okay. What is your father's name?
2     A.   Charles Munn, Jr.
3     Q.   And when did he die?
4     A.   November 1999.
5     Q.   And was he active in politics?
6     A.   Yes.
7     Q.   What exactly did he do?
8     A.   He was an activist.
9     Q.   He was an activist? Was he associated
10 with an organization?
11    A.   Yes. You mean work or political?
12    Q.   Right now political, just talking about
13 political.
14    A.   Bladen Improvement Association.
15    Q.   What was it called, Bladen?
16    A.   Bladen Improvement Association.
17    Q.   Was he the head of that organization?
18    A.   He was the president for a while.
19    Q.   And what was the purpose of the Bladen
20 Improvement Association?
21    A.   It is an organization that was
22 established under the federal law. It's mostly --
23 it has a PAC, Political Action Group and mostly to
24 ensure that minorities are represented.
25    Q.   Okay. Minorities are represented where?

Ophelia Munn-Goins - Volume I         Page 16

1 what year. I was someplace else in the world.
2     Q.   During the time that he was president of
3 the ---
4     A.   Right.
5     Q.   --- Bladen Improvement Association?
6     A.   Yes.
7     Q.   Okay, yes what?
8     A.   I was someplace else in the world. If
9 it was in '88, I was in Texas. If it was in '90,
10 I was in Virginia.
11    Q.   Okay. Well, I'll tell you what, why
12 don't we go back through where you've lived? It
13 sounds like that might be helpful. You're retired
14 military, right?
15    A.   Yes.
16    Q.   Is that why you were moving around a
17 lot?
18    A.   Yes.
19    Q.   Okay. I hate to go back this far, but
20 starting with, did you graduate from high school
21 in 1975?
22    A.   Yes.
23    Q.   Okay. Starting from '75 forward, can
24 you give me, if you don't remember the exact
25 street address, just the towns and states or

Ophelia Munn-Goins - Volume I                    Page 17

1  countries you lived in.
2       A.   1975 to 1980 I lived in Winston-Salem,
3  North Carolina.
4       Q.   Were you attending Winston-Salem State
5  at that time?
6       A.   Yes.
7       Q.   Okay.
8       A.   From 1981 from January to May, I lived
9  in Riegelwood, North Carolina.
10 (Off-record comments)
11      A.   Riegelwood.  Home, I moved home.
12           From July of '81 until August of '81, I
13 lived in San Antonio, Texas.
14      Q.   August of '82?
15      A.   One.
16      Q.   From July -- for one month?
17      A.   Well, it was like eight weeks I lived in
18 San Antonio, Texas.
19      Q.   Okay.
20      A.   From August -- September '81 until
21 August of '82, I lived in Korea.
22      Q.   Where in Korea?
23      A.   Camp Casey.
24      Q.   Is that in a city, or near a city?
25      A.   Tongduchon, the city is Tongduchon.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 18

1       Q.   Okay.
2       A.   The camp.  Uh-huh (yes).
3            THE COURT REPORTER:  Can you spell
4  that?
5            THE WITNESS:  No.  D-U-N-G-K-U-S-N
6  (sic) -- something.
7  (Off-record comments)
8            THE WITNESS:  From August of 1982
9  to November I lived in -- oh, until May -- can I
10 skip the intermediate two weeks or months, six
11 months?
12      Q.   (Ms. Shea)  If you could just say, you
13 know, there was a period at such and such a spot
14 where I don't remember where I was.
15      A.   Where I know where I was.
16      Q.   Feel free to say that.
17      A.   Okay.
18      Q.   But if you can designate the time period
19 as much as possible, that would be good.
20      A.   From August of '82 until September of
21 '90 San Antonio, Texas.  No, that's not -- that's
22 not correct.  That's not correct.  From '82 to
23 November -- in November of '82 until July or
24 August of '84, I was in Herlong, California.
25      Q.   Okay.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 19

1       A.   August to November I was in San Antonio.
2  And then November of '82.
3       Q.   August to November of 1982 you were in
4  San Antonio?
5       A.   Right.
6       Q.   Okay.  I'm probably going to have to
7  slow you down a little bit.
8       A.   Okay.
9       Q.   But -- okay.  So then from -- now we're
10 on November of '82 forward.
11      A.   Okay.
12      Q.   Until when?
13      A.   I'll say June '84.  I was in Herlong,
14 California.
15      Q.   Is that H-u-r?
16      A.   H-e-r.
17      Q.   H-e-r.  Okay.
18      A.   And then from July of '84 until maybe
19 June '86, I was in Vicenza, Italy.
20      Q.   Okay.
21      A.   From July-August '86 until November
22 1987, I was in Wurzburg, Germany.
23      Q.   Okay.
24      A.   From November '87 until April, I think,
25 '88, I was in San Antonio, Texas.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 20

1       Q.   So you've got three separate times so
2  far that you've been in San Antonio ---
3       A.   I was ---
4       Q.   --- right?
5       A.   --- back there again.
6       Q.   Okay.
7       A.   What month did I give you?
8       Q.   April '88 was the end month.
9       A.   Then I think May of '88 until August of
10 '89, I was at Fort Drum, New York.
11      Q.   Okay.
12      A.   From August '89 until September 1990,
13 San Antonio, Texas.
14      Q.   Were you at Fort Sam Houston?
15      A.   I was.
16      Q.   Ah.  That's where my dad was when I was
17 born.
18      A.   Okay.  Big place.  Wonderful.  From, I
19 think it was October -- September time frame of
20 '90 until March 1991, I was in Saudi Arabia.
21      Q.   Now, I can't -- I remember the first
22 Gulf War started around that time.  Were you there
23 for part of the war?
24      A.   I was.
25      Q.   Okay.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 21

1    A.    Until it was over.  The end of March
2    until June 1991, I was in San Antonio, Texas.
3    June or July 1991 to August '91, I was in
4    Riegelwood, North Carolina.  From August 1991
5    until August 1993, I was in Pittsburgh,
6    Pennsylvania.
7        Q.    And is that when you were attending the
8    University of Pittsburgh?
9        A.    Yes.
10       Q.    Okay.
11       A.    From August 1993 until October 1996, I
12   was in Washington, DC.  I lived in Maryland, but
13   when I worked I lived -- lived in Silver Spring,
14   Maryland.
15       Q.    Okay.
16       A.    October '96 until December 1998, I was
17   in Columbus, Georgia.  January 1999 until December
18   2001, I lived in Alexandria, Virginia.  January
19   199 -- excuse me, that was 2001.  From January
20   2002 to present, I was in Riegelwood, North
21   Carolina.
22       Q.    Okay.  And you were hired to work at
23   Bladen Community College in 2002, right?
24       A.    Yes.
25       Q.    Okay.  Now, except for the 2002 forward

Ophelia Munn-Goins - Volume I                    Page 23

1    colonel?
2        A.    Retired as a lieutenant colonel.
3        Q.    You -- that was your rank when you
4    retired, right?
5        A.    Yes.
6        Q.    Are you currently employed?
7        A.    No.
8        Q.    In addition to your involvement as a
9    member of the school board, are you active in
10   politics at this time in any way?
11       A.    Do you mean do I support other
12   candidates?  Do I work with the candidates?  Do
13   I ---
14       Q.    Yes, do you -- I mean, not just do you
15   vote, or are you rooting for someone to win an
16   election.  But do you work for candidates, or do
17   you campaign, or do you do any community activism?
18   Anything like that?
19       A.    Well, I'm a community activist, yes.
20       Q.    Okay.  Can you describe your community
21   activist activities?
22       A.    I help senior citizens get medicine.  I
23   help them with housing issues.  Help students try
24   to find money for college.
25       Q.    All right.  Do you -- well, let me ask

Ophelia Munn-Goins - Volume I                    Page 22

1    part, were you in the military during this entire
2    time from high school until --
3        A.    From college.
4        Q.    From college, okay.  So when you lived
5    in Winston-Salem you were not in the military yet?
6        A.    No.
7        Q.    Okay.  And then you retired from the
8    military immediately before going to work at
9    Bladen Community College?
10       A.    While I worked -- I worked there part
11   time while I was still on active duty.
12       Q.    Okay.
13       A.    I was on leave.
14       Q.    When did you first start?
15       A.    January 2002.
16       Q.    Okay.  So you were hired as a part-time
17   instructor at that time?
18       A.    Yes.
19       Q.    And when did you retire from the
20   military?
21       A.    February 1, 2002.
22       Q.    And I guess if you were at Fort Sam
23   Houston, you were in the Army, right?
24       A.    Yes.
25       Q.    Okay.  And you were a lieutenant

Ophelia Munn-Goins - Volume I                    Page 24

1    you about the work you do with senior citizens, is
2    that as part of an organization?
3        A.    No.
4        Q.    You just do that ---
5        A.    Oh, yeah, for senior citizens?  Yes, it
6    is.
7        Q.    Oh, okay.  What's the organization?
8        A.    The Lumber River Counsel of Government
9    Aging Advisory.
10       Q.    The Lumber River Counsel of Government?
11       A.    Aging Advisory Committee on Board.
12       Q.    Agent, a-g-e-n-t?
13       A.    A-g-i-n-g, Aging.
14       Q.    Oh, Aging.  I'm sorry.  Okay.
15       A.    For housing, I help them do that.
16       Q.    And do you have a position -- do you
17   have a position title with that organization?
18       A.    No.
19       Q.    Are you a volunteer?
20       A.    Yeah.
21       Q.    You don't get paid for what you do?
22       A.    No.
23       Q.    Okay.  And all your work that you've
24   described with senior citizens is through this
25   organization?

Ophelia Munn-Goins - Volume I                          Page 25

1       A.   Yes.
2       Q.   The medicine and the housing?
3       A.   Yes.
4       Q.   Okay.  And what exactly do you do in
5   trying to find senior citizens medicine and
6   housing?  Do you go through governmental agencies?
7       A.   I did.  I don't now.  Now, I'm not doing
8   that much.  I was.
9       Q.   Oh okay.  When were you doing it?
10      A.   From 2002 until maybe 2006-2000 -- early
11  2007.
12      Q.   And was there a reason you stopped doing
13  it?
14      A.   I haven't gotten any calls.
15      Q.   Oh, so they call you and ask you.  They
16  call you if they need you?  Okay.
17      A.   Yes.
18      Q.   Yes.
19  (Off-record comments)
20      Q.   And then as far as helping students find
21  money for college, is that for an organization?
22      A.   Yes.
23      Q.   And whose -- what's the organization?
24      A.   Charles and Eva Munn Foundation.
25      Q.   And is that foundation named for your

11-05-08      Munn-Goins vs. Bladen\7:08CV21        COPY

---

Ophelia Munn-Goins - Volume I                          Page 26

1   father?
2       A.   Yes, and mother.
3       Q    Oh, okay.  I thought you said Charles E.
4   Munn?
5       A.   Charles and Eva Munn Foundation.
6       Q.   Okay.  And does that -- were you a
7   founder of that foundation?
8       A.   Yes.
9       Q.   Did you found it with anybody else?
10      A.   Community -- couple community members,
11  cousins ---
12      Q.   Who ---
13      A.   --- siblings.
14      Q.   --- were they?
15      A.   Lanna Carter, Kathleen Munn, Dr. Blanks
16  -- Delilah Blanks.
17          MS. SHEA:  Off the record.
18  (Off record)
19      Q.   (Ms. Shea)  Okay, Lanna Carter, is she a
20  relative of yours?
21      A.   Cousin.
22      Q.   And Kathleen Munn?
23      A.   Sister.
24      Q.   And is it Ms. Blanks or Dr. Blanks?
25      A.   Doctor.

11-05-08      Munn-Goins vs. Bladen\7:08CV21        COPY

---

Ophelia Munn-Goins - Volume I                          Page 27

1       Q.   Okay.  What is she?
2       A.   Commission.  Commission, county
3   commissioner.
4       Q.   County commissioner?  Okay.  Anybody
5   else?
6       A.   I'm sure, but I can't think of them now.
7       Q.   Is there a board of directors for
8   that ---
9       A.   There is.
10      Q.   I'm sorry.  I probably should've told
11  you this before we started, but I can tell you
12  talk a lot faster than I do, and you're probably
13  going to have to wait for me to finish my
14  question, so the court reporter can get down what
15  I'm asking you and what you're answering.  Okay.
16  It'll probably drive you crazy because I talk
17  slow.  I'm from the Midwest.
18          Okay.  Who's on the board of directors
19  for this organization?
20      A.   I am.
21      Q.   Anybody else?
22      A.   Kathleen Munn.
23      Q.   Is her name spelled with a K or a C?
24      A.   K.  Wanda Daniels.
25      Q.   Is Wanda Daniels a family member?

11-05-08      Munn-Goins vs. Bladen\7:08CV21        COPY

---

Ophelia Munn-Goins - Volume I                          Page 28

1       A.   No.
2       Q.   What's your relationship to her, if any?
3       A.   None.
4       Q.   No relationship?
5       A.   No.
6       Q.   How did she get on the board?
7       A.   She was in the community and willing to
8   work or assist.
9       Q.   Did you ask her to be ---
10      A.   Yes.
11      Q.   --- on the board?
12      A.   I did ask her.
13      Q.   Was she a volunteer before you asked
14  her ---
15      A.   Yes.
16      Q.   -- to join the board?  So you were all
17  were doing this work before you incorporated, is
18  that ---
19      A.   Yeah.  When we start to incorporate, we
20  started working together.  So once it was
21  incorporated and I explained to her what we were
22  doing and she started working with us, and then
23  she agreed to be a member of the board.
24      Q.   Okay.  So would it be fair to say she
25  joined the board a little later than some of the

11-05-08      Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                    Page 29

1   others?  You were a founding member, right, so you
2   were on the board from the beginning?
3       A.   Yes.
4       Q.   And would the same be true of Kathleen?
5       A.   Yes.
6       Q.   Did Wanda join at a later time?
7       A.   The answer would have to be yes, but she
8   was on the board when the initial board was
9   established, she was a member.
10      Q.   Okay.  So she was on the board from the
11  very beginning?
12      A.   Yes.
13      Q.   Okay.  So you all -- before you formally
14  created a board, you were doing work.  Is that
15  right?  You were doing this service work through
16  the ---
17      A.   No.
18      Q.   Okay.  Well, how did you know Ms.
19  Daniels?
20      A.   Oh, she was in my neighborhood.  She's a
21  friend.
22      Q.   A friend?  Okay.
23      A.   Yeah.  She's in the neighborhood.
24  Everyone's from the neighborhood except one person
25  now.

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I                    Page 31

1       Q.   You went to elementary school together?
2       A.   All the way through.
3       Q.   She didn't go to Winston-Salem State,
4   did she?
5       A.   No.  Public school.
6       Q.   Okay.  You went all the way through high
7   school together, but she was a year ahead of you?
8       A.   Yes.  Wanda McCoy.
9       Q.   And how do you know her?
10      A.   I know her from growing up and church.
11      Q.   Did you all go to school together?
12      A.   No.
13      Q.   Just through church?
14      A.   Through church and then I met her at BCC
15  again.  We were reacquainted at BCC.
16      Q.   And what -- does she work at BCC?
17      A.   She's a student.
18      Q.   Was she one of your students?
19      A.   Yes.
20      Q.   And do you remember approximately when
21  she was your student?
22      A.   From 2003 to 2006.
23      Q.   So she was your student for multiple
24  years?
25      A.   Yes.

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I                    Page 30

1       Q.   But she -- okay, okay.  Anybody else on
2   the board?
3       A.   Currently?
4       Q.   Yes.
5       A.   Or before?
6       Q.   Well, right now I'll ask currently.
7       A.   Linda Miller.
8       Q.   And is she a relative?
9       A.   No.
10      Q.   Is she a neighbor?
11      A.   A member of the community.
12      Q.   And how do you know her?
13      A.   I've been working for her in church and
14  other places.
15      Q.   Do you know her primarily through your
16  church?
17      A.   I know her from school.
18      Q.   You all were classmates?
19      A.   No, she's ahead of me, a year ahead of
20  me.
21      Q.   Okay.  Did you go to high school
22  together ---
23      A.   Elementary ---
24      Q.   --- in different ---
25      A.   --- went to school together.  I went ---

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I                    Page 32

1       Q.   Any other current board members?
2       A.   That's current.
3       Q.   That's the entire current board?
4       A.   Yes.
5       Q.   And then the original founding board?
6       A.   Naomi Miller.
7   (Off-record comments)
8       A.   Naomi Miller.
9       Q.   And how do you know Ms. Miller?
10      A.   From the community.
11      Q.   How, exactly, do you know her through
12  the community?
13      A.   She works at BCC satellite campus.
14      Q.   Okay.  Which campus would that be?
15      A.   East Arcadia.
16  (Off-record comments)
17      A.   East Arcadia.
18      Q.   Is that how you met her?
19      A.   No, I grew up with her.  I mean, I've
20  known her all my life.
21      Q.   Okay, she's another one -- did you go to
22  school with her?
23      A.   No, she's from a different town.  She's
24  -- I just know her.
25      Q.   Okay.

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I                    Page 33

1    A.    I grew up with her in the area so.
2    Q.    Do you all go to the same church?
3    A.    No.
4    Q.    Okay.  And she is no longer on the
5    board, is that right?
6    A.    That's correct.
7    Q.    Do you know why she left the board?
8    A.    No.
9    Q.    Do you have terms for board members?
10    A.    Yes.
11    Q.    What's the term?
12    A.    Three years unless you're appointed.
13    Q.    Did she leave at the end of her
14    three-year term?
15    A.    No.
16    Q.    Did -- she left before the end of her
17    three-year term?
18    A.    She did a second term.  I mean, she --
19    somewhere in the midst she left, and I can't tell
20    you
21    when nor why.
22    Q.    Okay.  She had two terms but left before
23    the end of her second term?
24    A.    Yes.
25    Q.    Okay.  And that was her decision as far

Ophelia Munn-Goins - Volume I                    Page 34

1    as you know?
2    A.    Yes.
3    Q.    Okay.  I'm assuming you were on the
4    founding board, right?
5    A.    Yes.
6    Q.    And Kathleen Miller was?
7    A.    Munn, yes.
8    Q.    Munn, I'm sorry.  Kathleen Munn was.
9          Besides the two of you and Ms. Miller,
10    who else was on the found ---
11    A.    Wanda Hall.
12    Q.    And how do you know Ms. Hall?
13    A.    Church.
14    Q.    And did Ms. Hall leave at the end of her
15    term?
16    A.    She just left two months ago.
17    Q.    Okay.  And was that because her term had
18    expired?
19    A.    She was inactive.
20    Q.    How long had she been inactive?
21    A.    Two years.
22    Q.    Do you know if there's a reason for
23    that?
24    A.    No.
25    Q.    You don't know?

Ophelia Munn-Goins - Volume I                    Page 35

1    A.    I do not know.  Herbert Harris.
2    Q.    Herbert?  And how do you know Mr.
3    Harris?
4    A.    Friend of the family.
5    Q.    Is he another person you've known all
6    your life?
7    A.    No.
8    Q.    Okay.  How long have you known him?
9    A.    Maybe five years.
10    Q.    Okay.  So just a fairly short time as of
11    the time of your ---
12    A.    He's a friend of my sister.
13    Q.    Okay.
14    A.    She's known him longer.
15    Q.    Friend of ---
16    A.    Kathleen
17    Q.    --- Kathleen Munn?
18    A.    Yes.
19    Q.    Okay.  Did they have a dating
20    relationship?
21    A.    No.
22    Q.    Just a friend?
23    A.    Yes.
24    Q.    Okay.  And he's no longer on the board,
25    right?

Ophelia Munn-Goins - Volume I                    Page 36

1    A.    Right.
2    Q.    When did he leave?
3    A.    Maybe 2006-2007 -- 2007.
4    Q.    One other thing I'll tell you with these
5    dates.  Approximate dates are fine.  I know it's
6    hard to remember back about all these people and
7    all these dates.  So don't feel like you have to
8    give me an exact date.  And do you know why he
9    left?
10    A.    No.
11    Q.    Was it before the expiration of his
12    term?
13    A.    I don't remember.
14    Q.    Okay, anybody else?
15    A.    No.
16    Q.    Okay.  When was this organization
17    incorporated?
18    A.    2002.
19    Q.    Is it a nonprofit?
20    A.    Yes.
21    Q.    And the purpose of the organization is
22    to provide finances for students?
23    A.    No, it's tutoring assistance.  Tutoring
24    and assistance to students.
25    Q.    Oh, okay.

Ophelia Munn-Goins - Volume I       Page 37

1    A.   Ages 8 -- I mean, 4 to 18. As well as
2   computer training and other services to ensure
3   they
4   are successful in educational needs.
5      **Q. Okay. And about what -- what's your**
6   **best estimate as to the annual income of that**
7   **organization?**
8    A.   Less than $12,000.
9      **Q. Per year?**
10    A.   Yes.
11      **Q. How do you find the students that you**
12   **want to provide the assistance to?**
13    A.   They find us.
14      **Q. Okay. How do they find you?**
15    A.   Through word of mouth.
16      **Q. Is that it?**
17    A.   That's it.
18      **Q. Okay. They -- you don't work with the**
19   **public schools or anything in identifying children**
20   **who might need your ---**
21    A.   That's not ---
22      **Q. --- help?**
23    A.   --- helpful. No.
24      **Q. Okay.**
25    A.   That's not helpful.

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

---

Ophelia Munn-Goins - Volume I       Page 38

1      **Q. Do you make any determinations of**
2   **financial need before you provide the help?**
3    A.   No.
4      **Q. Okay. So it's not based on financial**
5   **need at all?**
6    A.   No.
7      **Q. Okay. Do you have any criteria for**
8   **providing assistance to these kids?**
9    A.   Must need assistance.
10      **Q. Must need assistance.**
11    A.   A desire to learn. That's it.
12      **Q. Okay. And approximately how many**
13   **children per year would you say you've helped**
14   **since this organization was formed in 2002, right?**
15   **I thought that's what you said. Yes.**
16    A.   I don't know, but the students may -- it
17   can range from throughout the year we have as many
18   as 25 during the summer to sometimes 8 to 12
19   during the winter months. It varies.
20      **Q. More -- generally, you'd have more in**
21   **the summer?**
22    A.   Yes.
23      **Q. Okay. And do you actually have classes**
24   **in a building?**
25    A.   Yes.

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

---

Ophelia Munn-Goins - Volume I       Page 39

1      **Q. Where are the classes held?**
2    A.   1183 East Arcadia Road.
3      **Q. Is that an instructional building?**
4    A.   It is.
5      **Q. Does it ---**
6    A.   It's called ---
7      **Q. --- have a name?**
8    A.   It's called East Arcadia Center for
9   Excellence.
10      **Q. And is that building property of the**
11   **foundation?**
12    A.   Of the family.
13      **Q. Of the Munn family?**
14    A.   Yes.
15      **Q. And does it have classrooms in it?**
16    A.   Yes.
17      **Q. Okay. And so during the school year**
18   **recognizing that you may not have as many kids**
19   **participating then, do they come after school?**
20    A.   Yes.
21      **Q. And for how long?**
22    A.   Until 5:30-6 o'clock. Pick up no later
23   than 6:00.
24      **Q. Okay. And during the summer, do they**
25   **come all day?**

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

---

Ophelia Munn-Goins - Volume I       Page 40

1    A.   Eight to two, unless it's a certain
2   program, and then it may be the afternoon.
3      **Q. Okay.**
4    A.   But it's normally like eight to two.
5      **Q. And do you teach at this school or ---**
6    A.   Sometimes I do.
7      **Q. --- institution?**
8    A.   Sometimes I do.
9      **Q. Do the other board members teach?**
10    A.   No.
11      **Q. Okay. Who teaches besides you?**
12    A.   Parents pay for tutors, specific tutors
13   to come in.
14      **Q. And then they just use your building?**
15    A.   Use the building, correct. And then
16   either some volunteers come in, or I have another
17   lady sometimes that I pay to come in and tutor
18   specifically science.
19      **Q. And you pay the person out of the**
20   **foundation money?**
21    A.   No, I pay. I
22      **Q. Oh, you pay that out of your own pocket?**
23    A.   My own pocket.
24      **Q. Where do your funds generally come from?**
25   **Who donates to your organization?**

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

Ophelia Munn-Goins - Volume I                    Page 41

1       A.   Several organizations donate from the
2   Longshoremens, to the North Carolina Youth
3   Advisory, to the church, senior citizens,
4   individuals, raffles, International Paper.
5       Q.   Okay.  When you say Longshoremen, you
6   mean the union?
7       A.   The organization, yes.
8       Q.   The Longshoremen's union?
9       A.   Yes.
10      Q.   Was your father a member of that union?
11      A.   No.
12      Q.   How did -- do they have a local in the
13  area?
14      A.   Yes.
15      Q.   Okay.  And is that how you get the
16  donations from them?
17      A.   Yes.
18      Q.   Where is their local that ---
19      A.   Wilmington.
20      Q.   Do you know the number?
21      A.   No.
22      Q.   Okay.  And the North Carolina Youth
23  Advisory you said?
24      A.   Yes.
25      Q.   And is that an agency of the state

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

---

Ophelia Munn-Goins - Volume I                    Page 42

1   government?
2       A.   Yes.
3       Q.   And they make grants?
4       A.   Yes.
5       Q.   And then the church, would this be your
6   church?
7       A.   Yes.
8       Q.   Any other churches?
9       A.   Early on members of churches did.
10  Different -- multi members of churches.
11      Q.   But when you said church, you meant the
12  church ---
13      A.   Sunday school.
14      Q.   --- itself donates?
15      A.   The Sunday school -- church, Sunday
16  School donate.
17      Q.   Okay.  Like the class decided as a class
18  to make a donation to ---
19      A.   Yes.
20      Q.   --- your foundation.  Okay.  And what is
21  your church?
22      A.   Pleasant Union Baptist.
23      Q.   In what city?
24      A.   Riegelwood -- East Arcadia, but it's a
25  Riegelwood address.

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

---

Ophelia Munn-Goins - Volume I                    Page 43

1       Q.   Okay.  And you said the senior citizens,
2   did you mean an organization, or did you mean just
3   various senior citizens make donations out of ---
4       A.   Both.
5       Q.   --- their own --- okay.
6       A.   Both.
7       Q.   Which organizations have made donations
8   to your foundation?
9       A.   East Arcadia Senior Citizens.
10      Q.   Any other organizational donors?
11      A.   Senior citizens, no.
12      Q.   Okay.  And then International Paper, is
13  that where your father worked?
14      A.   Yes.
15      Q.   And so that company has made donations
16  to your foundation?
17      A.   Grants.
18      Q.   Made grants?  And then you said raffles,
19  is that -- those would be things that you all did
20  on your own to try to raise money?
21      A.   Yes.
22      Q.   And do you usually do those through your
23  church, or ---
24      A.   Through the organization.
25      Q.   Okay.  Do you go to the shopping center

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

---

Ophelia Munn-Goins - Volume I                    Page 44

1   to sell tickets?
2       A.   No.
3       Q.   Sell them at church?
4       A.   No.
5       Q.   Where do you sell them?
6       A.   Anywhere, on the street, not at church
7   though.
8       Q.   Okay.  I don't mean in church, but I
9   mean out on the church grounds ---
10      A.   No.
11      Q.   --- after the service is over?
12      A.   Never.
13      Q.   No?
14      A.   Cannot sell on the church ground.  Just
15  different places other than the church.
16      Q.   But people just go out in public and
17  sell tickets?
18      A.   Yes.
19      Q.   Okay.  And do you get prizes that are
20  donated for the raffles?
21      A.   Sometimes they're donated.  Very seldom
22  we buy the prize with the proceeds -- from the
23  proceeds.  Comes from the proceeds.
24      Q.   Okay.
25      A.   Sometimes.

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

Ophelia Munn-Goins - Volume I                    Page 45

1       Q.   And what are the prizes usually?  Is it
2   a trip we wish?
3       A.   Gift card, radio, MP3 player.
4       Q.   So under $100 probably?
5       A.   Oh, no.  Under 50.
6       Q.   Okay.  Now, are there any other
7   organizations you're involved in the community
8   besides this foundation and the school board?
9       A.   Bladen Improvement Association, but it's
10  not in my community but, yes.
11      Q.   Okay.  And we've talked a little bit
12  about that one.  Are there any others?
13      A.   Eastern Stars.
14      Q.   What's that?
15      A.   It's like the Shriners.
16      Q.   Is it a female version of the Shriners?
17      A.   Yeah.
18      Q.   Okay.
19           MR. GRESHAM:  I thought it was the
20  Masons.
21           THE WITNESS:  That's a different --
22  the Masons aren't -- yeah.
23           MS. SHEA:  Yes, I think ---
24           THE WITNESS:  Yeah, yeah.
25           MS. SHEA:  --- they're all the

Ophelia Munn-Goins - Volume I                    Page 46

1   same, aren't they?
2           MR. GRESHAM:  No.  No.
3           THE WITNESS:  No, they're really
4   not.  You're right.  It's Mason, not Shriner.
5       Q.   Masons?
6       A.   It's more like Masons.  Yeah.
7       Q.   Okay.
8       A.   Let's just put Mason.
9       Q.   And are you an officer or anything in
10  that organization?
11      A.   No.
12      Q.   Just a member?
13      A.   Yes.
14      Q.   And would that be the East Arcadia
15  branch?
16      A.   Yeah.  It's in another town.
17      Q.   Oh okay, what town?
18      A.   Leland, L-e-l-a-n-d.
19      Q.   Okay.
20      A.   North Carolina.  Committee 100.
21      Q.   This is a different organization, right?
22      A.   Yes.
23      Q.   Okay.  And what's that?
24      A.   I don't think I could tell you.
25      Q.   You have to ask your attorney?

Ophelia Munn-Goins - Volume I                    Page 47

1       A.   No, not -- it's -- they are more about
2   -- let me give you the other one first.
3       Q.   Okay.
4       A.   Bladen -- I forgot the name of that one.
5   I can't think of it.
6       Q.   Okay, so there's something called Bladen
7   that you can't think of the full name of?
8       A.   Yes.
9       Q.   And then there's Committee 100 ---
10      A.   Committee 100 ---
11      Q.   --- which is different ---
12      A.   --- is a -- it's a different
13  organization, and I think they're more about
14  economics, bringing economics in -- in to the
15  community or to the county.  And the Southern
16  Economic Development is the other one.  Southern
17  Economic Development was the other one and it's
18  about economics.
19  (Off-record comments)
20      A.   Economic Development is not Bladen.
21  Southern Economic Development is the other one.
22      Q.   Okay.
23      A.   It's about economics.
24      Q.   Now, when you said it was about bringing
25  economics into Bladen County, were you talking

Ophelia Munn-Goins - Volume I                    Page 48

1   about Committee 100 or Southern Economic?
2       A.   Both, they both are.  They both have
3   some dealings.
4       Q.   And when you say bringing economics into
5   the county, what you really mean is bringing --
6       A.   Business.  It's about the economics.
7   It's bringing in business.  Committee 100 has
8   another focus.  I can't think of what it is
9   offhand.
10      Q.   Okay.
11      A.   I don't remember.
12      Q.   Okay.  But kind of recruiting businesses
13  to put their facilities in Bladen County to create
14  jobs for employ -- for people ---
15      A.   Yes.
16      Q.   --- who live in the county.
17      A.   Yes.
18      Q.   Okay.
19      A.   Yes.
20      Q.   Are you anything other than a member of
21  Committee 100?
22      A.   No.
23      Q.   And where are they based?
24      A.   Elizabethtown.
25      Q.   And Southern Economic Development, are

Ophelia Munn-Goins - Volume I                          Page 49

1    you a member of that organization?
2        A.   Yes.
3        Q.   Not an officer?
4        A.   No.
5        Q.   Okay, and where are they based?
6        A.   Bladen County, Elizabethtown.
7        Q.   Any other community involvement?
8        A.   Church.
9        Q.   Okay, and that's the church we've
10   already talked about, right?
11       A.   Yes.
12       Q.   Are you an elder in your church?
13       A.   No.
14       Q.   Are you ---
15       A.   Usher.
16       Q.   --- an usher?
17       A.   Yes.
18       Q.   Are you involved in the government of
19   your church at all?
20       A.   Yes.
21       Q.   You are?
22       A.   I am.
23       Q.   Okay.  How so?
24       A.   Baptist policy is that the members
25   govern the church.

---

Ophelia Munn-Goins - Volume I                          Page 51

1    member of that church even though ---
2        A.   I did.
3        Q.   --- you were away?
4        A.   Yes.
5        Q.   Okay.
6        A.   So really, I was still a member.
7        Q.   Okay.  And ---
8        A.   (Inaudible) ---
9        Q.   --- you say you joined at age 12.  Is
10   that when you were baptized?
11       A.   Yes.
12       Q.   Were you going to that church as a
13   little child?
14       A.   Yes.
15       Q.   Okay.  So when you say joined, you
16   really mean you officially became baptized, right?
17       A.   Yes.
18       Q.   Okay.  So really you've been a member of
19   that church your whole life?
20       A.   Yes.
21                 MR. GRESHAM:  You've attended.
22                 MS. SHEA:  Well, in various
23   capacities.
24       Q.   (Ms. Shea)  Any other community
25   involvement?

---

Ophelia Munn-Goins - Volume I                          Page 50

1        Q.   Okay, are you different from any other
2    member of your church, or ---
3        A.   No.
4        Q.   Okay.  So when you say you're involved,
5    you mean as a member or as any member of that
6    church, right?
7        A.   Yes.
8        Q.   Okay.  Apart from usher, do you hold any
9    formal positions with that church?
10       A.   No.
11       Q.   Okay.  Have you been ---
12   (Off-record comments)
13       Q.   Have you been a member of that church
14   your whole life?
15       A.   No.
16       Q.   Okay.  When did you join that church?
17       A.   When I was young, 12, until the 80s --
18   mid-80s -- early -- yeah, mid-80s.
19       Q.   Now, did you leave in the mid-80s
20   because you were going into the military, or did
21   you leave for another reason?
22       A.   Because I was away.
23       Q.   Okay, so ---
24       A.   In the military.
25       Q.   Did you kind of consider yourself a

---

Ophelia Munn-Goins - Volume I                          Page 52

1        A.   None that I can think of at the moment.
2        Q.   Okay.  And if you think of something
3    later on, feel free to jump in with that even if
4    we're talking about something else because I would
5    like to get everything you're involved in.  But it
6    sounds like it's plenty.  Now, you were working at
7    one time on your PhD, right?
8        A.   Yes.
9        Q.   Did you ever get that?
10       A.   No.
11       Q.   How far along are you on your PhD?
12       A.   My dissertation.
13       Q.   You've taken your comps?
14       A.   Yes.
15       Q.   And is that at Fayetteville State?
16       A.   Yes.
17       Q.   And what is the program you're in?
18       A.   Educational leadership.
19       Q.   Is that the same or similar to
20   educational administration?
21       A.   I don't know.
22       Q.   Okay.  What is educational leadership?
23       A.   It prepares you to be, I guess, an
24   executive or VP or president of a -- of an
25   institution whether it's a community college,

Ophelia Munn-Goins - Volume I                    Page 53

1   college or four-year institution.
2       Q.  Okay.  So maybe a -- I don't know if
3   it's educational administration or public
4   administration. That would qualify you to be
5   probably a lower-level administrator in an
6   institution, and your program would allow you to
7   be up at the top?
8       A.  Yes.
9       Q.  Okay.  And when did you start that
10  program?
11      A.  August 2005.
12      Q.  Okay.  So that was while you were still
13  teaching at Bladen Community College, right?
14      A.  Yes.
15      Q.  And did you have -- your other degrees
16  have not been in that field, right?
17      A.  No.
18      Q.  Okay.  Your bachelor's degree is in
19  what?
20      A.  Psychology.
21      Q.  Is that a BS?
22      A.  Yes.
23      Q.  And that's from Winston-Salem State,
24  right?
25      A.  Yes.

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I                    Page 55

1   online education, right?
2       A.  No.
3       Q.  It was live, but not in Boston?
4       A.  Yes.
5       Q.  Okay.  And where was it?
6       A.  Vicenza, Italy.
7       Q.  Okay.  And then the degree you got from
8   Pittsburgh, that was actually done in Pittsburgh,
9   right?
10      A.  Yes, and I didn't finish on the other
11  one.
12      Q.  The HR in education was not completed?
13      A.  No.  I didn't complete -- t was in
14  Italy, and it was in Heidelberg, Germany,
15  different locations.
16      Q.  You did get the degree though, right?
17      A.  Yes.
18      Q.  Okay.  And you did get the MS from
19  Pittsburgh?
20      A.  Yes.
21      Q.  Okay.  And so what caused you to think
22  you would like the educational leadership PhD?
23      A.  Working at Bladen Community College and
24  in education.
25      Q.  So were you thinking you would like to

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I                    Page 54

1       Q.  And then do you have more than one
2   master's degree?
3       A.  Yes.
4       Q.  Okay.  Can you just tell me what each of
5   your master's degrees are in and which school you
6   got them from?
7       A.  One is in human resources and -- I don't
8   know the acronym -- human resource and education I
9   think from Boston University and health
10  information systems from the University of
11  Pittsburgh.
12      Q.  And your masters are both master's of
13  science?
14      A.  Yes.
15      Q.  Now, I don't think you listed Boston as
16  any of the addresses you lived at.  Did you ---
17      A.  I did it overseas.
18      Q.  Okay.  Did they have ---
19      A.  Satellite campus.
20      Q.  I'm sorry.  We probably need to stop
21  talking at the same time.  They had a satellite
22  campus overseas, and you took courses there in
23  person?
24      A.  Yes.
25      Q.  Okay.  It wasn't correspondence or

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I                    Page 56

1   be in high administration, if you will pardon that
2   expression?
3       A.  Yes.
4       Q.  Okay.  And is there a reason why you
5   decided that appealed to you?  You know, I decided
6   to go too law school because I thought it would be
7   interesting and fun.  You know, did you -- was
8   there any thought process that went into your
9   deciding
10  you wanted an educational leadership PhD and
11  wanted to be in upper administration at a school?
12      A.  Yes.  When I was working at Bladen
13  Community College as an instructor, I felt that
14  that was a good place to go to help students and
15  to bring about change.  I thought it was a good
16  opportunity and a -- and a good field.
17      Q.  Okay.  And when you talk about bringing
18  about change, was there anything that you saw at
19  the college that you thought needed to be changed?
20      A.  Nothing in particular.
21      Q.  Okay.  So things were fine, but you just
22  thought it would be good to be in a position like
23  that?
24      A.  Yes.
25      Q.  Okay.  Now, before you went to work at

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I                    Page 57

1     Bladen Community College, apart from the military,
2     were you employed anywhere?
3          A.   Yes.
4          Q.   Can you give me each job from high
5     school?  Hopefully with the military there aren't
6     going to be too many, but every job you've had
7     since high school before you went to -- leading up
8     to your employment at Bladen Community College?
9          A.   Work study at college -- in college.
10         Q.   Okay.  And that would be through either
11    Winston-Salem State, Boston U or Pittsburgh?
12         A.   Winston-Salem State only.
13         Q.   Okay.  And did you -- that degree was
14    psychology, right?
15         A.   Yes.
16         Q.   Did you spend time observing
17    psychologists, or ---
18         A.   No.
19         Q.   --- did you work with -- counsel kids or
20    what did you do?
21         A.   I worked as a graduate nurse at Bowman
22    Gray Hospital with -- for a year and a half.
23    (Off-record comments)
24         Q.   Okay.  And that would be approximately
25    which years?

Ophelia Munn-Goins - Volume I                    Page 58

1          A.   '79 to '80 -- through -- '79 through
2     '80.
3          Q.   Okay.  What else?
4          A.   I worked at some book company for four
5     months in '80.
6          Q.   Would this be a publisher or a
7     bookstore?
8          A.   Publisher.
9          Q.   Was that in Winston-Salem?
10         A.   Yes.
11         Q.   I bet I know who that is, but I can't
12    think of their name right now.  Did they do
13    yearbooks?
14         A.   No.
15         Q.   Oh okay.  Maybe it's not the one I was
16    thinking.  Okay.  So you did that for about eight
17    months, and that was while you were still in
18    school?
19         A.   Four months.
20         Q.   Four months.  I'm sorry.
21         A.   Four months.
22         Q.   While you were still in school?
23         A.   No, it was out of school.  It was in
24    1980 -- it might have been '81.  Might have been
25    '81.

Ophelia Munn-Goins - Volume I                    Page 59

1          Q.   Okay.  Anybody else?
2          A.   Yes.  I worked for like a 7-11 for a
3     year.
4          Q.   And which town was that in?
5          A.   Winston-Salem.
6          Q.   As a clerk?
7          A.   Yes.
8          Q.   I did that in college during the summer.
9          A.   In the 70s.
10         Q.   Approximately what year, in the 70s?
11         A.   '76-'78.  I don't know.  It was in the
12    70s.
13         Q.   All right.
14         A.   The town of East Arcadia.  In 1980 for a
15    few months -- 1981, excuse me.
16         Q.   What were you doing there?
17         A.   Town clerk.
18         Q.   Town clerk?
19         A.   Yes.
20         Q.   Oh, okay.  You didn't have to run for
21    that?
22         A.   No.
23         Q.   Was that a clerical position?
24         A.   Yes.
25         Q.   Was there more than one town clerk?

Ophelia Munn-Goins - Volume I                    Page 60

1          A.   There were two of us working at the
2     time.
3          Q.   But it wasn't an elective office, right?
4          A.   No.
5          Q.   Okay.
6          A.   I'm not sure if the other person was a
7     town clerk or not.  I don't know what her position
8     was.
9          Q.   Okay.  Any others?
10         A.   Ask the question again.
11         Q.   Any other employment apart from the
12    military, apart from your employment at Bladen
13    Community College?
14         A.   Fayetteville State University.
15         Q.   And what was your position there?
16         A.   Instructor.
17         Q.   What did you teach?
18         A.   Information systems.
19         Q.   So this was relatively recent?
20         A.   It was in 2005-2006.
21         Q.   Okay.  So that was when you were still
22    working at Bladen, right?
23         A.   Yes.
24         Q.   So this was a second job?
25         A.   It was part time, yes.  Taught one

Ophelia Munn-Goins - Volume I                    Page 61

1    class.
2        Q.   And you got permission from the school,
3    from Bladen to teach at Fayetteville State, right?
4        A.   Yes.
5        Q.   Any others?
6        A.   I worked for Edward Jones.  Well, I
7    didn't really work, I was a trainee.
8        Q.   What were you a trainee for?
9        A.   Financial advisor.
10       Q.   Was that just this year?
11       A.   Yes.
12       Q.   For a couple of months?
13       A.   Yes.
14       Q.   The reason I know this much is because
15   your attorney gave me the information about that
16   today so.  Were you supposed to be counseling
17   people on what to do with their money?
18       A.   Yes.  Yes.
19       Q.   And if you counsel them the right way,
20   you get commissions, is that the ---
21       A.   Yes.
22       Q.   --- way it works?  Okay.  And I
23   understand you are no longer employed with Edward
24   Jones?
25       A.   That's correct.

Ophelia Munn-Goins - Volume I                    Page 63

1        A.   No.
2        Q.   Okay.  Were you going to be an online
3    counselor?  Was that ---
4        A.   --- You become a financial advisor, you
5    find a location.  I don't know where that location
6    would be in North Carolina.  It would be in my
7    area where I live.
8        Q.   So you would open an office?
9        A.   Yes.
10       Q.   Okay.  I got it.  Okay.  Anything else?
11       A.   As a job, no.
12       Q.   No other paid employment?
13       A.   YTB Travel Network.
14       Q.   Oh, that's the job that paid $10 in
15   change?  I could see why you quit that one.
16       A.   I didn't quit.
17       Q.   Oh, you didn't?
18       A.   It was -- It's an internet -- I don't
19   know how to explain it.  Internet ---
20       Q.   Internet travel agencies?
21       A.   Yes.
22       Q.   Okay.
23       A.   That's what it is.
24       Q.   So you're still doing it, but you're not
25   making enough to get by?

Ophelia Munn-Goins - Volume I                    Page 62

1        Q.   And why not?
2        A.   I guess the economy.  I don't know.
3        Q.   Okay.  Did they tell you they didn't
4    need you anymore?
5        A.   They just say we made a determination.
6    That's it.  That's all they say.
7        Q.   Okay.  So you didn't quit?
8        A.   No.
9        Q.   They told you we've made a
10   determination?
11       A.   Yes.
12       Q.   And is it your understanding that's --
13   whether they make a determination or not, is
14   probably based on the commissions you generate?
15       A.   No, I never got that far.
16       Q.   Okay.  So you don't -- okay.  And I
17   think based on your answers your attorney gave me
18   today, they're based in St. Louis, Missouri?
19       A.   Yes.
20       Q.   Were you working in St. Louis?
21       A.   No.
22       Q.   You were working in ---
23       A.   I was working online.
24       Q.   Okay.  If you had completed the
25   training, would you have had to move somewhere?

Ophelia Munn-Goins - Volume I                    Page 64

1        A.   Not making anything.
2        Q.   Well you made $10.  Okay so you're still
3    doing that in your spare time?
4        A.   Well, it'll end in -- it'll end in -- this
5    month it ended.  I quit paying.  You have to pay.
6        Q.   Oh, you have to pay?
7        A.   You have to pay.  It's not like you make
8    money.  You pay.
9        Q.   Oh, my gosh.
10       A.   So I'm -- I'm tired of paying.
11       Q.   I don't blame you.  Okay.  All right.
12   Now, I think you said that you actually began
13   teaching part time at Bladen Community College
14   while you were still in the military, right?
15       A.   Officially, yes.
16       Q.   Was your active phase pretty much over
17   by the time you started teaching there?
18       A.   Yes.
19       Q.   Okay.  So you were just waiting for the
20   official retirement date ---
21       A.   Yes.
22       Q.   --- essentially?  You were honorably
23   discharged from the military, right?
24       A.   Yes.
25       Q.   And your retirement rank is lieutenant

Ophelia Munn-Goins - Volume I                                    Page 65

1    colonel?
2         A.    Yes.
3         Q.    Okay.  How were you first attracted to
4    Bladen Community College as a place to work?
5         A.    Dr. Page talking to him.
6         Q.    So you already knew Dr. Page?
7         A.    Yes.
8         Q.    And how did you know Dr. Page?
9         A.    My father was a member of the Board of
10   Trustees, and I met him through him.
11        Q.    Did you and Dr. Page get along well?
12        A.    Yes.
13        Q.    Did you consider him a friend?
14        A.    Yes.
15        Q.    And so he recommended that you apply for
16   a teaching job?
17        A.    Yes.
18        Q.    Now, at that time Kay Geisen was not
19   there yet, right?
20        A.    Correct.
21        Q.    Okay.  Did you know Lloyd Horne?
22        A.    No.
23        Q.    So you applied for a job?
24        A.    Yes.
25        Q.    And the job you applied for was

Ophelia Munn-Goins - Volume I                                    Page 66

1    information technology?
2         A.    Isn't it information systems, computer
3    science.
4         Q.    Computer science.  Okay.  And would you
5    have gotten that background through your degree
6    through the University of Pittsburgh?
7         A.    Yes.
8         Q.    Now, did Dr. Page just tell you put in
9    an application.  We'd like to consider you, or did
10   he tell you, we'll hire you.  We need a teacher,
11   you've got the job?
12        A.    I don't remember.
13        Q.    Okay.  Was it your impression that you
14   were probably going to get it, or did you know?
15        A.    Didn't know.
16        Q.    Did you have to go through any kind of
17   application process or anything?
18        A.    I was part time at first.
19        Q.    Right.
20        A.    And that's what he encouraged me to do,
21   part time.
22        Q.    But to start the part-time work, do you
23   remember having to go through any process other
24   than talking to Dr. Page?
25        A.    Talk to Dr. Garner.

Ophelia Munn-Goins - Volume I                                    Page 67

1         Q.    Who's that?
2         A.    She died.  She used to be the VP of the
3    curriculum instruction.
4         Q.    She would have been Kay Geisen's
5    predecessor?
6         A.    Yes.
7         Q.    Okay.  And can you tell me that name
8    again?
9         A.    Sherry Garner.
10        Q.    Okay.  And is she Dr. Garner?
11        A.    Yes.
12        Q.    Okay.  So you talked to Dr. Page, and
13   you interviewed with Dr. Garner and that went
14   well?
15        A.    Yes.
16        Q.    Okay.  And then do you remember filling
17   out an application?
18        A.    Yes.
19        Q.    Okay.
20              MS. SHEA:  And John, I'll have to
21   have  copies of these made later on.
22              MR. GRESHAM:  That's fine.  I can
23   look on with her.
24              MS. SHEA:  Okay.
25              (DEPOSITION EXHIBIT

Ophelia Munn-Goins - Volume I                                    Page 68

1              NUMBER ONE WAS MARKED
2              FOR IDENTIFICATION)
3         Q.    (Ms. Shea)  I'll hand you what's been
4    marked as Exhibit One.  And is that your initial
5    employment application at Bladen Community
6    College?  Take a minute and read it if you need
7    to.
8         A.    I don't know.  There's no date on it.
9         Q.    Okay.  I may need to look at that and
10   see if I can find anything.
11   (Ms. Shea examined document)
12        Q.    Is there anything on this document that
13   would help you determine whether this was your
14   first application for employment?  And if not,
15   that's fine.  (Witness examined document)
16        A.    Can't tell you.
17        Q.    You do remember that you filled out an
18   application for employment when you started work?
19        A.    Yes.
20        Q.    Back in 2002?
21        A.    Yes.
22        Q.    Okay.  And did you ever fill out another
23   employment application?
24        A.    I think I did.
25        Q.    Was that in 2007?

Ophelia Munn-Goins - Volume I                    Page 69

1    A.    2002.
2    Q.    You think you filled out two employment
3    applications?
4    A.    2002.
5    Q.    One for the part-time position and one
6    for the full time?
7    A.    Yes.
8    Q.    Okay.  And so -- and then you did one in
9    2007 also, right?
10   A.    Yes.
11   Q.    Apart from those three, did you ever
12   fill out an employment application at Bladen
13   Community College?
14   A.    Not that I'm aware of.
15   Q.    Okay.  So this would be one of the
16   three?
17   A.    If I did three.  I thought I did a
18   second one in 2002.
19   Q.    Okay.
20   A.    But I'm not sure.
21   Q.    Is that your handwriting?
22   A.    Yes.  It appears to be.
23   Q.    Okay.  And that's your work experience
24   at least as of some point in your life?
25   A.    Yes.

Ophelia Munn-Goins - Volume I                    Page 70

1    Q.    Okay.  So the only thing -- we're not
2    sure ---
3    A.    It doesn't look right though.  It's just
4    missing a lot in between.
5    Q.    I think it does appear to be missing
6    some pages.
7    A.    Okay.
8    Q.    Yeah.  But at least what you see does
9    look like your handwriting ---
10   A.    Yes.
11   Q.    --- your employment history, and your
12   education?
13   A.    Yes.
14   Q.    Okay.  So you were hired part time and
15   taught part time for how long?
16   A.    Four months -- four-and-a-half months.
17   Q.    And would that be to the end of the
18   spring 2002 semester?
19   A.    Yes.
20   Q.    Okay.  And then at some point had you
21   talked to Dr. Page or Dr. Garner or anybody about
22   going to a full-time position?
23   A.    Dr. Garner called me and talked to me
24   about it.
25   Q.    Okay.  And did she make an offer to you?

Ophelia Munn-Goins - Volume I                    Page 71

1    A.    Yes.
2    Q.    And about when was that done, if you
3    remember, in 2002?
4    A.    The summer 2002.
5    Q.    Had you told her before that you would
6    be interested in working full time?
7    A.    Yes.
8    Q.    And those full-time positions I guess
9    can be either nine-month positions, ten-month
10   positions or twelve-month positions, is that
11   right?
12   A.    Yes.
13   Q.    And do twelve-month employees make more
14   money than nine-month employees?
15   A.    No.
16   Q.    They all make the same amount of money?
17   A.    No.
18   Q.    Well, let me take that back.  The months
19   out of the year that they teach do not affect
20   their salary?
21   A.    Correct.
22   Q.    Okay.  Is it just that the same salary
23   gets stretched out over 12 months?
24   A.    No.
25   Q.    What's the difference between a

Ophelia Munn-Goins - Volume I                    Page 72

1    nine-month, a ten-month and a twelve-month
2    employee then?
3    A.    The month -- the months they work.  Just
4    the number of months they work.  Not about the
5    salary.
6    Q.    Okay.  So ---
7    A.    As far as I know.
8    Q.    Okay.  As far as you know?  You are not
9    a hundred percent sure of that?
10   A.    I'm a hundred percent sure that your
11   salary -- a twelve-month, doesn't necessarily make
12   me more than a nine-month or a ten-month.  A
13   nine-month doesn't make less than a twelve-month.
14   It depends.
15   Q.    Depends on what you teach, right?
16   A.    What you teach and your salary when you
17   came in and those other factors.
18   Q.    Okay.  Let me try to say it this way
19   then, and this may make it easier.  Let's just
20   take one person as an example, and I'm going to
21   use you as the example.  Okay.  You have a certain
22   educational background, right?
23   A.    Yes.
24   Q.    And you have a certain type of work
25   experience.  Right?

Ophelia Munn-Goins - Volume I                    Page 73

1     A.   Yes.
2     Q.   And a certain level of expertise ---
3     A.   Yes.
4     Q.   --- right?  If you, Ophelia Munn-Goins,
5   were a nine-month employee, you would make X
6   number of dollars based on those criteria and
7   maybe some other criteria, right?
8     A.   Yes.
9     Q.   Okay.  If you were a twelve-month
10  employee, is it your understanding that they would
11  just take that nine-month salary and stretch it
12  out over 12 months?
13    A.   No.
14    Q.   Is it your understanding you would get
15  three extra months of pay?
16    A.   Yes.
17    Q.   Because you were working during those
18  extra three months, right?  You were teaching?
19  (Short pause)
20    A.   If you -- can I just say, I don't quite
21  understand what you are asking.
22    Q.   Okay.  Okay.  That's fine.
23    A.   But if you are a ten-month employee, you
24  can get paid for 12 months, then your salary's
25  divided by 12.

Ophelia Munn-Goins - Volume I                    Page 74

1     Q.   All right.  But if you are a
2   twelve-month employee, and you're actually
3   working, you know ---
4     A.   I don't know anything about ---
5     Q.   --- August through ---
6     A.   --- the other employees.
7     Q.   --- July?
8     A.   I have no clue.
9     Q.   You have no idea.  Okay.  That's fine.
10  Fair enough.
11    A.   Okay.
12    Q.   Okay.  You do know there are the three
13  types, right?
14    A.   I did know that.
15    Q.   Okay.  And is it also your understanding
16  that faculty, full-time faculty at community
17  colleges are under a contract?  They're not
18  tenured?
19    A.   Yes.
20    Q.   As they would be at a university, right?
21    A.   Yes.
22    Q.   And each year the faculty member has to
23  sign a contract ---
24    A.   Yes.
25    Q.   --- with the school?  And it's for the

Ophelia Munn-Goins - Volume I                    Page 75

1   academic year?
2     A.   Yes.
3     Q.   And it might be a ten-month contract; it
4   might be a nine-month year contract; or it might
5   be a twelve-month contract, right?  If you know?
6     A.   I don't know.
7     Q.   You don't know.  Okay.  That's fine.
8          MS. SHEA:  We'll mark this Exhibit
9   Two, A through E.
10  (Off-record comments)
11         (DEPOSITION EXHIBIT
12         NUMBER TWO WAS MARKED
13         FOR IDENTIFICATION)
14    Q.   (Ms. Shea)  Okay.  Ms. Munn-Goins, I'm
15  going to hand you and your attorney what we've
16  marked as Exhibit Two.  And if you take a minute
17  and look at each of those, and then I'll ask you
18  some questions about them.
19  (Witness examined document)
20    Q.   Have you had a chance to look at Exhibit
21  Two?
22    A.   Yes.
23    Q.   Okay.  Do those appear to be the
24  contracts that you signed with Bladen Community
25  College each year that you taught there?

Ophelia Munn-Goins - Volume I                    Page 76

1     A.   Yes.
2     Q.   And are those your signatures on each of
3   those?
4     A.   It looks like one's missing.  Yes.
5     Q.   Okay.  Is your signature missing
6   from ---
7     A.   No, the ---
8     Q.   --- any of those?
9     A.   --- contracts appear to be missing
10  though.
11    Q.   Okay.  Which year appears ---
12    A.   --- The part-time ---
13    Q.   --- to be miss ---
14    A.   --- contract, but the full time, yeah.
15    Q.   Oh well, actually no, you anticipated my
16  next exhibit.  I kept the part-time one separate
17  at least I think.
18         MR. GRESHAM:  I would note, Robin,
19  the last contract dated September 1, '06.  So it
20  appears from August 1, '05, through March 31, '07,
21  which appears to be a two-year contract.
22         MS. SHEA:  Okay.  All right.
23         MR. GRESHAM:  But I don't know
24  whether that is a...
25         MS. SHEA:  Okay.  Thank you.

Ophelia Munn-Goins - Volume I                                     Page 77

1    Q.   (Ms. Shea)  Now I'll hand you what's
2    going to be marked as Exhibit Three.  And I think
3    these are the part-time contracts, but take a look
4    at them and then I'll ask you questions about
5    them.
6               (DEPOSITION EXHIBIT
7              NUMBER THREE WAS MARKED
8               FOR IDENTIFICATION)
9    A.   Several are missing, but -- they
10   missing.  A bunch of them are missing.
11   Q.   Okay.  At least for the ones that are
12   there, do those appear to be part-time contracts
13   for you with Bladen Community College?
14   (Witness examined documents)
15   A.   Yes.
16   Q.   Okay.  And you're saying there should be
17   more than three?
18   A.   Yes.
19   Q.   Okay.  Do you have a rough idea of how
20   many there should be?
21   A.   No.
22   Q.   Okay.  Not even a ballpark, ten?
23   A.   Ten.
24   Q.   Probably ten or so?
25   A.   Yeah.

Ophelia Munn-Goins - Volume I                                     Page 78

1    Q.   Okay.  Was that because -- after you
2    became a full-time faculty member, did you also
3    teach part time at Bladen?
4    A.   Yes.
5    Q.   Okay, and so that's why there would be
6    so many more.
7    A.   Yes.  And the original part-time
8    contract is not there.
9    Q.   Okay.  Now, the part-time contracts,
10   were they just for one semester?
11   A.   Each semester.
12   Q.   Each?
13   A.   Yes.
14   Q.   So if you were teaching an extra course,
15   you would sign a part-time contract with the
16   college?
17   A.   Yes.
18   Q.   Okay.  And that would just state the
19   extra course you were teaching and a pay rate?
20   A.   Yes.
21   Q.   And some other information, but that was
22   basic information on the part-time contracts?
23   A.   Yes.
24   Q.   Okay.  And so your testimony is you
25   would enter into a new part-time contract every

Ophelia Munn-Goins - Volume I                                     Page 79

1    time you took on an additional course to the
2    courses that would have been covered by your
3    regular contract, is that right?
4    A.   If the courses were above the original
5    contract, yes.
6    Q.   Okay.  The original contract would
7    envision a certain course load for you, right?
8    A.   Yes.
9    Q.   And then if they added to that, they
10   would have you enter one of these part-time
11   contracts?
12   A.   Yes.
13   Q.   Okay.  And you did that more than three
14   times?
15   A.   Yes.
16   Q.   The contracts that are marked as Exhibit
17   Three, would your -- would you have signed
18   something like this for your initial employment
19   with Bladen Community College when you were
20   teaching only part time?
21   A.   I think so.
22   Q.   Okay.  Now, is it your understanding
23   that when you became a full-time faculty member
24   you were considered a ten-month employee?
25   A.   Yes.

Ophelia Munn-Goins - Volume I                                     Page 80

1    Q.   And that would've begun in the fall of
2    2002, correct?
3    A.   Yes.
4    Q.   And was Dr. Garner your immediate
5    supervisor?
6    A.   No.
7    Q.   Who was your immediate supervisor?
8               MR. GRESHAM:  Pardon?
9               THE WITNESS:  I'm trying to think.
10   She may have been initially.  Unofficially, Mr.
11   Dickey sort of act like a supervisor.
12   Q.   Okay.  Do you know his full name?
13   A.   No.
14   Q.   Is it D-i-c-k-e-y?
15   A.   Yes.
16   Q.   Do you know his position?
17   A.   He was the senior CIS instructor.
18   Q.   You didn't have a CIS Department chair?
19   A.   I don't remember.
20   Q.   Okay.  As far as you know, Mr. Dickey
21   and Dr. Garner were the only people you had to
22   answer to in some way?
23   A.   Yes.
24   Q.   Okay.  And ultimately Dr. Page, right?
25   A.   Yes.

Ophelia Munn-Goins - Volume I                Page 81

1      Q.   During the fall of 2002, were you happy
2   with your job?
3      A.   Yes.
4      Q.   Did you have any issues at all?
5      A.   None that I can think of.
6      Q.   Okay.  You got along fine with Mr.
7   Dickey?
8      A.   Yes.
9      Q.   And with Dr. Garner?
10     A.   Yes.
11     Q.   And with Dr. Page?
12     A.   Yes.
13     Q.   And by this time your father was
14  deceased, right?
15     A.   Yes.
16     Q.   So did you have any dealings with the
17  Board of Trustees in 2002?
18     A.   Yes.  I mean, I talked to them.
19     Q.   Was that all generally okay, positive,
20  or neutral?
21     A.   Yes.
22     Q.   Okay.  Did you feel like you had good
23  relationships with the students?
24     A.   Yes.
25     Q.   So were you generally satisfied with

Ophelia Munn-Goins - Volume I                Page 82

1   your job in 2002?
2      A.   Yes.
3      Q.   Were you okay with your pay in 2002?
4      A.   Yes.
5      Q.   You felt like it was a fair pay for what
6   you were doing?
7      A.   Yes.
8      Q.   Okay.  And you got along okay with your
9   fellow faculty members and the staff?
10     A.   Yes.
11     Q.   Okay.  In the spring of '03 -- or let's
12  -- yes, let's just do the spring of '03, and then
13  starting in the fall of '03, I'll just do full
14  academic years.  During the spring of 2003, were
15  you still -- everything was fine?
16     A.   Yes.
17     Q.   Okay.  And then in the fall of '03 Dr.
18  Garner was still your vice president?
19     A.   Yes.
20     Q.   Was Mr. Dickey still the senior CIS?
21     A.   No.
22     Q.   He had left by then?
23     A.   Yes.
24     Q.   Do you remember approximately when he
25  left?

Ophelia Munn-Goins - Volume I                Page 83

1      A.   I think the summer of 2003.  I'm not
2   sure.
3      Q.   Okay.
4      A.   Oh now, 2004.
5      Q.   You think it was 2004?
6      A.   I don't know.
7      Q.   Not sure?  Okay.  That's fine.  Was he
8   -- whenever he left, was he replaced by somebody?
9      A.   No.
10     Q.   Okay.  So at that point you would start
11  reporting directly to the vice president of
12  curriculum?
13     A.   No.  Oh, there was someone else there.
14  There was another lady.  I don't remember her
15  name.  She retired.  She was the department chair
16  for a while.
17     Q.   I guess Mr. Dickey and this lady,
18  whatever her name was, you kind of viewed them as
19  being the equivalent of a department head?
20     A.   Yes.
21     Q.   Okay.  But that wasn't really their
22  formal job title, right?
23     A.   The department chair was.  That was her
24  formal job.
25     Q.   Oh, she was a ---

Ophelia Munn-Goins - Volume I                Page 84

1      A.   She was a ---
2      Q.   --- department chair?
3      A.   --- department chair.
4      Q.   For CIS?
5      A.   It wasn't CI -- it was business.
6      Q.   Okay.
7      A.   For business.
8      Q.   Was it your understanding that the
9   Business Department chair then reported to Dr.
10  Garner?
11     A.   Yes.
12     Q.   Okay.  And if you think of her name,
13  would you just jump in and say it?
14     A.   Yes.
15     Q.   Okay.  Thanks.  Okay.  So at some point
16  in 2003 or 2004 Mr. Dickey left.  And was that a
17  retirement?
18     A.   Yes.
19     Q.   And he was replaced by this other lady?
20     A.   No.  He was not replaced.
21     Q.   He was not replaced so you reported to
22  the chair of the Business Department?
23     A.   Yes.
24     Q.   Okay.  Who reported to the vice
25  president.

Ophelia Munn-Goins - Volume I                    Page 85

1      A.   Yes.
2      Q.   Okay.  Up until the time Mr. Dickey
3   left, was everything okay as far as you were
4   concerned?  You were satisfied with your job, got
5   along well with everybody, thought your pay was
6   fair ---
7      A.   Yes.
8      Q.   No issues?
9      A.   (No audible response)
10     Q.   Yes?  And then from the time Mr. Dickey
11  left until Dr. Geisen came, was everything still
12  okay?
13     A.   I don't remember when she came.  I don't
14  know.
15     Q.   I don't -- I'm not asking you when she
16  came.  I'm just saying during that period where
17  there was no senior CIS instructor and you were
18  reporting directly to this Business Department
19  chair, was everything still okay?
20     A.   Yes.
21     Q.   Okay.  And then Dr. Geisen came in 2004?
22     A.   I don't remember.
23     Q.   Okay.  Does that sound ---
24     A.   I have no idea.
25     Q.   No idea, okay.  Did Dr. Garner retire or

Ophelia Munn-Goins - Volume I                    Page 86

1   ---
2      A.   She died ---
3      Q.   --- pass away?
4      A.   She died.
5      Q.   She died while she was still teaching?
6      A.   In 2005 I think.
7   (Off-record comments)
8      A.   I think it was 2005.
9      Q.   Okay.
10     A.   January 2005.
11     Q.   And was there a search for a
12  replacement?
13     A.   I'm sure.
14     Q.   Do you know anything about that search?
15     A.   No.
16     Q.   You didn't suggest any people for the
17  position?
18     A.   I don't remember if I suggested anyone
19  for that position or not.  I don't remember.
20     Q.   Did you express any interest in that
21  position?
22     A.   No.
23     Q.   Okay.  Did you feel you were qualified
24  for it?
25     A.   Yes.

Ophelia Munn-Goins - Volume I                    Page 87

1      Q.   You did?
2      A.   Yes.
3      Q.   Okay.  But you didn't -- you didn't
4   apply for it?
5      A.   I didn't want to work 12 months.  No.
6      Q.   Okay.  Do administrators usually work 12
7   months?
8      A.   Yes.
9      Q.   And so did you have children by this
10  time?
11     A.   Yes.
12     Q.   And so it was a lot easier having that
13  summer off?
14     A.   Yes.
15     Q.   Okay.  Do you remember knowing anything
16  about the people who were being considered for the
17  position that Dr. Geisen eventually got?
18     A.   Yes.
19     Q.   And what do you know about the
20  candidates?    A.   I heard Bruce Crocker was one
21  of them.  He is another colleague.
22     Q.   And what does he teach?
23     A.   Business or accounting, something
24  business.  And some -- I don't remember who the
25  other person was.

Ophelia Munn-Goins - Volume I                    Page 88

1      Q.   So to your knowledge there were three
2   people being considered?
3      A.   No, I don't know how many were
4   considered.
5      Q.   Oh okay.
6      A.   I just know he was one.
7      Q.   Okay.
8      A.   I heard.
9      Q.   And somebody ---
10     A.   Oh, no.
11     Q.   ---- else ---
12     A.   Lynn King, I heard was interested.
13  (Off-record comments)
14     A.   Lynn, L-y-n-n.
15     Q.   Is Lynn a man or a woman?
16     A.   A man.  And I don't remember who else,
17  but I think there were others.
18     Q.   Okay.  Is Lynn King a colleague also?
19     A.   Yes.
20     Q.   And where does he teach?
21     A.   He doesn't.  He's a curriculum
22  specialist.
23     Q.   Okay.  So at least Mr. Crocker, Mr.
24  King, somebody else.  And did you know about Dr.
25  Geisen?

Ophelia Munn-Goins - Volume I                    Page 89

1    A.   That she had applied?
2    Q.   That she was a candidate?
3    A.   Yes.
4    Q.   Okay.  And did you know her before that?
5    A.   Yes.
6    Q.   How did you know her?
7    A.   She was an instructor colleague.
8    Q.   And what did she teach?
9    A.   Psychology.
10   Q.   So at least three of the people you knew
11   about who were in the running for this position
12   were people you had worked with?
13   A.   I don't know if they were in the
14   running.  I just heard they had applied.
15   Q.   Okay.  Well, yes, that's a better way to
16   put it.
17        Did you have an opinion as to who should
18   get the job?
19   A.   No.
20   Q.   Did you get along fine with the three
21   people you've named?
22   A.   Yes.
23   Q.   And then at some point I guess there was
24   an announcement that a selection had been made and
25   that it would be Dr. Geisen?

---

Ophelia Munn-Goins - Volume I                    Page 90

1    A.   I don't know.
2    Q.   Okay.  You came to find out at some
3    point that Dr. Geisen had been selected?
4    A.   Yes.
5    Q.   Okay.  And were you okay with that?
6    A.   Yes.
7    Q.   You didn't have any issues with the
8    thought of her being your boss I guess in a way?
9    A.   Had no problems with that.
10   Q.   Okay.  And we don't know exactly when
11   she became the vice president, right?
12   A.   I don't remember.
13   Q.   Okay.  Once she became the vice
14   president whenever that was, you would have been
15   reporting directly to her or through this Business
16   Department manager?
17   A.   Business Department director -- chair.
18   Q.   Okay.  So that person would be your
19   immediate supervisor, and then Dr. Geisen would be
20   the next person up the chain of command?
21   A.   Yes.
22   Q.   Okay.  Have you remembered the name of
23   that Business Department chair?
24   A.   Retire -- no.
25   Q.   Okay.

---

Ophelia Munn-Goins - Volume I                    Page 91

1    A.   But I know who the new one was, Cynthia
2    McCoy.
3    Q.   Okay.  And do you remember approximately
4    when Ms. McCoy became the ---
5    A.   No.
6    Q.   --- department chair?
7    A.   I don't remember.
8    Q.   Okay.  Let me just do it this way then.
9    I was trying to use people, so it would be easier
10   for you to kind of picture what it was like at the
11   time, but during the 2003-04 academic year, fall
12   of 2003 to May of 2004, do you remember that year
13   at all?
14   A.   Not really.
15   Q.   Okay.  Do you remember having any
16   dissatisfaction with your job at that time?
17   A.   No.
18   Q.   Okay.  Do you remember having any
19   personality conflicts with Dr. Geisen or Dr. Page,
20   or I don't know if Mr. Horn was there yet?
21   A.   He was there.
22   Q.   He was there by then, by 2004?
23   A.   Sure.
24   Q.   Did you get along okay with him?
25   A.   Yes.

---

Ophelia Munn-Goins - Volume I                    Page 92

1    Q.   Okay.  So things were still going fine?
2    A.   Yes.
3    Q.   Okay.  And then 2000 -- fall of 2004
4    through the spring of 2005, same question.
5    A.   What was the question?
6    Q.   Was everything okay as far as you ---
7    A.   Oh.
8    Q.   --- were concerned?
9    A.   Yes.
10   Q.   Okay.  Was there a point at which you --
11   I don't know if complaint is the right word.  Was
12   there a point at which you said that you thought
13   your military background should be included in
14   determining your salary?
15   A.   Yes, I said Dr. Garner.
16   Q.   You told ---
17   A.   Dr. Garner and I ---
18   Q.   --- Dr. Garner that?
19   A.   --- discussed it, and she said that she
20   would give me credit for my military service.
21   Yes.  And I think I talked to Lloyd Horne about
22   it, yes.
23   Q.   Okay.  When did Dr. Garner tell you she
24   would give you credit for your military service?
25   A.   When we talked in 2002, she asked me ---

Ophelia Munn-Goins - Volume I                    Page 93

1    Q.    At the time ---
2    A.    --- to give her ---
3    Q.    --- you were hired?
4    A.    Yes.  She asked me give her a copy of my
5  -- I think it's my DD214 or something.
6    Q.    And would that be retirement credit?
7    A.    Yes.  She would check into giving it to
8  me.
9    Q.    Okay.
10    A.    Not that she would give it to me, that
11  she would check into giving it to me.
12    Q.    Okay.  Did you ever express to her or
13  anybody else that you thought your military
14  experience should also be taken into account as
15  far as your pay as opposed to retirement?
16    A.    I'm not sure what you're asking me.
17    Q.    Did you ever express to anyone at Bladen
18  Community College that you thought, in determining
19  your salary ---
20    A.    Uh-huh (yes).
21    Q.    --- that the fact that you had, what, 20
22  years of military ---
23    A.    Uh-huh (yes).
24    Q.    --- experience should count for
25  something?

Ophelia Munn-Goins - Volume I                    Page 94

1    A.    It did.
2    Q.    It did?
3    A.    Yes.  I'm sure she gave me credit for
4  that when she made the offer.
5    Q.    Okay.  So in terms of your salary and in
6  terms of retirement?
7    A.    Not for retirement, no.  But as far as
8  my salary, I'm sure -- I think she included that I
9  had experience in information systems, and she
10  included that.
11    Q.    And then as far as the retirement she
12  said she would look into it?
13    A.    Yes.
14    Q.    Okay.  Did she ever get back to you
15  about the retirement?  Did you ever go back to her
16  and ask?
17    A.    No.
18    Q.    Why didn't you go back?
19    A.    Time.  Things just happen.
20    Q.    Busy?
21    A.    (No response)
22    Q.    Busy?
23    A.    Yes.
24    Q.    Okay.  And then at some point you also
25  talked to Mr. Horne about that?

Ophelia Munn-Goins - Volume I                    Page 95

1    A.    Yes.
2    Q.    Do you remember approximately when that
3  was?
4    A.    No.
5    Q.    Okay.  But did you go to see him in his
6  office?
7    A.    I'm sure.
8    Q.    Okay.  And did you basically say the
9  same thing you had said to Dr. Garner that, you
10  know, she was going to look into whether you could
11  get retirement credit for your military service.
12  And nothing had ever happened, and now you were
13  going to talk to him and see if anything could be
14  done?    A.    Words to that effect, I'm sure.
15    Q.    Okay.  I know those are not your exact
16  words but, yes.  You went to him, and you had a
17  meeting.
18    A.    Yes.
19    Q.    And you discussed all that with him?
20    A.    Yes.
21    Q.    Do you remember his response?
22    A.    No, but probably he'll check into it.  I
23  don't know.
24    Q.    Okay.  Probably the same response you
25  got from Dr. Garner?

Ophelia Munn-Goins - Volume I                    Page 96

1    A.    Yes.  I don't know.
2    Q.    And did Mr. Horne ever get back with
3  you?
4    A.    No.  Not that I remember anyway.
5    Q.    Is it your understanding that to get
6  military -- to get credit for military time
7  through the state employment system you actually
8  have to buy it?
9    A.    No.
10    Q.    You did not understand that?
11    A.    I never knew anything about it.
12    Q.    Okay.
13    A.    Period.
14    Q.    So you're not denying it, you just don't
15  know because nobody ---
16    A.    Right.
17    Q.    --- ever got back to you?
18    A.    Right.
19    Q.    Okay.  Did you ever go follow up with
20  Mr. Horne again?
21    A.    No, not that I know of.
22    Q.    Okay.  And again, why didn't you follow
23  up with him?
24    A.    It was a moot point.  It was moot.
25    Q.    Why was it moot?

Ophelia Munn-Goins - Volume I                        Page 97

1      A.   Because I didn't care.  It was not an
2  issue.
3      Q.   Oh, okay.
4      A.   Dr. Garner was gone, so it was not an
5  issue.
6      Q.   But you were still fairly young, and --
7  I mean would you have wanted it?
8      A.   Not really.
9      Q.   Okay.  Now, I think you said you started
10  your PhD program in 2005, is that right?
11      A.   EdD?  Yes.
12      Q.   Oh, it's an EdD?  Sorry.
13      Do you remember talking to anybody at
14  Bladen about entering that program?
15      A.   Yes.
16      Q.   Who did you talk to?
17      A.   Cynthia McCoy, Barbara Singletary, Lee
18  Ann Bryan, Kay Geisen.  I tell you -- I mean I
19  talked to everyone.
20      Q.   Okay.  When you -- I want to go through
21  those names more slowly.  The first one I think
22  was Barbara Singletary?
23      A.   Cynthia McCoy.
24      Q.   Oh, Cynthia McCoy.  Okay.  Was it -- you
25  know, without having you identify every single

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

---

Ophelia Munn-Goins - Volume I                        Page 99

1  just going through the program.  That was it, just
2  general conversation.
3      Q.   Casual?
4      A.   Yeah.
5      Q.   Okay.
6  (Off-record comments)
7      A.   Marva, about enrolled in school.
8      Q.   And I think you named Kay Geisen, right?
9  Do you remember the gist of your conversations
10  with her?
11      A.   Same thing, just to let her know.  She
12  told me about her program that she had enrolled in
13  and completed.  She just -- just conversation.
14  You know, she provided guidance.
15      Q.   So everybody seemed to be supportive of
16  you?
17      A.   Yes.
18      Q.   And was there anybody else you listed?
19      A.   Dr. Page, I talked to him.
20      Q.   Dr. Page, okay.  And he was supportive
21  also?
22      A.   Yes.  Lee Anne Bryan.
23      Q.   Now, is she another faculty member?
24      A.   Yes.
25      Q.   Okay.  And was that kind of casual

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

---

Ophelia Munn-Goins - Volume I                        Page 98

1  conversation you might have had with Ms. McCoy
2  about that, was the gist of the conversations, oh,
3  I'm going to get my doctorate.  You know, this
4  will be fun.  I'm been looking forward to it?  Or
5  was it just kind of a casual conversation like
6  that?
7      A.   No, to let her know because I had
8  classes start a certain time.
9      Q.   Okay.
10      A.   So I had to make sure that it was okay,
11  the times that I'd be leaving, and I didn't have
12  any classes scheduled at that time.
13      Q.   Okay.  And was the next one Barbara
14  Singletary?
15      A.   Yes.
16      Q.   Okay.  And what was her position?
17      A.   I don't know at that time.  She was in
18  Con-Ed.  I don't know what she did.
19      Q.   Okay.  And can you just kind of
20  summarize the gist of your conversations about the
21  program with ---
22      A.   Oh, they asked ---
23      Q.   --- Ms. Singletary?
24      A.   --- questions about the program, and
25  Marva Dinkins.  They would just talk about people

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

---

Ophelia Munn-Goins - Volume I                        Page 100

1  conversation?
2      A.   Yes.
3      Q.   Okay.  And have we covered everybody, or
4  is there --
5      A.   I'm sure there are others.
6      Q.   Okay, but those were the people you had
7  identified, weren't they?
8      A.   Yes.
9      Q.   Okay.  So your recollection is that all
10  the conversations you had at Bladen about going
11  back for your doctorate degree were positive and
12  supportive?
13      A.   Yes.
14      Q.   Okay.  Nobody told you, well, gosh, if
15  you do this, you're not going to have time to
16  teach here.  We don't like that.
17      A.   No.
18      Q.   Okay.  Did Bladen pay for you to go
19  back?
20      A.   They provided $200, 200-some dollars for
21  tuition and books.
22      Q.   Was that per semester or just ---
23      A.   It might ---
24      Q.   --- total?
25      A.   --- have been a hundred and ninety

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 101

1   dollars.  One semester I got 100-and-some dollars,
2   one semester I got 200-some dollars.
3        Q.   And would you have gotten that through
4   Mr. Horne?  Would ---
5        A.   Yes.
6        Q.   Is that how you would've applied for it?
7        A.   I went through the department chair.
8        Q.   Okay.  So Ms. McCoy would've gone to Mr.
9   Horne ---
10       A.   Should have gone ---
11       Q.   --- with the request?
12       A.   Yes.
13  (Off-record comments)
14       A.   It would have been gone from Cynthia
15  McCoy to Kay Geisen to Lloyd Horne.
16       Q.   Okay.  That would -- so you didn't talk
17  directly to Mr. Horne about that?
18       A.   I'm sure I did because I didn't get my
19  money.  I didn't get it.  Oh, you just apply.  I
20  don't know.  I talked to him about money for
21  school, yes.
22       Q.   Did you get your money?
23       A.   Yes.
24       Q.   Okay.  You always got it?
25       A.   Yes.

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

Ophelia Munn-Goins - Volume I                    Page 102

1        Q.   Okay.
2        A.   I got something.  They had a committee
3   that would approve the funds.
4        Q.   Okay.  Do you remember ever telling Dr.
5   Geisen that you were going back to school because
6   you wanted her job?
7        A.   No.
8        Q.   You never said that, or you don't
9   remember?
10       A.   I want a VP job, not her job.  Not at
11  Bladen.  a VP job.
12       Q.   Wasn't ---
13       A.   I don't want ---
14       Q.   --- she a ---
15       A.   --- her job.
16       Q.   --- VP?
17       A.   Yeah, but not her job specifically, a VP
18  job.
19       Q.   You told her you wanted a VP job?
20       A.   A VP job.
21       Q.   Okay.
22       A.   So like -- if I said her job, it's like
23  VP.
24       Q.   Right.
25       A.   Not at Bladen.

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

Ophelia Munn-Goins - Volume I                    Page 103

1        Q.   The equivalent of your job?
2        A.   Exactly.
3        Q.   Okay.  Did you ever talk to Darrell Page
4   or -- well, let me just start with Darrell Page.
5   Did you ever talk to him about your aspirations to
6   become a vice president?
7        A.   I'm sure I did.
8        Q.   And ---
9        A.   And president.
10       Q.   And president, some day?
11       A.   Yeah, I'm sure.
12       Q.   Okay.  Was he -- was your recollection
13  that he was supportive of that?
14       A.   Uh-huh (yes).
15       Q.   And encouraged you to pursue that?
16       A.   Yes.
17       Q.   Okay.  Did you ever talk about that with
18  Mr. Horne?
19       A.   Probably not.
20       Q.   Okay.  He was the money guy, right?
21       A.   Yes.
22       Q.   Okay.  How about Dr. Geisen, did you
23  ever talk to her just about the fact that you
24  wanted to progress from instructor to vice
25  president or president?

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

Ophelia Munn-Goins - Volume I                    Page 104

1        A.   Not in a -- like a formal setting.  If I
2   was talking to her about something in
3   conversations, I'd go to her and talk to her
4   sometimes, and she would encourage me.  So yes.  I
5   mean...
6        Q.   Okay ---
7        A.   (Inaudible) ---
8        Q.   --- so Dr. Geisen was also supportive
9   too?
10       A.   Yes.
11       Q.   Okay.  Your evaluations while you were
12  teaching at Bladen Community College were good?
13       A.   The one I received.
14       Q.   You only got one?
15       A.   One, in fact, I don't know of any
16  others.
17       Q.   Okay.  And it was good?
18       A.   Yes.
19       Q.   That's your recollection?
20       A.   Yes.
21       Q.   Were there any criticisms that you
22  recall?
23       A.   None.
24       Q.   Not even constructive criticism?
25       A.   From?

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

Ophelia Munn-Goins - Volume I                    Page 105

1     Q.   Any -- whoever did the evaluation.  You
2  don't recall ---
3     A.   I'm sure.  There may have been some
4  constructive criticism.
5     Q.   Okay.  You ---
6     A.   I don't ---
7     Q.   --- you don't recall any negative ---
8     A.   No.
9     Q.   --- comments?  Okay.  And did you get
10 evaluated by students also?
11    A.   Yes.
12    Q.   And is it your recollection that those
13 evaluations were good?
14    A.   Mostly good but with constructive
15 criticism.
16    Q.   Okay.  Did you ever have a student just
17 go off on some ---
18    A.   Oh, yeah.
19    Q.   Just blast you for something stupid?
20    A.   Might have been according to them.
21    Q.   Okay.
22    A.   I'm sure.  Yes.
23    Q.   But there were some like that?
24    A.   One, maybe two.
25    Q.   Okay.  Overall they were good?

---

Ophelia Munn-Goins - Volume I                    Page 106

1     A.   Yes.
2     Q.   It sounds like from your testimony that
3  really things were very good at this job, is that
4  right?
5     A.   Compared to what?
6     Q.   I don't know.  I mean, it sounds like
7  you were happy there?
8     A.   Yes.
9     Q.   You liked the people you worked with?
10    A.   Yes.
11    Q.   You got along well with everybody?
12    A.   Yes.
13    Q.   You might have had a couple of students
14 go off on you on an evaluation here and there.
15 But that's normal, right?
16    A.   It was okay.
17    Q.   And overall the students were good?
18    A.   Yes.
19    Q.   And liked you?
20    A.   Yes.
21    Q.   And you got along fine with Mr. Horne
22 and Dr. Page and Dr. Geisen?
23    A.   Yes.
24    Q.   Okay.  And with Cynthia McCoy?
25    A.   Yes.

---

Ophelia Munn-Goins - Volume I                    Page 107

1     Q.   You felt your pay was fair?
2     A.   Yes.
3     Q.   And the issue with retirement was kind
4  of a nonissue as far as you were concerned?
5     A.   Yeah.
6     Q.   Okay.  Did you ever have a problem with
7  air quality?
8     A.   Yes.
9     Q.   Okay.  Can you tell me about that?
10    A.   There was something in our classroom
11 that would make me lose my voice, and I couldn't
12 speak.
13    Q.   And did you go to anybody about that?
14    A.   I saw a pulmonologist.
15    Q.   Oh, so you went to a doctor about it?
16    A.   Yes.
17    Q.   Okay.  And did the doctor give you a
18 diagnosis?
19    A.   Yes.
20    Q.   What was the diagnosis?
21    A.   Laryngitis, bronchitis at that point.  I
22 saw several doctors.
23    Q.   And who was the doctor?
24    A.   I don't know.
25    Q.   Do you remember the town?

---

Ophelia Munn-Goins - Volume I                    Page 108

1     A.   I saw one in Elizabethtown and emergency
2  urgent care.  It's a PA I ended up seeing there.
3  I saw another one.  I think I saw that PA twice,
4  and then I saw the pulmonologist in Wilmington.
5     Q.   Pulmonologist?
6     A.   Yes.
7     Q.   And do you remember the pulmonologist's
8  name?
9     A.   No.
10    Q.   And they said that you had laryngitis or
11 bronchitis ---
12    A.   That's what ---
13    Q.   --- or both?
14    A.   --- the PA said.
15    Q.   Okay.
16    A.   The pulmonologist did not come up with a
17 final diagnosis.
18    Q.   Did the -- was this pulmonologist a he
19 or a she?
20    A.   He.
21    Q.   Okay.  Did he come up with a preliminary
22 diagnosis?
23    A.   Don't remember.
24    Q.   Do you remember when you went to see
25 these healthcare providers?

Ophelia Munn-Goins - Volume I            Page 109

1      A.   I saw one, a PA one time in May.  And
2  the only way I know it was May is because I was in
3  the building by myself.  Because I couldn't speak,
4  and I had someone watching out for me.  The next
5  time I saw him I don't remember.
6         The pulmonologist I saw off and on from
7  2006, February I think, February-March time frame
8  until maybe three months, four months.
9      Q.   So about the end of the semester
10  probably?
11     A.   Yes.
12     Q.   Okay.  So this would have been in late
13  '05 and the first part of '06 ---
14     A.   And some ---
15     Q.   --- that you were ---
16     A.   --- of '04.
17     Q.   And some of '04?
18     A.   Some of '04 as well, yeah.
19     Q.   Had you talked to anyone at the college
20  about this problem?
21     A.   Yes.
22     Q.   And who did you talk to?
23     A.   I don't know if I talked to Kay or not,
24  but I'm sure I did to get the equipment, Lloyd
25  Horne, Cynthia McCoy, Lee Anne Bryan, and I'm sure

Ophelia Munn-Goins - Volume I            Page 110

1  others.
2      Q.   And again, I think you've already
3  testified to this, and I'm sorry to be asking it
4  again.  Lee Anne Bryan is another faculty member?
5     A.   Yes.
6     Q.   Okay.  So what did you tell Dr. Geisen
7  and Mr. Horne and Cynthia McCoy and Lee Anne about
8  this problem that this one classroom was causing
9  you problems?
10     A.   Office and classroom.
11     Q.   Your office?
12     A.   The office as well because of the carpet
13  because I wanted it removed.  And I was promised
14  that it would be removed, but it never was.  But I
15  didn't spend a whole lot of time in my office.  I
16  spent most of it in the classroom, so I was given
17  a breathing machine, a machine -- an air quality
18  -- air purifier machine.
19     Q.   Okay.  In the classroom?
20     A.   Yes.
21     Q.   Did the classroom have the same kind of
22  carpet as ---
23     A.   No carpet ---
24     Q.   --- the office?
25     A.   There something with the mold -- there

Ophelia Munn-Goins - Volume I            Page 111

1  was mold in the building in the -- from rain and
2  wet -- dampness in the building.
3      Q.   And what building would that have been?
4     A.   Seventeen.
5     Q.   And do you remember the number of your
6  classroom?  I guess there was a room number?
7     A.   Yeah.  Maybe one -- or I don't know,
8  100-something.  I don't ---
9     Q.   One hundred and something?
10     A.   --- know if it was 101 or 104.
11     Q.   Okay.  How about -- did your office have
12  a room number?
13     A.   It did.  I don't remember.
14     Q.   When you -- among the college people,
15  Dr. Geisen, Lloyd Horne, Cynthia McCoy, and Lee
16  Anne -- I mean, when you talked to Lee Ann about
17  it, would that be more as a friend?
18     A.   Uh-huh (yes), just talking.
19     Q.   That wouldn't be an official complaint
20  to the school, right?
21     A.   Right.
22     Q.   Because she wasn't in a position of
23  authority?
24     A.   She was like a lead.  But, no.
25     Q.   Okay.  Now, when you went to Dr. Geisen,

Ophelia Munn-Goins - Volume I            Page 112

1  Lloyd Horne, or Cynthia McCoy, was that more --
2  that was more like making a formal -- I hate to
3  use the word "complaint" because I don't mean you
4  were necessarily complaining, but you were
5  officially putting the school on notice that there
6  was a problem.
7     A.   I don't know.  I guess I was.
8     Q.   Okay.
9     A.   I mean, I told them.
10     Q.   Okay.  And you would expect them to
11  possibly do something about it if there was
12  something that could be done about it, right?
13     A.   Yes.
14     Q.   With Lee Anne, you might not -- that
15  would be more just talking?
16     A.   Well, she had the same issue.
17     Q.   Oh, she ---
18     A.   She had a ---
19     Q.   --- did too?
20     A.   --- problem breathing with her lungs as
21  well.  She was experiencing problems.
22     Q.   Okay.  And you had never had any
23  problems with this from 2002 to 2004?
24     A.   No.
25     Q.   And then in 2004 you started having

Ophelia Munn-Goins - Volume I                              Page 113

1   trouble?
2        A.   Yes.
3        Q.   Was new carpet put in in 2004?
4        A.   No.  I moved I think.  They moved me
5   from 2003 into that place in 2004 I believe.
6        Q.   Okay.
7        A.   I don't know.
8        Q.   Okay.
9        A.   Something like...
10       Q.   Okay.
11       A.   But I was always -- mostly I started
12  spending more time in that classroom in 2000 --
13  late 2003 I believe.
14       Q.   Okay.  And did your office change?
15       A.   It changed in 2003 as well.
16       Q.   Okay.  And the problem started in 2004?
17       A.   Four.
18       Q.   Okay.  And was new carpet put in in 2004
19  in ---
20       A.   No.
21       Q.   --- your office?  Okay.
22       A.   Old carpet.
23  (Off-record comments)
24       Q.   Do you remember what you told Kay Geisen
25  about the problem with the air quality?

Ophelia Munn-Goins - Volume I                              Page 114

1        A.   No.
2        Q.   Okay.  Do you remember what you told
3   Lloyd Horn about it?
4        A.   No.
5        Q.   Okay.  How about Cindy McCoy?
6        A.   No.
7        Q.   Do you remember, essentially more or
8   less in substance, telling them that you were
9   having respiratory problems in those rooms?
10       A.   Yes.
11       Q.   And you wanted them to remove the carpet
12  from your office?
13       A.   Yes.
14       Q.   Okay.  Did you ask for anything else in
15  addition to getting rid of the carpet?
16       A.   Yes.
17       Q.   What else?
18       A.   I asked for the air purifier for the
19  classroom.
20       Q.   Okay.  And was that something you
21  requested right off the bat when you talked to
22  either Dr. Geisen, Mr. Horne, or Cynthia McCoy?
23       A.   No.  No.
24       Q.   Okay.  Do you know whether Lee Anne
25  Bryan had made a complaint to any of those people?

Ophelia Munn-Goins - Volume I                              Page 115

1        A.   Yes, she had.  And yes, she did get a
2   breathing machine -- I mean, an air purifier
3   machine in her office as well.
4        Q.   Do you know whether any kind of study
5   was done?
6        A.   Yes.
7        Q.   About the air -- okay.  The school did a
8   study of the air quality after getting your
9   complaint?
10       A.   I'm not sure if it was after ---
11       Q.   Or your concern?
12       A.   I'm not sure if it was after my concern,
13  but, yes, they did do one.
14       Q.   They did eventually do one.  And do you
15  know what the findings were?
16       A.   Yes.  They found several spores.
17       Q.   And how did you learn that?
18       A.   I received a copy of the report.
19       Q.   And did you get that from the school?
20       A.   From Lloyd Horne.
21       Q.   Okay.
22  (Off record)
23       Q.   (Ms. Shea)  And your recollection is
24  that the report found several spores?
25       A.   Yes.

Ophelia Munn-Goins - Volume I                              Page 116

1        Q.   Okay.  Do you remember whether the
2   report had a conclusion?
3        A.   I don't remember.
4        Q.   Okay.  Would it be your understanding
5   that probably a certain number of spores would be
6   expected in normal air?
7        A.   I don't...
8        Q.   Okay.  Do you -- you don't remember
9   whether the report concluded, you know, there are
10  spores in the air; this is normal level, or there
11  are spores in the air, and this is an abnormal
12  level?
13       A.   I do remember some show abnormal levels,
14  and I do remember it gave a recommendation how to
15  clean it.  But I don't know if that was the
16  conclusion.
17       Q.   Okay.  Do you remember what the
18  recommendation was about how to clean it?
19       A.   No.
20       Q.   And so the conclusion of this was that
21  you were given an air purifier in your classroom?
22       A.   Yes.
23       Q.   Was the carpet ever removed from your
24  office?
25       A.   No.

Ophelia Munn-Goins - Volume I                    Page 117

1    Q.    Okay.  Once you got the air purifier in
2    your classroom, did that resolve the problem?
3        A.    Not totally, no.
4        Q.    Was that problem ever resolved to your
5    satisfaction?
6        A.    I'm not sure what you're asking.
7        Q.    Did you continue to have problems until
8    the time you left the school forever in 2007?
9        A.    I continued to have problems speaking
10   sometime in the classroom, but not like I did
11   then.  No.
12       Q.    Okay.  Did you ever tell Mr. Horne or
13   anyone that you were going to take legal action
14   against the school if they didn't resolve that
15   problem?
16       A.    No.
17       Q.    Have you ever been a party to a lawsuit
18   other than this one?
19       A.    On my own?
20       Q.    First, I'll ask you on your own.
21       A.    No.
22       Q.    Okay.  You were a party to a lawsuit in
23   connection with an organization, right?
24       A.    Yes.
25       Q.    According to some responses that we
11-05-08    Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                    Page 119

1        A.    No.
2        Q.    So it's only turning it around?
3        A.    Yes.
4        Q.    Okay.  And are you on the board of
5    directors of this organization?
6        A.    Yes.
7        Q.    Who else is on it?
8        A.    Horace Munn.
9        Q.    Horace Munn, is that your brother?
10       A.    Yes.
11       Q.    Okay.
12       A.    Leisha Brown.
13       Q.    Leisha?
14       A.    L-e-i-s-h-a Brown.  That's it.
15       Q.    That's it, okay.  And who's Ms. Brown?
16       A.    Sister.
17       Q.    Your sister?
18       A.    Yes.
19       Q.    Okay.  And are you the president?
20       A.    Yes.
21       Q.    Okay.  All right.  And when was that
22   organization incorporated?
23       A.    1986.
24       Q.    Was that established by your father
25   initially?
11-05-08    Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                    Page 118

1    received today from your attorney.
2        A.    Yes.
3        Q.    Can you tell me about that lawsuit?  And
4    first, tell me who the plaintiff was.
5        A.    I was the plaintiff on behalf of Bladen
6    County Enterprises, Inc.
7        Q.    Okay.  Now, Bladen County Enterprises,
8    Inc., that was not one of the organizations you
9    listed ---
10       A.    I forgot ---
11       Q.    --- earlier today.
12       A.    --- about that one.
13       Q.    Okay, this is an additional one.  Okay.
14   And what is that organization?
15       A.    Investment, investment group.
16       Q.    Can you be more specific?
17       A.    That's all they do.  They invest in
18   property, money.  That's it.  That's all.
19       Q.    Is it a for profit?
20       A.    Yes.
21       Q.    So this entity buys real property and
22   then resells it?
23       A.    They could, or they buy, yeah.  CDs,
24   stock market, whatever.
25       Q.    Do they rent property?
11-05-08    Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                    Page 120

1        A.    Yes.
2        Q.    Okay.  Well, what was the dispute?
3        A.    Corinthian Place needed some money in a
4    hurry.  They needed some investors.  They came to
5    the organization and asked if we wanted to be
6    investors.  The group agreed, but first they had
7    to do some research on their financial status and
8    their issues, why they need the money.
9             Corinthian Place Party agreed to pay the
10   legal fees for the review and then filed
11   bankruptcy before the money was transferred.  And
12   the organization asked for the legal fees, the
13   payment of the legal fees.  So small claims.
14       Q.    Okay.  And what is Corinthian Place?
15       A.    Long-term care facility.
16       Q.    And where is it?
17       A.    Leland.
18       Q.    And I guess it doesn't exist anymore?
19       A.    No, it does.
20       Q.    It does?
21       A.    There was a bankruptcy.
22       Q.    Okay, so it was a reorganization?
23       A.    I don't know what happened to it.
24       Q.    Okay.  Which county was the lawsuit
25   filed in?
11-05-08    Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                    Page 121

1    A.   Brunswick.
2    Q.   North Carolina?
3    A.   Yes.
4    Q.   And when was it filed?
5    A.   September 2007.
6    Q.   And has it been ---
7    A.   Yes.
8    Q.   --- disposed of?
9    A.   Yes.
10   Q.   Okay.  What was the resolution?
11   A.   That they filed bankruptcy.  They had no
12   money to pay.
13   Q.   Okay, so it's kind of dead?
14   A.   Basically.
15   Q.   So you filed the suit before they
16   actually had filed for bankruptcy?
17   A.   Before -- no, after.  Didn't know they
18   had filed for bankruptcy until then.
19   Q.   Okay.  Had any litigation activity taken
20   place before you found out that they had filed for
21   bankruptcy?
22   A.   Nothing that they could -- I just
23   followed through with it anyway.
24   Q.   Okay.
25   A.   And then the estate, my father's estate.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 122

1    Q.   And you were the administrator?
2    A.   Yes.
3    Q.   Or the executor?
4    A.   Executor.
5    Q.   He had a will?
6    A.   Executrix.  Yes.
7    Q.   Were there any disputes about your
8    father's estate?
9    A.   Yes.
10   Q.   With your siblings?
11   A.   No.  His wife.
12   Q.   Oh, okay.  Was his wife your mother?
13   A.   No.  His wife ---
14   Q.   He remarried later?
15   A.   (No audible response)
16   (Off-record comments)
17   A.   Yes.  His wife.
18   Q.   What is your mother's name?
19   A.   Eva Munn.
20   Q.   Is she still alive?
21   A.   No.
22   Q.   When did she die?
23   A.   '76.
24   Q.   Was she married to your father until she
25   died?

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 123

1    A.   Yes.
2    Q.   Okay.  And then he remarried?
3    A.   Yes.
4    Q.   And who was his next wife?
5    A.   Maggie Thomas.
6    Q.   And is that the woman you're referring
7    to?
8    A.   Yes.
9    Q.   Who you had the dispute with?
10   A.   Yes.
11   Q.   Okay.  Was your father ever married to
12   anybody else?
13   A.   No.
14   Q.   And Ms. Thomas was married to your
15   father when he died?
16   A.   Yes.
17   Q.   Is she still alive?
18   A.   Yes.
19   Q.   And where is she living now?
20   A.   Leland.
21   Q.   And what was the resolution of your
22   father's estate?  How did the dispute get
23   resolved, if you remember?
24   A.   She had to return property.  We had to
25   return property.  We had to pay her so much money,

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 124

1    and no one could sue each other.
2    Q.   Okay,  In other words, you've settled
3    it?
4    A.   Yes.
5    Q.   Okay.  Did you have an attorney?
6    A.   Yes.
7    Q.   And who was your attorney?
8    A.   Ruben Moore.
9    Q.   Can you spell that?
10   A.   R-u-b-e-n.
11   Q.   And where is he?
12   A.   I don't know where he is now.  He was in
13   Elizabethtown.
14   Q.   Okay.
15   A.   He's has since -- since retired.
16   Q.   He's still living?
17   A.   I don't know.  And David Wall.  We had
18   two attorneys.
19   Q.   And where is Mr. Wall?
20   A.   Elizabethtown.
21   Q.   Is he still in practice?
22   A.   Yes.
23   Q.   And then who represented your step-
24   mo0her?
25   A.   Gary Grady.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 125

1          Q.   And is Mr. Grady the attorney for the
2    Board of Trustees?
3          A.   Yes, he is.
4          Q.   Okay.  Do you remember as part of that
5    settlement having any kind of confidentiality
6    agreement?
7          A.   Yes.
8          Q.   Are you under a confidentiality ---
9          A.   I think so.  I think so.  I don't
10   remember -- quite remember what happened.
11         Q.   You might be?
12         A.   Yes.
13         Q.   Okay.  I won't ask you anymore questions
14   about it just in case.  Well, let me ask you one.
15   This won't breach the confidentiality agreement.
16   What county was that ---
17         A.   Bladen.
18         Q.   And if you would, please let me finish
19   my question.
20         A.   I apologize.
21         Q.   Okay.
22              MR. GRESHAM:  See, we think you
23   know more about Eastern North Carolina geography.
24   When she said it was in Elizabethtown, that's
25   where the courthouse ---
11-05-08    Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                    Page 126

1              THE WITNESS:  Yeah.
2              MR. GRESHAM:  --- is for Bladen
3    County.
4              MS. SHEA:  Oh, I should have known
5    that, shouldn't I?  Yes.
6              MR. GRESHAM:  I know you travel a
7    lot.
8          Q.   (Ms. Shea)  Okay.  Any other legal
9    proceedings you've ever been involved in?
10         A.   None that I can remember.
11         Q.   Okay.  Have you ever filed a charge of
12   discrimination?
13         A.   No, not that I remember.
14         Q.   Okay.  And I'm just throwing out names
15   to help you remember.  You're familiar with the
16   Equal Employment Opportunity Commission?
17         A.   Yes.
18         Q.   You've never filed a charge with them to
19   your knowledge?
20         A.   Not that I can remember.
21         Q.   Okay.  How about the U.S. Department of
22   Labor?
23         A.   Not that I can remember.
24         Q.   How about Occupational Safety and Health
25   Administration?
11-05-08    Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                    Page 127

1          A.   Not that I remember.
2          Q.   Okay.
3              MR. GRESHAM:  When you're in the
4    Army, there are very few agencies that you can use
5    to sue your employer.
6              THE WITNESS:  Yeah.
7    (Off-record comments)
8              MS. SHEA:  Let's take a break.
9    (Brief break)
10         Q.   (Ms. Shea)  Ms. Munn-Goins, during the
11   break did you think of anything you wanted to
12   change about your earlier testimony?
13         A.   Yes.
14         Q.   Okay.
15         A.   One person's name that was a department
16   chair was Rebecca Jones.
17         Q.   Thank you, okay.  Thanks a lot.  Was the
18   Bladen School Board in litigation against the ---
19         A.   Oh.
20         Q.   --- county commissioners?
21         A.   Forgot about that one.
22         Q.   Okay.  What was that all about?
23         A.   Trying to get additional funds for the
24   school, the school system.  And I'll give you a
25   second one.
11-05-08    Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                    Page 128

1              MR. GRESHAM:  Those would have been
2    in her official capacity as an ---
3              MS. SHEA:  Right.
4              MR. GRESHAM:  --- as an individual.
5          Q.   (Ms. Shea)  Right.  That -- yes -- you
6    did ---
7          A.   There were two.
8          Q.   Okay.
9          A.   There was one against the County
10   Commission, and there was one against Clarke
11   Brother & Sons or Son & Sons.  Some other company,
12   just litigation.
13         Q.   And that was also in your official
14   capacity ---
15         A.   Yeah.
16         Q.   --- as a school board member?  And what
17   was the nature of the dispute there?
18         A.   Repairs that were not done at the
19   schools and subcontractors.
20         Q.   Is the lawsuit against the Board of
21   Commissioners still pending?
22         A.   No.
23         Q.   Was it settled?
24         A.   Judge Manning made a ruling, so there
25   was a ruling.
11-05-08    Munn-Goins vs. Bladen\7:08CV21        COPY

SHEET 17  PAGE 129

Ophelia Munn-Goins - Volume I                    Page 129

1    Q.   Okay.  Did you win?  You, meaning the
2  school board?
3    A.   I think both of them lost.  Both the
4  commissions and the school board lost.
5    Q.   Everybody lost, okay.  Was that Judge
6  Howard Manning?
7    A.   I think so.
8    Q.   Okay.  And the lawsuit against Clark
9  Brothers, is that still going on?
10   A.   They settled.
11   Q.   And were both of those filed in Bladen
12 County, both of those lawsuits?
13   A.   I don't know where the one against the
14 contractor is filed but the commissioners, yes.
15   Q.   Okay.  And that's all the litigation you
16 remember, right?
17   A.   That's all I can remember.
18   Q.   Okay.  Now, I'm going to completely
19 change tracks here, and want to talk to you about
20 this pay information that was available through
21 the college, faculty salary information.
22   A.   Okay.
23   Q.   Okay?  I just wanted to warn you of that
24 because it's so different from what we've been
25 talking about.  It's your understanding that

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

---

PAGE 130

Ophelia Munn-Goins - Volume I                    Page 130

1  faculty pay information is publicly available,
2  right?
3    A.   Yes.
4    Q.   Okay.  And you can request that
5  information from the school, right?
6    A.   Yes.
7    Q.   And it's your understanding you have the
8  right to that information, correct?
9    A.   Correct.
10   Q.   Okay.  And you requested that several
11 years, is that right?
12   A.   Correct.
13   Q.   Did you request it every year that you
14 taught at Bladen Community College?
15   A.   Yes.
16   Q.   Starting in 2002?
17   A.   Yes.
18   Q.   Okay.  And was it given to you every
19 year?
20   A.   Yes.
21   Q.   And you paid a fairly small fee to the
22 school, and then they would give you the
23 information?
24   A.   Yes.
25   Q.   Okay.  In 2002 who did you make that

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

---

PAGE 131

Ophelia Munn-Goins - Volume I                    Page 131

1  request to?
2    A.   Rosemary Crumb.
3    Q.   Crumb or Crump?
4    A.   C-r-u-m-b.
5    Q.   Crumb.  Okay, and what was her position
6  at the time if you know?
7    A.   She worked in personnel.  I mean, I
8  don't know.
9    Q.   So she was an HR person?
10   A.   Yes.
11   Q.   Okay.  And did you -- what you pay her a
12 dollar that year?
13   A.   Yes.
14   Q.   And then she gave you the information?
15   A.   Yes.
16   Q.   Okay.  What did you do with that
17 information when you got it?
18   A.   Shared it with others who wanted it.
19   Q.   Okay.  And who were the people you
20 shared it with?
21   A.   Lee Anne Bryan and that year I think she
22 was the only one.
23   Q.   Do you have any idea why Lee Anne Bryan
24 wouldn't have gotten it herself the way you did?
25   A.   No.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

---

PAGE 132

Ophelia Munn-Goins - Volume I                    Page 132

1    Q.   Okay.  She didn't give you a reason for
2  that?
3    A.   No.
4    Q.   Did she ask to see it, or did you offer
5  it to her?
6    A.   I don't remember.
7    Q.   Okay.  And then in 2002 you did it
8  again?
9         MR. GRESHAM:  2002 or ---
10        MS. SHEA:  Or I'm sorry.  Thank
11 you.
12   Q.   (Ms. Shea)  2003?
13   A.   Yes.
14   Q.   You made the same request in -- was it
15 to Ms. Crumb again?
16   A.   Yes.
17   Q.   And was she still in the same position
18 as far as you know at that time?
19   A.   Yes.
20   Q.   Okay.  And she gave it to you?
21   A.   Yes.
22   Q.   You paid a dollar?
23   A.   I don't know how much I paid.  I paid.
24   Q.   That's the ballpark anyway?
25   A.   Yes.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 133

1   Q.   A dollar is in the ballpark?  Okay.  And
2   did you share it with other employees in 2003?
3        A.   Yes.
4        Q.   And do you remember who ---
5        A.   No.
6        Q.   Okay.
7        A.   I know I shared it, but I don't know
8   with whom.
9        Q.   Okay.  And if you don't remember who you
10  shared it with, I assume you also don't remember
11  why they didn't just go get it themselves?
12       A.   Correct.
13       Q.   Okay.  2004, you asked for it?
14       A.   I think I did.
15       Q.   Okay.  And I think, if I can find it
16  here, I have a copy of a request that I think
17  might have been your request in 2004.  Let me see
18  if I can find that.
19  (Ms. Shea examined document)
20                 (DEPOSITION EXHIBIT
21                 NUMBER FOUR WAS MARKED
22                 FOR IDENTIFICATION.)
23       Q.   Okay.  I'm going to hand you what's been
24  marked as Exhibit Four.  Do you recognize that
25  document?

Ophelia Munn-Goins - Volume I                    Page 134

1        A.   Yes.
2        Q.   Is that your handwriting?
3        A.   Yes.
4        Q.   And is that a 2004 request for salary
5   information?
6        A.   Yes.
7        Q.   Okay.  And I believe that was to
8   somebody else, wasn't it?
9        A.   It was Rosemary Crumb.
10       Q.   Okay.
11       A.   Pitkins is her last name.
12       Q.   Okay.  And again, you reference a one
13  dollar fee ---
14       A.   Yeah.
15       Q.   --- for the information?  Okay.
16            And in 2004 was Ms. Crumb still in human
17  resources ---
18       A.   I think so.
19       Q.   --- in the same job she'd been in?
20       A.   I think she was.
21       Q.   Okay.  And did you share that
22  information with somebody else in 2004?
23       A.   I'm sure I did.
24       Q.   Do you remember who?
25       A.   No.

Ophelia Munn-Goins - Volume I                    Page 135

1        Q.   Okay.  And I should -- in 2002, 2003,
2   2004, you shared it with other -- at least one
3   other individual, maybe multiple individuals?
4        A.   Not in 2002 because I didn't really no
5   anyone.  That's why I don't think I only shared it
6   with the one person ---
7        A.   Okay.
8        Q.   --- in 2002.
9        Q.   In 2003 and 2004, you did share it with
10  other people?
11       A.   Yes.
12       Q.   Plural?
13       A.   I -- I'm sure I did.
14       Q.   Okay.  And there was no uproar about
15  that, is that right?
16       A.   No.
17       Q.   Did you get in trouble for asking for
18  it?
19       A.   No.
20       Q.   Okay.  Then in 2005, did you ask for it
21  again?
22       A.   I'm probably sure I did.
23       Q.   Okay.  And would that have been from Ms.
24  Crumb?
25       A.   I can't tell you.  I don't know who was

Ophelia Munn-Goins - Volume I                    Page 136

1   there then.
2        Q.   Did she leave at some point around 2005
3   or 2006?
4        A.   Yes.
5        Q.   Okay.  And at some point did those
6   requests get referred to Mr. Horn?
7        A.   Yes.
8        Q.   Okay.  And that might have been 2005, or
9   it might have been 2006?  You just don't remember?
10       A.   Yes.
11       Q.   Okay.  But in any event in 2005, you did
12  ask for the information from somebody; you got it;
13  you might have shared it with some people.  No big
14  deal, right?
15       A.   Yes.
16       Q.   Okay.  And then in 2006 Ms. Crumb was
17  gone, right?
18       A.   I don't know.
19       Q.   You don't know?
20       A.   I don't know when she left.
21       Q.   Okay.
22       A.   It's probably six because I think that
23  -- yes.  Because I sent it to the other person.
24       Q.   Tiina Mundy?
25       A.   Yes.

Ophelia Munn-Goins - Volume I                          Page 137

```
1        Q.   Okay.
2                  MS. SHEA:  And off the record.
3    (Off record)
4                  (DEPOSITION EXHIBIT
5                  NUMBER FIVE WAS MARKED
6                  FOR IDENTIFICATION)
7        Q.   (Ms. Shea)  Ms. Munn-Goins, I'm going to
8    hand you what's been marked as Exhibit Five, and
9    it is not a very good copy.  I apologize for that.
10   But do you recognize that document?
11       A.   Yes.
12       Q.   Is that a request you made to Tiina
13   Mundy in 2006 for the pay information?
14       A.   Yes.
15       Q.   Okay.  And now I see the fee has gone up
16   to $3.  Is that correct?
17       A.   Yes.
18       Q.   Okay.  Would Ms. Mundy be the one to
19   tell you that the fee had gone up?
20       A.   Yes.
21       Q.   And what's -- if you know, what's Ms.
22   Mundy's position?
23       A.   I put personnel officer.  I don't know.
24
25       Q.   Personnel officer?
```

---

Ophelia Munn-Goins - Volume I                          Page 138

```
1        A.   That's what I put.  I don't know what
2    she is.
3        Q.   Okay.  That was a guess on your part?
4        A.   Yes.
5        Q.   Okay.  And this request is dated
6    February 21, 2006, is that right?
7        A.   It appears to be since I can't read it.
8    It's a lousy copy.
9        Q.   It's not the best copy in the world.
10   I'm sorry about that.  Can you take a look and see
11   whether you can figure out what that date is?
12       A.   It looks like February 20th.
13                  MR. GRESHAM:  Received Feb ---
14                  THE WITNESS:  --- That's up there.
15   So it's 22,600.
16       Q.   (Ms. Shea)  February 2006 anyway?
17       A.   Yes.
18       Q.   Okay.
19                  MR. GRESHAM:  Do you have something
20   that has this hand -- what the handwriting doodle
21   there is?
22                  MS. SHEA:  I do not.  That is the
23   best copy I have.
24                  MR. GRESHAM:  We presume the school
25   may ---
```

---

Ophelia Munn-Goins - Volume I                          Page 139

```
1                  MS. SHEA:  Presumably.  Presumably.
2    Yes.
3                  MR. GRESHAM:  Okay.
4        Q.   (Ms. Shea)  Okay.  When you asked for
5    the information from Ms. Mundy whenever you asked
6    for it, do you recall that it was handled
7    differently from past occasions?
8        A.   Yes.
9        Q.   Okay, what was different?
10       A.   She sent an email telling me that I had
11   to -- that Lloyd Horne, she forwarded an email
12   from Lloyd Horne saying I had to talk to Dr. Page
13   to get -- before it could be released.
14       Q.   Okay.  Did you ask her or anybody else
15   why you had to go through Dr. Page?
16       A.   Yes.
17       Q.   And what were you told?
18       A.   That I had to ask Dr. Page.
19       Q.   That was ---
20       A.   That Lloyd Horne said I had to ask Dr.
21   Page.
22       Q.   Okay, so you asked, why do I have to do
23   it?  And they said because Lloyd ---
24       A.   Lloyd Horne ---
25       Q.   --- said so.
```

---

Ophelia Munn-Goins - Volume I                          Page 140

```
1        A.   --- said to.
2        Q.   Okay.  And that was different from in
3    the past?
4        A.   Yes.
5        Q.   Okay.  And then did you make the request
6    through Mr. Horne -- or through Dr. Page I guess?
7        A.   Yes.
8        Q.   Okay.  Do you remember approximately
9    when you asked Dr. Page for that information?
10       A.   Sometime that year, no.
11       Q.   Okay.  You don't have an idea of how
12   much time elapsed between your first request to
13   Ms. Mundy and then when you went to Dr. Page?
14       A.   No.
15       Q.   Okay.  What happened when you went to
16   see Dr. Page about it?
17       A.   He asked me why, why I wanted it.
18       Q.   Okay.  And what did you tell him?
19       A.   For personal reasons.
20       Q.   Okay.  And what did you mean by that?
21       A.   For my personal use to do whatever I
22   choose to do with it.  It's personal.
23       Q.   Okay.
24       A.   And I explained to him that other people
25   were applying for jobs, and that way I could at
```

Ophelia Munn-Goins - Volume I                                   Page 141

1    least give them a ballpark figure of what the
2    position would pay.
3        Q.  You told Dr. Page that?
4        A.  Yes.
5        Q.  And what was his response?
6        A.  He just said okay.  That's all I
7    remember.
8        Q.  He said okay?
9        A.  (Witness moved head up and down)
10       Q.  And then did you get the information?
11       A.  A long time later.  I had to keep asking
12   Lloyd Horne for it.
13       Q.  Okay, you had to ask Lloyd Horne for it?
14       A.  And eventually he gave me one sheet,
15   then a couple days later I found an envelope in my
16   box with another sheet.  But I never received it
17   all, no.
18       Q.  Okay.  Did you ever have a discuss --
19   did you have any other discussions with Dr. Page
20   about the information except for the one you've
21   already testified about?
22       A.  Yes.  When I got a reprimand for it.
23       Q.  Okay.  But not until then?
24       A.  Right.
25       Q.  Okay.  So let's hold off on talking

Ophelia Munn-Goins - Volume I                                   Page 142

1    about the reprimand for now.
2        Then you asked Dr. -- or you asked Mr.
3    Horne about it?
4        A.  Yes.
5        Q.  Okay.  And do you remember every
6    conversation you had with Mr. Horne about it?
7        A.  No, I don't remember every.  But I
8    remember one or two.
9        Q.  Okay.
10       A.  When I went to his office and asked him
11   for it and he said, well, what do you need it for?
12   And I said it's for personal use, and I was going
13   to share it with Felicia Williams.  He said, well,
14   why don't you charge her for it?  And I said, no,
15   I'm
16   not going to charge her for it.  I was going to
17   give her a copy.  That was it.
18       Q.  Okay.  So you told him that you were
19   going to share the information with Felicia
20   Williams?
21       A.  Yes.
22       Q.  Okay.  And that you were just going to
23   give her a copy of what you had?
24       A.  Yes.
25       Q.  Okay.  And what was his response to

Ophelia Munn-Goins - Volume I                                   Page 143

1    that?
2        A.  I should charge her.
3        Q.  That you should charge Ms. Williams?
4        A.  Yes.
5        Q.  He thought you should charge her?
6        A.  He said you should charge her for a
7    copy.  And I said, no, I'm just going to give her
8    a copy.
9        Q.  Okay.  And what did he say?
10       A.  Nothing but laughed.
11       Q.  Just laughed.  Okay.  And do you
12   remember when that conversation took place?
13       A.  Sometime in late March because I called
14   Sharon Coe in the office, and I was telling him
15   that people were afraid to ask for a copy, but it
16   was public information.  He said they shouldn't be
17   afraid.  And I said, but they are.  And that's
18   when he told me I should charge Felicia.
19       Q.  Okay.  Do you remember any other
20   discussions with Mr. Horne about it?
21       A.  Yes.
22       Q.  Okay.
23       A.  After the reprimand.
24       Q.  No.  Let's hold off on the reprimand.  I
25   will ask you about all that.  I just don't want to

Ophelia Munn-Goins - Volume I                                   Page 144

1    right now.  Any other conversations with Mr. Horne
2    before you got the information?
3        A.  Yes.  I asked him for it, and he didn't
4    give it to me.  I had not received it.
5        Q.  Okay.  So first you had this ---
6        A.  One page.
7        Q.  --- conversation -- excuse me.
8        A.  Okay.
9        Q.  Let me finish.  First you had the
10   conversation with him where you told him you
11   needed the information.  You were going to share
12   it with Ms. Williams.  He said you ought to charge
13   her for it.  You said, no, I'm not going to do
14   that.  And he laughed.  And what?  You left there
15   thinking you were going to get it?
16       A.  Eventually.
17       Q.  Okay.  You felt like it was kind of a --
18   did you feel like it was a friendly conversation?
19       A.  Yes.
20       Q.  Okay.  And then was there another
21   conversation with Mr. Horne before you actually
22   got the information?
23       A.  Yes.  When I asked him for it again.
24       Q.  Okay.  So you thought you were going to
25   get it when you left his office after that first

Ophelia Munn-Goins - Volume I                Page 145

1   conversation.  You didn't get it.  Then you went
2   back to ask for it again?
3          A.   Yes.
4          Q.   And was that in his office?
5          A.   Yes.
6          Q.   And about how long was that conversation
7   after the first conversation?
8          A.   Maybe a couple weeks.
9          Q.   Okay.  And it was in his office?
10         A.   Yes.
11         Q.   And tell me everything you remember
12  about the second conversation.
13         A.   I just remember asking, telling him that
14  I did not get it.  And he said that he would get
15  it to me, and he gave me one sheet that day, only
16  one sheet.
17         Q.   Okay.  And was it a -- you're a computer
18  person, so you know what I'm talking about.  Was
19  it an Excel spreadsheet?
20         A.   Yes.  Looked like one.
21         Q.   Okay.  And it was one page?
22         A.   Yes.
23         Q.   And do you remember was it 8« by 11 or
24  11 by 14?
25         A.   I don't remember.
11-05-08      Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                Page 146

1          Q.   Do you remember?  Okay.
2          A.   I think 8« by 11, but I don't remember.
3          Q.   Okay.  Did it have names of faculty on
4   it?
5          A.   Yes.
6          Q.   And it had salaries?
7          A.   Yes.
8          Q.   Okay.  But I take it from what you are
9   saying it didn't involve the faculty?
10         A.   No.  It didn't have staff or con ed.
11         Q.   Okay.
12         A.   It only included faculty.
13         Q.   Faculty only.  What is con ed?
14         A.   Continuing Education.
15         Q.   And what is that as opposed to -- what
16  is a con ed position as opposed to a faculty
17  position?
18         A.   Faculty are staff.  I mean, instructors
19  with con ed are support personnel, administrative.
20         Q.   Con ed is administrative?
21         A.   GED, they handle GED.  Things like that.
22         Q.   Okay.  So he didn't include that with
23  what he gave you?
24         A.   Correct.
25         Q.   Okay.  And he didn't include staff like
11-05-08      Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                Page 147

1   secretaries?
2          A.   None of theirs.
3          Q.   Or them?
4          A.   That's correct.
5          Q.   Not Mr. Horne's salary or Dr. Page's
6   salary or Dr. Geisen's salary?
7          A.   Correct.
8          Q.   So upper administration was not included
9   on this list at all?
10         A.   No staff, no executive management.
11         Q.   Okay.
12         A.   And no staff.
13         Q.   And no -- and con ed, you would include
14  in staff?
15         A.   Well, con ed is a separate department
16  basically, but then on the curriculum, on -- no
17  administrative staff were included at all.  The
18  secretary, the janitor, none of them were included
19  -- were included.
20         Q.   Okay.  And what were you planning to do
21  with that information besides share it with Ms.
22  Williams?
23         A.   Well, I always share it with Lee Anne
24  Bryan.  I use it -- Barbara Morrison was retiring.
25  There was a guy looking for a job.  So what I
11-05-08      Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                Page 148

1   would normally do when people look for a job is
2   look at the salary range.  I would not tell them
3   exactly what the person makes, but I'll say you
4   could probably get about whatever.
5          Q.   Uh-huh (yes).
6          A.   There was someone looking for a job, and
7   I was going to tell him.
8          Q.   Who is the person looking for the job?
9          A.   I think it was Ronald Lloyd at that
10  time.
11         Q.   Ron Lloyd?
12         A.   Ronald Lloyd.
13         Q.   Ronald Lloyd.  And was he a friend of
14  yours?
15         A.   Yes.
16         Q.   Okay.  How did you know Mr. Lloyd?
17         A.   High school.
18         Q.   And the lady who was leaving, what was
19  her name?
20         A.   Barbara Morrison.
21         Q.   And what was her position?
22         A.   Political science instructor, history.
23         Q.   Okay, so Mr. Lloyd was interested in Ms.
24  Morrison's job?
25         A.   He was interested in a job.
11-05-08      Munn-Goins vs. Bladen\7:08CV21        COPY

Ophelia Munn-Goins - Volume I                    Page 149

1    Q.   Any job?
2    A.   Yes.
3    Q.   Or any job within reason?
4    A.   Yes.
5    Q.   Okay.  And so you were going to share
6  this information with him so that he could decide
7  whether this was a job he could support himself
8  with and, you know, make a decent living at?
9    A.   No.  What I do is look at the scale and
10  then I was going to tell him about -- because,
11  see, she had years.  He couldn't get the same
12  amount because he didn't have 30 years, 25 years,
13  so there's no way.  But you can look at the scale
14  and see where someone has been there maybe two or
15  three years, like me and what he could qualify
16  for.
17    Q.   Okay.  But you knew what you made,
18  right?
19    A.   Yes.
20    Q.   So you needed the other people's
21  information, why?
22    A.   I didn't say I needed it.  I asked.
23    Q.   Well, you wanted it, why?
24    A.   For personal reasons.
25    Q.   But you were going to use it to share

Ophelia Munn-Goins - Volume I                    Page 150

1  with Mr. Lloyd?
2    A.   No, not like that.  No.
3    Q.   You were going ---
4    A.   I would never show that.
5    Q
6    A.   I would never show him the schedule.
7    Q.   Okay.  You were not going to show him
8  names and salaries, but you were going to show him
9  -- you were going to use that information to tell
10  him, you know, you could expect probably somewhere
11  in
12  the ballpark of X-thousand dollars a year --
13    A.   Yes.
14    Q.   -- teaching at Bladen County with your
15  experience and your background?
16    A.   Definitely.
17    Q.   Okay.  So the sheet Mr. Horne gave you,
18  wouldn't that have accomplished that purpose?
19    A.   Yes.
20    Q.   Because it was just faculty, and that's
21  what you were thinking Mr. Lloyd would want,
22  right?
23    A.   Possibly, yes.
24    Q.   Okay.  But you were thinking he might
25  also want another type of position?

Ophelia Munn-Goins - Volume I                    Page 151

1    A.   No.
2    Q.   As far as the staff in the upper
3  administration positions, why did you want that?
4    A.   Personal information, just personal to
5  know.
6    Q.   Just so you'd know?
7    A.   Yeah.
8    Q.   Okay.
9    A.   It was public.  That's why I wanted it
10  because it was public.
11    Q.   Okay.  So you had the second
12  conversation with Mr. Horne, he gave you the one
13  sheet.  Did you notice right then that it didn't
14  have everybody on it?
15    A.   Yes.
16    Q.   And did you tell him this isn't
17  complete?
18    A.   I don't remember if I did or not.
19    Q.   Okay.  Did you have any further
20  discussion at that time with Mr. Horne?
21    A.   I don't remember.
22    Q.   Okay.  May have, may not have?
23    A.   Yeah.
24  (Off-record comments)
25    A.   Yes.

Ophelia Munn-Goins - Volume I                    Page 152

1    Q.   Yes?  Okay.  Was that conversation with
2  Mr. Horne, as far as you were concerned, was it a
3  friendly conversation?
4    A.   Yes.
5    Q.   Okay.  And then did you have any other
6  conversations with Mr. Horne before you actually
7  got the information in hand?
8    A.   I don't remember.
9    Q.   Okay.  At some point, you said there was
10  an envelope in your box?
11    A.   Yes.
12    Q.   And that had the second page?
13    A.   I don't know if there was a second page,
14  but it had con ed information.
15    Q.   Okay, did it also have upper executive
16  staff information?
17    A.   No.
18    Q.   But it did have all the con ed staff?
19    A.   I don't know.
20    Q.   Oh, okay.  You don't know?
21    A.   I didn't read it that well -- all of it,
22  so I don't know.
23    Q.   Okay.  But it was different from the
24  sheet you got from Mr. Lloyd in his office?
25    A.   Yes.

SHEET 20   PAGE 153

Ophelia Munn-Goins - Volume I                    Page 153

1    Q.   And did you ever get any other sheets
2  than those two?
3    A.   No.
4    Q.   And when you got the second sheet, did
5  you get that sheet together with the first sheet
6  you had already received from Mr. Horne, the one
7  with the faculty information on it?  Did you get
8  those two pages together?
9    A.   No.
10   Q.   You never put them together?
11   A.   I didn't get them together, no.
12   Q.   I know you didn't -- excuse me.  Did you
13  put them together?
14   A.   You mean staple them together?
15   Q.   Or just have them side by --
16   A.   Oh, I'm sure I did.
17   Q.   Okay.
18   A.   I'm sure.
19   Q.   And then did you share those pages with
20  certain people?
21   A.   Yes.
22   Q.   Okay.  And who were the people you
23  shared them with?
24   A.   Felicia Williams, Lee Anne Bryan,
25  Kenneth Oxendine.

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

---

PAGE 154

Ophelia Munn-Goins - Volume I                    Page 154

1    Q.   And nobody else?
2    A.   At the same time, Felicia Williams gave
3  a copy to Ella Joe Sellers.
4    Q.   Okay.
5  (Off-record comments)
6    Q.   Now, Felicia Williams, what is her
7  position?
8    A.   Instructor at the time.
9    Q.   Okay, what does she teach?
10   A.   English.  I think she's the chair.  I
11  don't know.
12   Q.   And I can't remember if you told me
13  this, what is Ms. Bryan's position?
14   A.   Accounting.
15   Q.   In what?
16   A.   Computer science.
17  (Off-record comments)
18   Q.   And Mr. Oxendine?
19   A.   He's one of the technical.  I don't know
20  which one.  He's technical.
21   Q.   Is he a faculty member?
22   A.   Yes.
23   Q.   Okay.  And how about Ms. Sellers?
24   A.   She's English faculty.
25   Q.   Okay.  Can you tell me about -- when you

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

---

PAGE 155

Ophelia Munn-Goins - Volume I                    Page 155

1  shared this information with Ms. Williams, Ms.
2  Bryan, and Mr. Oxendine, were all four of you
3  together?
4    A.   Yes.
5    Q.   Where were you?
6    A.   In my office.
7    Q.   Okay.  Was this after hours?
8    A.   No -- well, yes, it was.  It was after
9  hours.
10   Q.   Okay.
11   A.   My work hours were over, yes.
12   Q.   Approximately, what time of day was it?
13   A.   3:15-3:30, I think.
14   Q.   Okay.  And did you call them in?
15   A.   I called Felicia.
16   Q.   Okay.  How did Ms. Bryan and Mr.
17  Oxendine join you?  How did they find out?
18   A.   Ms. Bryan had already had a copy -- had
19  already given her a copy earlier.
20   Q.   Okay.  And how about Mr. Oxendine?
21   A.   He said he overheard us talking in the
22  office, and he came back and asked for a copy.
23   Q.   Okay.
24   A.   His office is next door.
25   Q.   So he heard you all talking, he said?

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

---

PAGE 156

Ophelia Munn-Goins - Volume I                    Page 156

1    Okay.  And did you give them copies of it?
2    A.   Yes.
3    Q.   Okay.  You didn't just show it to them,
4  you actually gave them their own copies?
5    A.   I gave Felicia a copy, and then I gave
6  Kenneth Oxendine a copy.
7    Q.   Okay.  Had you given Ms. Bryan a copy
8  before?
9    A.   Yes.
10   Q.   Okay.  So they all had actual copies in
11  their hands?
12   A.   No.  Lee Anne Bryan did not.  I had
13  given her a copy earlier on.  I don't know when.
14   Q.   Right, right.  But all I'm saying is she
15  had a copy, right?  She had possession of a copy?
16   A.   Yes.
17   Q.   Because you had given her one at some
18  point?
19   A.   Yes.
20   Q.   Okay.  And Ms. Sellers was not in that
21  little conference in your ---
22   A.   She ---
23   Q.   --- office?
24   A.   --- was.
25   Q.   Oh, she was?

11-05-08    Munn-Goins vs. Bladen\7:08CV21    COPY

Ophelia Munn-Goins - Volume I                    Page 157

1      A.   She was, but I didn't give her a copy.
2      Q.   Oh okay.  So you and Ms. Williams and
3  Mr. Oxendine and Ms. Sellers were all in your
4  office?
5      A.   Well, yes, or in my doorway, yes.
6      Q.   In the doorway?
7      A.   Yes.
8      Q.   And you gave copies to -- directly to
9  Ms. Williams and to Mr. Oxendine, right?
10     A.   Yes.
11     Q.   And you had previously given a copy
12  directly to Ms. Bryan, right?
13     A.   Yes.
14     Q.   And Ms. Williams gave her copy?
15     A.   A copy.
16     Q.   So she had two copies?
17     A.   I don't know if she made a copy then or
18  what, but she passed it to Ella Joe.
19     Q.   Okay.  But that was all done in your
20  office while you were there?
21     A.   In the hallway.
22     Q.   In the hall -- or yes.  Okay.  And do
23  you remember approximately what date that was?
24     A.   No.
25     Q.   Was it April of 2006?

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 158

1      A.   I think it was.
2      Q.   Did you give out copies to anybody else
3  at any time?
4      A.   Not that I can remember.
5      Q.   Okay, you might have?
6      A.   Could have.
7      Q.   Okay.
8      A.   But I doubt it.
9      Q.   Whenever you did give out copies, would
10  you have handed them directly to the person?
11     A.   Yes.
12     Q.   You didn't put them in people's
13  mailboxes or ---
14     A.   No.
15     Q.   --- on their desks, is that right?
16     A.   Yes.
17     Q.   Okay.  So if you gave it to more people
18  than just these people we've identified, you
19  would've handed it directly to them?
20     A.   I know I gave a copy to Felicia
21  Williams, Lee Anne Bryan, Kenneth Oxendine.  No
22  other person I gave a copy to.
23     Q.   Oh, okay.  You're sure of that?
24     A.   Yes.
25     Q.   Okay.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 159

1      A.   Who else would I give a copy to?
2      Q.   Those were the only people you directly
3  gave copies to?
4      A.   Those are the only people I gave a copy
5  to.
6      Q.   Directly?
7      A.   How do you give something indirectly?
8      Q.   Well, if you gave it to Ms. Williams and
9  then Ms. Williams gave it to Ms. Sellers, it
10  ultimately came from you, right?
11     A.   So you mean indirectly giving it to Ella
12  Joe?
13     Q.   I mean, there -- it's possible it could
14  have been indirectly given to other people,
15  correct, either with or without your knowledge?
16     A.   Possible, yes.
17     Q.   Okay.  But those were the only people
18  you knew about?
19     A.   Yes.
20     Q.   Okay.  Do you remember approximately how
21  long it was -- from the day you had the little
22  gathering in your office or your doorway or the
23  hallway where you handed out these copies how long
24  it was from that time until you got a phone call
25  telling

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 160

1  you that somebody had put information in
2  mailboxes?
3      A.   I never received a phone call.
4
5      Q.   Okay, you never knew that?
6      A.   The next morning I think it was either
7  Lee Anne or Cynthia McCoy told me that they were
8  placed in the mailbox.  I said, oh, I'm going to
9  go see if they put one in my mailbox.  And I went
10  over, there was not one in my mailbox.  I saw Kay
11  Geisen that
12  morning, and she said she did not want to talk
13  about it.  That she had gotten a call about it.
14  That's all I know.
15     Q.   Okay.  So nobody called you at home ---
16     A.   No.
17     Q.   --- and told you -- can I finish my
18  question?
19          Nobody called you at your home and told
20  you the faculty pay information had been put in
21  the mailboxes?
22     A.   No.
23     Q.   Okay.  You didn't know that until you
24  came to work that day, whatever day it was?
25     A.   Yes.

11-05-08      Munn-Goins vs. Bladen\7:08CV21      COPY

Ophelia Munn-Goins - Volume I                    Page 161

1    Q.   Okay.  Does April 27th sound right to
2  you, April 27th, 2006?
3    A.   If I look at a calendar, but I can't
4  tell you if that was the day or not.
5    Q.   Does that sound approximately like when
6  it would've happened, late April of 2006?
7    A.   It was probably April 2006, yes.
8    Q.   Okay.  So you came to work on whatever
9  morning this was, right?
10   A.   Yes.
11   Q.   And you didn't know anything had
12 happened, right?
13   A.   Right.
14   Q.   And you walked in and tell me what
15 happened first thing?
16   A.   Nothing happened first thing.  I went to
17 my class.  I did what I normally do.  I was
18 scheduled ---
19   Q.   You just taught your class?
20   A.   Well, I don't know what time it was, so
21 I can't say that it was before my first class or
22 my second class.  And then I can't tell you what
23 day of the week it was on because it would depend
24 upon what time I came in.  I don't know that
25 without looking at a calendar, and -- and I don't

---

Ophelia Munn-Goins - Volume I                    Page 162

1  remember -- I think it was Lee Anne who said that
2  it could have been Cynthia.  One of them told me
3  ---
4    Q.   Well, yes, but I want to back you way
5  up.  Because I want to know -- you walked in the
6  door on whatever day this was.  It was a big day,
7  right?
8    A.   Not to me.
9    Q.   It wasn't to you?
10   A.   No.
11   Q.   Okay.  So you walked in, you heard from
12 somebody that information had been put in
13 mailboxes?
14   A.   Yes.
15   Q.   Okay.  Who did you hear that from?
16   A.   I don't know if it was Lee Anne or
17 Cynthia.  Someone I saw that morning.
18   Q.   Someone told you?
19   A.   But it was not significant to me so.
20   Q.   Okay ---
21   A.   I didn't ---
22   Q.   Did the person who told you seem
23 concerned at all?
24   A.   No.
25   Q.   Okay.  Were you noticing a lot of

---

Ophelia Munn-Goins - Volume I                    Page 163

1  buzzing and talking going on among the faculty or
2  the employees?
3    A.   No, I'm in the building with three other
4  people.
5    Q.   Okay.  So it was quiet?
6    A.   Yeah.
7    Q.   Okay.  And you might have taught a
8  class?
9    A.   Yes.
10   Q.   Was there a time later in the day that
11 you realized this was more of a problem than you
12 thought originally?
13   A.   I never saw it as a problem, period.
14   Q.   Did you ever see any signs that it was a
15 problem for other people?
16   A.   No -- oh yeah, Dr. Geisen appeared like
17 it was a problem to her.
18   Q.   Okay.  When did you first see Dr. Geisen
19 that day?
20   A.   That morning when I went over to see if
21 a copy was in my mailbox.
22   Q.   Okay.  And about what time was that?
23   A.   I think it was like ten, but I don't
24 know.
25   Q.   Okay.  Roughly...

---

Ophelia Munn-Goins - Volume I                    Page 164

1    A.   It was morning.
2    Q.   Mid-morning?  Okay.  And when you went
3  over there Dr. Geisen was there?
4    A.   Yes.
5    Q.   And she seemed upset?
6    A.   Yes.
7    Q.   Okay.  Did she seem angry?
8    A.   Well, the way she's looking now.  I
9  don't know if that's anger.
10   Q.   For the record, I don't know what that
11 means.
12   A.   I don't either.
13        MR. GRESHAM:  Well, let's see.  Ms.
14 -- Dr. Geisen has her arms folded and is -- there
15 you
16 go.
17        THE WITNESS:  I can't tell you.
18   Q.   (Ms. Shea)  Was her face red?
19   A.   No.
20   Q.   Was she yelling?
21   A.   No.
22   Q.   Did she have tears in her eyes?
23   A.   No.
24   Q.   Was her voice shaking?
25   A.   No.

Ophelia Munn-Goins - Volume I                    Page 165

1    Q.    Okay.  Was she -- Did you discern she
2    was upset because of what she said versus the way
3    she acted or looked?
4    A.    I think it was the way she did her hands
5    like -- something like -- I don't know what she
6    did that morning.  I saw her, and she said
7    something about she is going to get to the bottom
8    of this.  She made some comment.
9    Q.    She said something about wanting to get
10   to the bottom of this?
11   A.    She made some comment.
12   Q.    Okay.  And that wasn't a very warm and
13   fuzzy comment, right?
14   A.    No, it was not.
15   Q.    That she was going to get to the bottom
16   of something.  Okay.  And you -- for the record,
17   you were showing your hands being spread out and
18   that was the way Dr. Geisen's hands were?
19   A.    No, t was down though.  Her hands were
20   down.  They weren't up here.  They were like down
21   like that.
22   Q.    Okay.
23   A.    Yes.
24   Q.    But were her fingers apart?
25   A.    Fingers were apart.

---

Ophelia Munn-Goins - Volume I                    Page 166

1    Q.    On both hands?
2    A.    If I remember correctly.
3    Q.    And she said she was going to get to the
4    bottom of this?
5    A.    Yeah.
6    Q.    And did you know what she was talking
7    about?
8    A.    No, not -- I thought I knew what she was
9    talking about because when I looked for a copy in
10   my mailbox and didn't see it, I told her I said, I
11   just came over to see if there was a copy in my
12   mailbox.  So I assume that's what she was talking
13   about.
14   Q.    Okay.  So you thought she was talking
15   about the pay information being in people's
16   mailboxes?
17   A.    Yes.
18   Q.    Okay.  And did she say anything back to
19   you?
20   A.    Other than that, no.
21   Q.    Were other people around?
22   A.    There were two other people in the mail
23   room.  I don't -- I think the one was Lucinda, and
24   I don't know who the other person was.
25   Q.    Were they in a position to hear what was

---

Ophelia Munn-Goins - Volume I                    Page 167

1    going on?
2    A.    I don't know.  My back was turned.  I
3    mean, I just went in, came out.
4    Q.    Okay.
5    A.    And I saw her as I was leaving the
6    mailbox.
7    Q.    So you don't remember any comments or
8    anything from them?
9    A.    No.
10   Q.    And you're not even sure they knew what
11   was going on?
12   A.    Correct.
13   Q.    Okay.  And you had looked in your
14   mailbox and there was not a copy in your mailbox?
15   A.    Correct.
16   Q.    Okay.  What was the next thing you heard
17   about this issue that day?
18   A.    There was a meeting.  I think that was
19   the same day.  There was a meeting in the
20   conference -- in the theater sometime that day.
21   Q.    Okay.  Was that in the afternoon?
22   A.    I don't know.
23   Q.    Okay.  Was this a meeting called by Dr.
24   Geisen?
25   A.    Yes, I think.

---

Ophelia Munn-Goins - Volume I                    Page 168

1    Q.    And was it a meeting of all faculty and
2    staff?
3    A.    I'm not sure because we had a meeting.
4    I'm not sure.
5    Q.    Okay.  Do you remember a lot of people
6    being there?
7    A.    I don't, no.
8    Q.    Do you remember that there were hardly
9    any people there?
10   A.    No.  I know faculty was there.
11   Q.    So when you say a lot of people, I
12   consider that faculty, staff, and everybody.  But
13   if you remember all faculty was there, probably
14   all faculty.  And that's less -- there was
15   probably 30-some people.
16   Q.    Okay.  So at least 30-some people were
17   there?
18   A.    I think so.
19   Q.    Okay.  And can you tell me everything
20   you remember about what was said at that meeting?
21   A.    No.  I don't remember.
22   Q.    You don't remember anything?
23   A.    No.
24   Q.    Okay.  Nothing?
25   A.    No.

Ophelia Munn-Goins - Volume I                    Page 169

1    Q.  How long was the meeting, if you
2    remember?
3        A.  In my head I'm mixing a couple of
4    meetings together, so I'm not sure.  Unless I look
5    at something physically to see the date to see
6    something, I can't recollect something.  I'm thinking
7    about the meeting that everyone attended in the
8    auditorium.
9            But Dr. Page I think called that
10   meeting, so I'm not sure.  And he talked about the
11   pay scale.  That it was public information, and
12   they didn't cause some hardship -- or hard
13   feelings with somebody.  He didn't say who.
14       Q.  Okay.
15       A.  But I think that was a different
16   meeting.
17       Q.  Okay.  So what you're saying is there
18   was one meeting with Dr. Geisen in charge?
19       A.  Yes.
20       Q.  And another meeting with Dr. Page in
21   charge?
22       A.  Yes.
23       Q.  And you're not sure which was which, but
24   you believe that the meeting with Dr. Page had all
25   faculty and staff there?

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

---

PAGE 171
Ophelia Munn-Goins - Volume I                    Page 171

1    Q.  And that people had a right to it?
2        A.  Yes.
3        Q.  Okay.  Was that being passed out because
4    there was a -- were people upset at either of
5    these meetings?
6        A.  I didn't see anyone upset.  I didn't see
7    anyone upset.  She did say that people were upset
8    at that meeting and said she was going to do an
9    investigation.
10       Q.  Okay.
11       A.  In her meeting.
12       Q.  And that's Dr. Geisen ---
13       A.  In her meeting.
14       Q.  --- you're talking about?
15       A.  Yes.
16       Q.  Okay.  The meeting with Dr. Page was
17   later?
18       A.  Yeah, it was later.
19       Q.  Okay.  And do you have any idea how much
20   later?
21       A.  No.
22       Q.  Okay.  So as far as Dr. Geisen's meeting
23   is concerned, you believe just faculty were there.
24   You believe she passed out something indicating
25   that this pay information was public?

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

---

PAGE 170
Ophelia Munn-Goins - Volume I                    Page 170

1        A.  Exactly.
2        Q.  Okay.  And the meeting with Dr. Geisen
3    might have been just all faculty?
4        A.  Yes, I think.
5        Q.  Okay.
6        A.  There might have been some con ed people
7    there, but I don't remember seeing.
8        Q.  And in the meeting with Dr. Geisen, you
9    do not remember anything that was said?
10       A.  I think that's the same meeting that she
11   said that it was public information and passed out
12   a sheet.  But I don't know if that was the meeting
13   with
14   Dr. Page.
15       Q.  Somebody said that at one of the two
16   meetings.
17       A.  Yes.  So that might have been her
18   meeting, and they passed out a sheet showing it
19   was public information.  So that may have been the
20   meeting she had.  So both meetings came kind of
21   close.
22       Q.  Okay.  So at one of these meetings,
23   whoever was presiding over it, passed out a sheet
24   of paper saying that this was public information?
25       A.  Yes.

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

---

PAGE 172
Ophelia Munn-Goins - Volume I                    Page 172

1        A.  Yes.
2        Q.  And you recall her saying that people
3    were upset that information -- I mean, did you
4    have the impression that information had been
5    given out to everybody at the school?
6        A.  No.
7        Q.  You did not have that impression?
8        A.  No.
9        Q.  Okay.  Did you ever get that impression
10   at some later point?
11       A.  No.  Never
12       Q.  You never had that impression?
13       A.  No.
14       Q.  Okay.
15       A.  And it wasn't that she was upset about
16   the pay scale.  Upset because something was
17   written on the pay scale.  And I never saw it, so
18   I don't know what she was upset about.
19       Q.  Okay.  Was it said at either of these
20   meetings that somebody had written "unfair" and
21   "inequity is amazing" and things like that?
22       A.  I've never heard inequity is amazing  or
23   it was unfair.  That was her meeting.
24       Q.  Okay.
25       A.  She mentioned that.

11-05-08     Munn-Goins vs. Bladen\7:08CV21     COPY

Ophelia Munn-Goins - Volume I                    Page 173

1    Q.    Okay.
2    A.    About something that...
3    Q.    Okay.  Have you told me everything you
4    remember about Dr. Geisen's meeting?
5    A.    Probably not, but I don't know which
6    meeting I'm referring to.  See because I can't, in
7    my head, decipher which was one day, which was the
8    next.
9    Q.    Have you told me everything you remember
10   about Dr. Page's meeting?
11   A.    I'm sure I didn't.
12   Q.    Okay.  Then what I'd like -- what you're
13   saying is the only way you can testify about what
14   went on in these meeting is to kind of do a
15   composite.  Is that right?
16   A.    No.  What I'm telling you is, I -- I
17   can't see dates, I can't see the time frame.  I
18   know what happened those days.  But if I can see a
19   date, I can tell you in her meeting people, left
20   out buzzing.  I know that.  I remember that.
21   Q.    People left Dr. Geisen's meeting
22   buzzing?
23   A.    Buzzing.
24   Q.    With each other?
25   A.    Yeah.

Ophelia Munn-Goins - Volume I                    Page 174

1    Q.    Talking about it?
2    A.    And I -- I never saw anything written on
3    anything, so I don't know what she was referring
4    to.
5    Q.    But she said that unfair was written on
6    something?
7    A.    She did say unfair was written it.  She
8    said comments. or somebody wrote on it, they said.
9    Q.    Okay.
10   A.    And put it -- it wasn't in every box and
11   said that she had received a phone call from
12   someone.  I later found out -- they said it was
13   Ann Russell.  And then -- because I did make a
14   comment to somebody.  Well, common sense would
15   have been to tell her take them out of the boxes
16   if it was an issue.  That would have been my
17   spiel.
18   Q.    That was your thought?
19   A.    Yeah.  That was my thought.  If it was
20   an issue, you know, take them out of the box.
21   People are at home, because I heard she received a
22   call that night at home.
23   Q.    And you remember she said that there was
24   going to be an investigation ---
25   A.    Yes.

Ophelia Munn-Goins - Volume I                    Page 175

1    Q.    --- as to who did that?
2    A.    Yes.
3    Q.    Okay.  And anything else you remember?
4    And people were buzzing as they left the room?
5    A.    Yeah, people were talking.  Several
6    people talked.  And then a couple days later
7    people are still talking and buzzing.  And someone
8    came to talk to me, but I don't think it was that
9    day.  I think it was the next day or a couple days
10   later.
11   Q.    Okay.  And then do you -- what all do
12   you remember about the meeting that Dr. Page
13   presided over?
14   A.    He appeared to be upset, and he talked
15   about -- I think he reinforced that it was public
16   information, and it upset some people.  I really
17   didn't pay much attention.  I apologize.  I had
18   heard it.  Dr. Geisen already told us about it,
19   and then his meeting he was reiterating the same
20   thing.  I don't think the meeting was very long.
21   Q.    Okay.  Like 15 minutes?
22   A.    I don't remember.  I just know that it
23   didn't appear to be long.
24   Q.    Okay.  Less than an hour?
25   A.    Yes.

Ophelia Munn-Goins - Volume I                    Page 176

1    Q.    Okay.  Less than half an hour?
2    A.    Probably.
3    Q.    Uh-huh (yes).  And you've told me
4    everything you remember about either of these
5    meetings even if you don't remember exactly which
6    meeting it occurred in?
7    A.    Yes.
8    Q.    Okay.  Do you remember anything else
9    related to this issue until you got called in to
10   be interviewed for the investigation?
11   A.    Yes.
12   Q.    Okay, what do you remember in between
13   there?
14   A.    A lot of people coming to me talking to
15   me about it.  I remember someone coming to me and
16   saying they think -- first, she said, well, I
17   might know who did it.  I understand that they
18   know it was not me.
19   Q.    Who said that?
20   A.    Ella Joe Sellers.  And I wanted her to
21   go see Dr. Page and tell him because she didn't
22   feel comfortable talking to Dr. Geisen.  Because I
23   thought he was -- would listen to her and be
24   compassionate.
25   Q.    And you did not tell anybody what Ella

Ophelia Munn-Goins - Volume I                    Page 177

1   had said to you at that time?
2       A.   No.
3       Q.   Okay.  Did anybody else come to you and
4   make comments like that?
5       A.   No.
6       Q.   Okay.  Did Ella Joe Sellers in that
7   first conversation where she said she put it in
8   mailboxes?
9       A.   She didn't tell me in the first
10  conversation.
11      Q.   She didn't say that.  Okay.  What did
12  she say?
13      A.   She was just saying that if she knew who
14  did it, she wouldn't know what to do.  Ad it
15  wasn't her, and she felt bad.  It was on the
16  second conversation we had that she said.  And I
17  told her if you know who did it, then just go tell
18  Dr. Page.
19      Q.   She said that if she knew who did it,
20  she wouldn't know what to do?
21      A.   Right.  If she knew, she wouldn't know
22  what to do.
23      Q.   Okay.  Did you have reason to believe
24  that Ms. Sellers was uncomfortable with Dr. Geisen
25  for some reason?

Ophelia Munn-Goins - Volume I                    Page 178

1       A.   Not really, it's just that I've known
2   Dr. Page longer, so I just...
3       Q.   Okay.  So it wasn't any disrespect to
4   Dr. Geisen?
5       A.   No.
6       Q.   You just had known Dr. Page for a long
7   time and felt like he'd be understanding?
8       A.   Yes.
9       Q.   Okay.  And you didn't take this anywhere
10  yourself?
11      A.   No.
12      Q.   This information?  Okay.  And then did
13  you talk to anybody else before you got called in
14  for the interview?
15      A.   Yes.
16      Q.   Who else?
17      A.   Cynthia McCoy, Lee Anne Bryan.
18  Different people talked about it, but everyone
19  that I talked to, I just mentioned to Cynthia what
20  was said to me.  And Ella Joe said she didn't
21  write on anything and put it in a box.  Now, she
22  said she didn't write on
23  anything and put it in the box so that implies she
24  did not put it in the box is what I thought
25  initially.

Ophelia Munn-Goins - Volume I                    Page 179

1       Q.   Okay.  So she did -- the first time you
2   talked to her, she denied writing anything on the
3   document?
4       A.   She has always denied writing anything
5   on the document.
6       Q.   Right, but did she deny it in that first
7   conversation with you?
8       A.   Yeah.  She said she didn't write
9   anything and put it in the box.
10      Q.   And so you took that to mean she hadn't
11  put it in the boxes either?
12      A.   Right.
13      Q.   Okay.  And as far as Cynthia McCoy and
14  Ms. Bryan, what was the nature of your discussions
15  with them?
16      A.   Just that, you know, anyone couldn't
17  have done it.
18      Q.   They didn't say they had done it, right?
19      A.   No.
20      Q.   Is there anybody else you remember
21  talking to before the investigation began?
22      A.   Yeah, I'm sure I talked to Kenneth.  I'm
23  sure.  I don't -- I mean, what conversation I had
24  with him other than like we don't know who put it
25  in the box basically.

Ophelia Munn-Goins - Volume I                    Page 180

1       Q.   Okay.  So all those conversations would
2   be just like we don't know who did it?
3       A.   Right, and no one knew who wrote on it
4   or what was written on it other than that -- I
5   only know the one comment about something being
6   unfair.
7       Q.   Uh-huh (yes).
8       A.   That was it.
9       Q.   And as of this point you had never seen
10  the document that was found in the mailboxes,
11  right?
12      A.   That's correct.
13      Q.   Okay.  Any other discussions with
14  anybody before you were called in for your
15  interview?
16      A.   Yeah, with Ella Joe.
17      Q.   Another one with Ella Joe?
18      A.   With Ella Joe.
19      Q.   Okay.  And tell me about that.
20      A.   And she explained how bad she felt
21  because she had put it in the box.  But she never
22  put anything in the box with writing on it and a
23  couple of boxes only.
24      Q.   This was before your interview?
25      A.   Yes.