# OPHELIA MUNN-GOINS - VOLUME II

## SHEET 1  PAGE 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

CASE NO. 7:08-CV-21

OPHELIA MUNN-GOINS,              )
                                 )
              Plaintiff,         )
                                 )
    vs.                          )  D E P O S I T I O N
                                 )
BOARD OF TRUSTEES OF BLADEN      )
COMMUNITY COLLEGE, DARRELL PAGE, )
in his individual and official   )
capacity, and DR. KATHRYN GEISEN in )
her individual and official capacity) )
                                 )
              Defendants.        )
-----------------------------------


OPHELIA MUNN-GOINS - VOLUME II


TAKEN AT THE LAW OFFICES OF:
FERGUSON STEIN CHAMBERS GRESHAM & SUMTER, P.A.
312 West Franklin Street
Chapel Hill, NC 27516


11-06-08
10:34 O'CLOCK A.M.


Dale L. Ring
Court Reporter

Chaplin & Associates
                              P. O. Box 407
                              Kernersville, NC 27285-0407
                              (336) 992-1954

## PAGE 2

Ophelia Munn-Goins Volume II                    Page 2

ATTORNEY NOTES

PAGE LINE    SUBJECT MATTER    RELATES TO    ACTION

11-06-08    Munn-Goins v. Board of Trustees\7:08CV21    COPY

## PAGE 3

Ophelia Munn-Goins Volume II                    Page 3

APPEARANCES OF COUNSEL

Robin E. Shea, Esquire
CONSTANGY BROOKS & SMITH, LLC
100 North Cherry Street, Suite 300
Winston-Salem, NC  27101

John W. Gresham, Esquire
FERGUSON STEIN CHAMBERS GRESHAM & SUMTER, P.A.
741 Kenilworth Avenue, Suite 300
Charlotte, NC  28204


OTHER APPEARANCES

Kay Geisen
Darrell Page
Lloyd Horne

11-06-08    Munn-Goins v. Board of Trustees\7:08CV21    COPY

## PAGE 4

Ophelia Munn-Goins Volume II                    Page 4

I N D E X

STIPULATIONS                                      6
EXAMINATION
   By Ms. Shea                                    7


ADJOURNMENT                                       97
REPORTER CERTIFICATE                              98

E X H I B I T S

| Name | Offered By | Identified |
| --- | --- | --- |
| Exhibit Number 30<br>(Second page of pay information of all employees of college) | Ms. Shea | 7 |
| Exhibit Number 31<br>(Dr. Geisen's notes) | Ms. Shea | 9 |
| Exhibit Number 32<br>(Letter from Mr. Gresham dated 12-06) | Ms. Shea | 25 |
| Exhibit Number 33<br>(Letter from Mr. Gresham dated 3-23-06) | Ms. Shea | 28 |
| Exhibit Number 34<br>(Letter from Darrell Page to Ms. Munn-Goins dated 4-30-07) | Ms. Shea | 33 |
| Exhibit Number 35<br>(Unofficial transcript of Ophelia Munn-Goins) | Ms. Shea | 42 |
| Exhibit Number 36<br>(Classified ad dated 6-23-07) | Ms. Shea | 51 |
| Exhibit Number 37<br>(Classified ad dated 10-9-07) | Ms. Shea | 55 |

11-06-08    Munn-Goins v. Board of Trustees\7:08CV21    COPY

Ophelia Munn-Goins Volume II                    Page 5

E X H I B I T S Continued

| Name | Offered By | Identified |
|------|-----------|-----------|
| Exhibit Number 38 (Classified ad dated 10-9-07) | Ms. Shea | 58 |
| Exhibit Number 39 (Application for employment) | Ms. Shea | 61 |

Ophelia Munn-Goins Volume II                    Page 6

STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Dale L. Ring, Notary Public in and for the County of Forsyth, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony was waived.

Ophelia Munn-Goins Volume II                    Page 7

1    The witness, OPHELIA MUNN-GOINS, being
2  first duly sworn to state the truth, the whole
3  truth, and nothing but the truth, testified as
4  follows:
5        (10:34 o'clock a.m.)
6            EXAMINATION
7  BY MS. SHEA:
8        Q.  Hi, Ms. Munn-Goins.  We are resuming
9  your deposition today.  And I guess, before I get
10  started on anything, do you want to change or
11  amplify or add to or subtract from anything you
12  testified to yesterday?
13        A.  No.
14            (DEPOSITION EXHIBIT
15             NUMBER 30 WAS MARKED
16             FOR IDENTIFICATION)
17        Q.  Okay.  I'm going to hand you and Exhibit
18  that will be marked Exhibit 30, and I'm going to
19  hand it to you with yesterday's Exhibit Six, okay?
20        A.  Uh-huh (yes).
21        Q.  Okay.  Take a minute and look at Exhibit
22  30, if you will.
23  (Witness examined document)
24        A.  Okay.
25        Q.  And you had testified yesterday, I

Ophelia Munn-Goins Volume II                    Page 8

1  believe, that you talked to Mr. Horne in his
2  office about wanting the pay information for, I
3  guess, all employees of the college, right?
4        A.  Yes.
5        Q.  And he gave you one page in his
6  office ---
7        A.  Yes.
8        Q.  --- do you remember that?
9            And then you said at some later point a
10  second page was in your mailbox in an envelope.
11        A.  Yes.
12        Q.  Okay.  Is Exhibit 30 the second page,
13  ignoring the handwriting that's on it right now?
14        A.  And ignoring some of this other stuff.
15  It wasn't this format, but it was close.
16        Q.  Oh, okay.  What was different about the
17  format of the document you received?
18        A.  Half of the information on this side
19  (indicated), half on this side (indicated).
20        Q.  I'm sorry?
21        A.  Half -- names on this side (indicated)
22  and pay information on this side (indicated).
23        Q.  Okay.  So, the document you received
24  actually had -- it was a full eight and a half by
25  11 Excel spreadsheet or something that looked like

1    Excel?
2         A.   Close, yes.
3         Q.   And the names were on the  far left-hand
4    side of the sheet?
5         A.   Yes.
6         Q.   And the pay information  was on the  far
7    right-hand side of the sheet?
8         A.   Well, not completely,  but on the right,
9    yes.
10        Q.   And obviously, there was  no handwriting
11   on it, right?
12        A.   Right.
13        Q.   On what you got.  Is the information on
14   Exhibit 30 the same as the information that was on
15   the second page you got in your mailbox?
16        A.   It appears to be, but I can't be sure.
17        Q.   Okay.  It appears to be?
18        A.   Yes.
19        Q.   Okay.   And you  did not write that
20   handwriting on that page, is that correct?
21        A.   No,  I did  not write on  any of  these
22   papers.
23        Q.   Okay.
24            (DEPOSITION EXHIBIT
25            NUMBER 31 WAS MARKED

1            FOR IDENTIFICATION)
2            I'm going  to hand you now  what will be
3    marked as  Exhibit 31.   And I know you didn't
4    generate this document.  This is some notes from
5    Dr. Geisen's investigation of the pay information
6    incident, okay?
7         A.   Okay.
8         Q.   What I want  you to do -- I know  you
9    didn't write this, but there is  a description of
10   Dr. Geisen's interview with you that's  on all of
11   page one  and about a  quarter of the  way through
12   page two.  And what I'd like for you to do is just
13   read that section, all  of page one  and the top
14   quarter of page two,  and let me know whether  you
15   agree that what she  wrote is what happened during
16   your interview, okay?
17        A.   Uh-huh (yes).
18        Q.   Does that make sense?
19        A.   Uh-huh (yes).
20        Q.   Okay.
21        A.   Yeah.
22        Q.   And take your time reading that?
23   (Off-record comments)
24   (Witness examined document)
25            THE WITNESS:  Okay.

1         Q.   (Ms. Shea)   Okay.   Have you read the
2    section in Exhibit 31 that pertains to you?
3         A.   Yes.
4         Q.   And do you agree that  that accurately
5    summarizes your  meeting with Dr.  Geisen on May
6    1st, 2006?
7         A.   No.
8         Q.   Can  you tell me each point  that you
9    disagree with?
10        A.   When she said -- states that, "She could
11   see that  it was the  writing,  inequitable and
12   unfair on  the copies  that had  been" -- I  never
13   knew about the word inequitable.
14        Q.   Okay.
15        A.   I'd  heard the word  unfair, but never
16   inequitable.
17        Q.   Okay.
18        A.   I'd  never heard that.   And she --  I
19   mean, I probably said that.  I'm not going to deny
20   that.  And so it was Sandra Guyton who said
21   something's probably true.  I don't know  how --
22   Sandra Guyton was a  person who was  skilled in a
23   position with a GED,  just going to college for  a
24   social degree or something.  So, I  just ignored
25   her comments, because I didn't think she knew what

1    she was talking about anyway.
2         Q.   Okay.  Is there anything else that  you
3    disagree with, that you think inaccurately ---
4         A.   Oh, no.  When it  say fold, yeah, I  did
5    fold, but not  like that.   That's not  the way I
6    fold, no.
7         Q.   Okay.
8         A.   It said I folded ---
9         Q.   Just so we have a transcript that  will
10   make sense,  can you slow  down a little  bit with
11   your answers?
12        A.   Yes.
13        Q.   Okay.  You're referring to Exhibit ---
14        A.   Thirty.
15        Q.   --- 30, which was page two -- the second
16   page of  the document --  at  least has  the
17   information, I should say,  that was on the  second
18   page of the document that  you received in your
19   mailbox from Mr. Horne, right?
20        A.   Correct.
21        Q.   And -- okay.  Now, can  you back up  a
22   little bit and tell me  a little more slowly  what
23   you're disagreeing with in that summary?
24        A.   I'm not -- I'm not disagreeing  with
25   anything at this point, other  than what I said

PAGE 13

Ophelia Munn-Goins Volume II                    Page 13

1    about being unfair and inequitable.
2         Q.   Okay.
3         A.   That term I never used.
4         Q.   Okay.
5         A.   Because I didn't know about it.
6         MR. GRESHAM:   What she said is she
7    did not fold the document as that document is
8    represented.
9         Q.   (Ms. Shea)  You did not fold a document?
10        A.   That's not what I said.
11        Q.   Okay.
12        A.   I did not fold it the way it's
13   represented here.
14        Q.   The way it's folded in Exhibit 30?
15        A.   Correct.
16        Q.   And for the record, Exhibit 30 is not
17   folded at all, right?
18        A.   Well, the data is.  The information is
19   folded.
20        Q.   Let me -- I'm just going to go slow so
21   we can do it through the transcript, okay?  I'm
22   not disagreeing with you or arguing with you.  I
23   just want to take it step by step so we'll have a
24   transcript that makes sense, okay?
25        A.   Okay.

PAGE 14

Ophelia Munn-Goins Volume II                    Page 14

1         Q.   Okay.  That exhibit is not folded,
2    right?
3         A.   Correct.
4         Q.   That piece of paper, okay.  But what
5    you're saying is that it appears that the
6    information was folded before it was photocopied,
7    right?
8         A.   Yes.
9         Q.   Okay.  Anything else?
10        A.   Well, it said I gave a copy to Ella Jo
11   Sellers.  And I agree, I at least did give the
12   copy to Ella Jo, but she was there at the same
13   time.  I'm not denying I didn't say it, because I
14   may have.
15        Q.   Okay.  Okay.  So, is that everything you
16   disagree with?
17        A.   Basically, yes.
18        Q.   Okay.  Now, you were not present in the
19   interviews of the other employees, were you?
20        A.   No.
21        Q.   Did any of the other employees tell you
22   what took place in their interviews?
23        A.   Let me back up.
24        Q.   Okay.
25        A.   Can I look at that?  It said I was

PAGE 15

Ophelia Munn-Goins Volume II                    Page 15

1    called.  I was not called.  Someone came to our
2    office and told me about it.  It was either
3    Cynthia McCoy or Lee Anne Bryan.  I was not
4    called.
5         Q.   Okay.
6         A.   But it said called.
7         Q.   And that's why yesterday I asked you if
8    somebody had called you at home and you said no.
9    You said you found out about it when you got to
10   work that day.
11        A.   Correct.
12        Q.   Okay.
13        A.   So, no, I was not called.
14        Q.   Okay.
15        A.   That's incorrect.
16        Q.   And you did not tell Dr. Geisen that?
17        A.   No.
18        Q.   Okay.
19        A.   I wouldn't have told her that.
20        Q.   Okay.  Anything else?
21        A.   Nothing I saw at the moment.
22        Q.   Okay.  If you think of something later
23   on, feel free to say so, okay, and we can go back
24   to that.
25        A.   Okay.

PAGE 16

Ophelia Munn-Goins Volume II                    Page 16

1         Q.   Now, I guess, I think I was starting to
2    ask you, did Ella Jo Sellers or Felisa Williams or
3    any of the people -- Kenneth Oxendine, did they
4    talk to you about what took place in their
5    interviews?
6         A.   I don't remember.
7         Q.   Did any of the people who were
8    interviewed talk to you about what took place in
9    their interviews?
10        A.   I'm sure Lee Anne did, because she and I
11   talked about almost everything.
12        Q.   And do you remember what Lee Anne told
13   you?
14        A.   No.
15        Q.   Okay.  Do you remember what you said to
16   her?
17        A.   No.
18        Q.   Okay.
19        A.   You mean that day?  On that day?
20        Q.   I mean at any time if you had a
21   discussion with any of these people about their
22   interviews with the interview team?
23        A.   Oh, yeah.  Eventually, we all talked,
24   yes.
25        Q.   Okay.

Ophelia Munn-Goins Volume II                          Page 17

1    A.   About what, I don't know.   We just
2  talked.
3    Q.   Okay.  I mean, should we ---
4    A.   Questions were asked.
5    Q.   Can you hand me back that exhibit,
6  please?
7              MR. GRESHAM:   You can keep that
8  copy if you want, and I'll give her -- since I was
9  going to use ---
10             MS. SHEA:  That will work.
11             MR. GRESHAM:  Okay.
12   Q.   (Ms. Shea)  Okay.  According to this
13 document, the next person interviewed was Ella Jo
14 Sellers, right?  That's what this document says?
15   A.   Yes.
16   Q.   Okay.  You don't know that for a fact,
17 right?
18   A.   No.
19   Q.   Okay.  And you were not present during
20 Ella Jo Sellers's interview, right?
21   A.   Right.
22   Q.   And we know that you did have some
23 discussions with Ella Jo Sellers about her putting
24 a letter somewhere -- leaving a letter for Dr.
25 Geisen saying that she was the one who had put

11-06-08    Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                          Page 18

1  some of the information in mailboxes, right?
2    A.   Yes.
3    Q.   Apart from that, which you already
4  testified about yesterday, do you remember having
5  any conversations with Ella Jo Sellers about what
6  took place in her interview?
7    A.   Yes.
8    Q.   What did she tell you?
9    A.   She told me that she did not say that
10 she put it in the box.
11   Q.   Okay.
12   A.   That's all I remember.
13   Q.   She told you she didn't say that she put
14 it in the box?
15   A.   Correct.
16   Q.   Okay.  And -- okay.
17   A.   Oh, no.  She did say about no one
18 complaining.  Everyone denied hearing any
19 complaints.
20   Q.   And she had told you that, too?
21   A.   Yes.
22   Q.   I tell you what, why don't you just read
23 the description of the Ella Jo Sellers interview
24 and tell me how much of that you knew before you
25 got this document through this lawsuit.

11-06-08    Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                          Page 19

1  (Witness examined document)
2    A.   That's about all I knew, what I just
3  said.
4    Q.   Okay.  So, when you had conversations
5  with her about her interview, she essentially told
6  you what this summary says, right?
7    A.   No.  She -- actually told me, she said
8  she did not know who put it in the box and that
9  she did not know of anyone being upset about it or
10 complaining.  That's all she said.
11   Q.   Okay.  She didn't tell you anything
12 else?
13   A.   Not that I'm aware.
14   Q.   Until June when she talked to you about
15 she was really the one who put the information in
16 the boxes?
17   A.   Right.
18   Q.   Later, she told you that?
19   A.   That's correct.
20   Q.   I'm going to ask you the same thing
21 about Kenneth Oxendine.  And I think maybe the
22 most efficient way to do this is for you to just
23 read what the interview notes say about Kenneth,
24 and then I'll ask you a couple of questions about
25 him.

11-06-08    Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                          Page 20

1  (Witness examined document)
2    Q.   (Ms. Shea)  Have you had a chance to
3  read the summary of the Kenneth Oxendine
4  interview?
5    A.   Yes.
6    Q.   Okay.  Did Mr. Oxendine talk to you
7  privately about any of what's in this summary?
8    A.   Yes.
9    Q.   Okay.  Is this summary consistent with
10 what Mr. Oxendine told you?
11   A.   No.
12   Q.   What's different?
13   A.   He only told me that he said -- told
14 them that he asked me for a copy of the salary
15 sheet.  That's all he told me.  I don't know about
16 the rest of that.
17   Q.   Okay.  And I don't remember which
18 exhibit number it is right off hand, but there was
19 an email where he -- that we looked at yesterday.
20   A.   In June.
21   Q.   In June, and he told you -- he asked you
22 for a copy, right?
23   A.   Yes.
24   Q.   And he said that's what he told the
25 committee?

11-06-08    Munn-Goins v. Board of Trustees\7:08CV21   COPY

1    A.  Yes.
2        Q.  And is that what you're referring to?
3    A.  Yes.  That's all I'm aware of.
4        Q.  That's the only communication you ever
5    had with Kenneth ---
6    A.  Yes.
7        Q.  --- Oxendine about this issue?
8    A.  Yes.
9        Q.  Okay.  Now, if you'll go on, right below
10   Kenneth Oxendine is Felisa Williams.  And if
11   you'll read that, I'll ask you questions about
12   that one.
13   (Witness examined document)
14   A.  Okay.
15       Q.  Okay.  You've read the summary of the
16   Felisa Williams interview?
17   A.  Yes.
18       Q.  Did Ms. Williams talk to you about
19   anything that's in this written summary?
20   A.  I don't think so.  Not at all.
21       Q.  Did she tell you anything that conflicts
22   with what's in this written summary?
23   A.  No.  I had one conversation with Felisa
24   about it in general speaking, and she said she
25   didn't know who had put it in the box.  That's it.

1        Q.  Okay.  And then finally, on the last
2    page, there's a summary of the Lee Ann Bryan
3    interview.  If you would read that, please.
4    (Witness examined document)
5    A.  Okay.
6        Q.  You've had a chance to read that?
7    A.  Yes.
8        Q.  And did you have any discussions with
9    Lee Anne Bryan about her interview?
10   A.  Yes.
11       Q.  Is this summary consistent with what she
12   told you?
13   A.  Yes.
14       Q.  Did she tell you anything additional to
15   this?
16   A.  Probably, but I cannot remember the
17   conversation.
18       Q.  Okay.  Did she tell you anything that
19   conflicted with this summary?
20   A.  I don't know if she said anything about
21   spring break.  I mean, I can't tell you that.  I
22   wasn't there.
23       Q.  Okay.
24   A.  Did I give here a copy, yes.  She
25   brought a -- no, she didn't mention she brought a

1    copy with her.  No.  Was her copy different from
2    Ms. Sellers?  I don't know what Ms. Sellers and
3    Ms. Williams and those had, so I can't tell you
4    what that is, yes or no.  And I don't remember her
5    saying -- making a comment about it.  She may
6    have.  I don't...
7        Q.  Okay.  She didn't tell you anything that
8    directly contradicts what's in this summary, is
9    that right?
10   A.  No.
11       Q.  She either just didn't mention certain
12   details that are in here or you don't remember
13   whether she mentioned some of the details that are
14   in here.
15   A.  I don't remember.
16       Q.  Okay.
17   (Off-record comments)
18       Q.  (Ms. Shea)  Now, you testified yesterday
19   that you retained Mr. Gresham in June of 2006 or
20   May of 2006.
21   A.  Yes.
22       Q.  Immediately after you were disciplined
23   over this pay information incident?
24   A.  No.  That's not why I -- I retained him
25   to answer questions and to assist me.

1        Q.  Okay.  It was ---
2    A.  To be of counsel.
3        Q.  Okay.  Was it because you had been
4    disciplined?
5    A.  Because I -- she gave me a reprimand and
6    froze my salary, yes.
7        Q.  Okay.  Okay.  Yes, that's all I meant by
8    that.  Okay.  So -- okay.  Because you were
9    reprimanded and your salary was frozen, you were
10   also put on probation, right?
11   A.  Yes.
12       Q.  You thought it was in your interest to
13   retain an attorney?
14   A.  Yes.
15       Q.  Okay.  And Mr. Gresham was always your
16   attorney, right, nobody else was your attorney?
17   A.  Yes.
18       Q.  Were you aware that he sent a letter to
19   the college in December of 2006?
20   A.  Yes.
21       Q.  Did you review the letter before it was
22   sent out, if you know?
23   A.  I don't remember.
24       Q.  If you were able to read it, would you
25   possibly remember?

Ophelia Munn-Goins Volume II                                    Page 25

1    A.  I've probably read it so many times, I
2  can't tell you when I read it.
3    Q.  Okay.  But you do know he wrote a letter
4  to the school in December of 2006, right?
5    A.  Yes.
6    Q.  And that was challenging your
7  discipline?
8    A.  If that's what you call it, yes.
9    Q.  Yes.  When I say discipline, I just mean
10 you were punished in certain ways for, you know,
11 allegedly violating the policy in your ---
12   A.  No, I didn't violate policy.
13   Q.  Well, I mean that's the school's
14 position.
15            MR. GRESHAM:  No ---
16            THE WITNESS:  But I did not violate
17 a policy.
18   Q.  (Ms. Shea)  I'm not saying you did.
19   A.  They did not allege I violated a policy.
20   Q.  Discipline means you were subjected to
21 some adverse employment action, right?
22   A.  Yes.
23   Q.  Okay.  That's all I mean by discipline.
24            (DEPOSITION EXHIBIT
25            NUMBER 32 WAS MARKED

---

Ophelia Munn-Goins Volume II                                    Page 26

1            FOR IDENTIFICATION)
2            I'm going to hand you what's been marked
3  as Exhibit 25.
4            MR. GRESHAM:  Thirty-two.
5    Q.  (Ms. Shea)  Or I'm sorry, 35.
6    A.  Thirty-six.
7    Q.  Thirty-two.  Do you want to read that?
8  (Witness examined document)
9            MR. GRESHAM:  I don't think the
10 original had any underlining on it.
11           MS. SHEA:  I'm sure it probably
12 didn't.  That's what my copy looks like.
13   Q.  (Ms. Shea)  Okay.  Apart from the
14 underlining, do you ---
15           MR. GRESHAM:  I'll be glad, if you
16 want to, to substitute.  Because I had that ready
17 as an exhibit also, if you want to substitute one
18 of these ---
19           MS. SHEA:  An unlined version,
20 sure.  Okay.  Is that all right?
21   Q.  (Ms. Shea)  Why don't you take a minute
22 just to make sure that's the same letter I handed
23 you a minute ago except for no underlining.
24   A.  It appears to be the same document.
25   Q.  Okay.  Now that you've had a chance to

---

Ophelia Munn-Goins Volume II                                    Page 27

1  read that again, do you recall whether you
2  reviewed that before it was sent to the school?
3    A.  Yes, I think I did.
4    Q.  Okay.  That's all I have on that.  Thank
5  you.
6            Now, are you aware that your attorney
7  sent another letter to the school dated March
8  23rd, 2007 or there abouts?
9    A.  Yes.
10   Q.  Okay.  Are you aware of any
11 communications your attorney had with the school?
12 Not -- I don't want to know about anything you and
13 your attorney talked about.  Are you aware of any
14 communications your attorney had with the school
15 between December and March?
16            MR. GRESHAM:  Are you also talking
17 about the representative of the school?
18            THE WITNESS:  Yeah, the attorney.
19            MS. SHEA:  Phil Dixon?  Attorney
20 Phil Dixon?
21            MR. GRESHAM:  Yes.
22            MS. SHEA:  No.
23   Q.  (Ms. Shea)  Written correspondence, I
24 should say.
25   A.  Yeah, this one and another one.

---

Ophelia Munn-Goins Volume II                                    Page 28

1    Q.  Okay.  Two letters, right?
2    A.  At least.
3    Q.  Okay.  Are you aware of other letters?
4  Because the only ones I have are one in December
5  and one in March.  I just want to make sure there
6  weren't any additional letters.
7    A.  No, that would be it.
8    Q.  Okay.
9    A.  But I don't know the dates on...
10   Q.  Yes.  And I'm going to show you this and
11 let you look at it.
12           (DEPOSITION EXHIBIT
13           NUMBER 33 WAS MARKED
14           FOR IDENTIFICATION)
15           And I'm handing you what's been marked
16 as Exhibit 33.
17           MR. GRESHAM:  Right.  And this was
18 actually not to the school.
19           THE WITNESS:  Right.
20   Q.  (Ms. Shea)  Correct, but it was to the
21 school's counsel.
22   A.  Okay.  But the answer was no, I don't
23 remember it going to the school.  To correct my
24 answer.
25   Q.  Okay.  Do you recall this letter?

Ophelia Munn-Goins Volume II                    Page 29

1    A.    Yes.
2         Q.    Do you want to read it first?
3    A.    Yes.
4         Q.    Go ahead.
5    (Witness examined document)
6    A.    There's no attachment.    There's no
7    attachment, so...
8         Q.    Yes.    There were a number of attachments
9    to it, weren't there?
10   A.    Okay.
11        Q.    Okay.    I am leaving those off  just to
12   keep it efficient.
13   (Witness examined document)
14   A.    Okay.
15        Q.    Okay.    You've had a chance  to read all
16   of Exhibit 33?
17   A.    Without the attachments, yes.
18        Q.    Exhibit 33 has no attachments, correct?
19   A.    Correct.
20        Q.    Okay.    And you've read all of  Exhibit
21   33, have you not?
22   A.    Yes.
23        Q.    Did you review  that before it was  sent
24   to Mr. Dixon?
25   A.    No.

Ophelia Munn-Goins Volume II                    Page 30

1         Q.    You did not?
2    A.    No.
3         Q.    Okay. Okay.  Thank you.
4              THE WITNESS:  I'd like to give  you
5    a note on this.
6              MR. GRESHAM:  Okay.
7         Q.    (Ms. Shea)  Ms. Munn-Goins, I'd like to
8    ask what you noted  on that letter just now.  I'm
9    not asking  for your notes to your attorney.  I'm
10   asking  you  what you noticed on that  letter that
11   was...
12   A.    That "Dr. Geisen  was aware that  it was
13   not my client who put  the information in some  of
14   the faculty mailboxes."
15        Q.    Say that again.
16   A.    It reads, "Your client's beliefs are
17   incorrect.  First of all, another employee advised
18   Dr. Geisen that it was she, not my client, who put
19   the information in some of the faculty mailboxes."
20        Q.    Okay.
21   A.    You asked yesterday if  I knew she knew.
22   Well, at some point,  if her attorney knew, then
23   she would have at  least  knew that.  She should
24   have known.
25        Q.    Right.  And that's a letter dated March

Ophelia Munn-Goins Volume II                    Page 31

1    23rd, 2007, right?
2    A.    That's correct.
3         Q.    Okay.    And you did not review  that
4    letter before it went to Mr. Dixon, correct?
5    A.    I think I said no.  I think I said no.
6         Q.    I just wanted to double check that.
7    A.    Yeah.
8         Q.    Okay.    Apart from the letter that's
9    marked  Exhibit 32 and Exhibit 33, knowing that
10   Exhibit 33 is  omitting some  exhibits that went
11   with that letter,  are you aware of  any written
12   communications your attorney had  with either
13   anyone at Bladen Community  College or with Phil
14   Dixon or with any  other attorney representing the
15   college?
16   A.    Yes.    I -- email  between me and  my
17   attorney.
18        Q.    No. No. No.   That's not what I'm asking.
19   Are you aware of any communications your attorney
20   had with  either Mr. Dixon  or with any of  these
21   people ---
22   A.    Yes.
23        Q.    --- any of these defendants?
24   A.    Yes.
25        Q.    Written communications?

Ophelia Munn-Goins Volume II                    Page 32

1    A.    No, not written.  I know he told ---
2         Q.    Listen to the question, please.
3    A.    Okay.
4         Q.    I asked if you were aware of any written
5    communications your attorney  had with either Phil
6    Dixon, the attorney,  or with Mr. Horne ---
7    A.    No.
8         Q.    --- Mr. Page, Dr. Geisen, apart from
9    these two letters.
10   A.    I cannot think of any.
11        Q.    Okay.    That's all I  want to know.
12   That's all you can do.  You're no aware of  any
13   other communications in writing?
14   A.    I can't think of any.  No, ma'am.
15             MR. GRESHAM:  And I would say that
16   once Mr. Dixon had  contacted me I  was under  an
17   ethical obligation not to contact the school.
18             MS. SHEA:  Oh, I understand that.
19   I'm well aware of that.  I just want to make sure
20   there aren't any other letters, because those were
21   the only two I had.
22        Q.    (Ms. Shea)  Can you please hand me back
23   Exhibit 33?
24   (Witness complied)
25        Q.    You agree that Mr. Gresham was your

Ophelia Munn-Goins Volume II                    Page 33

1  attorney as of March 2007, right, he was still
2  representing you?
3      A.  Yes.
4      Q.  And you had authorized him to represent
5  you, right?
6      A.  Yes.
7      Q.  Okay.  I don't want to ask you about
8  anything you discussed with your attorney, okay?
9  I just want to ask what was in your mind.
10      As of March of 2007, did you have
11  reasonable doubts about the possibility of
12  continued collegial relationships with the
13  administration at Bladen Community College?
14      A.  Collegial?
15      Q.  I guess, that's -- I'm just quoting ---
16      A.  Yes.
17      Q.  --- from the letter.  That was an
18  accurate representation of your state of mind?
19      A.  Yes.
20      Q.  Okay.  Thank you.
21          (DEPOSITION EXHIBIT
22           NUMBER 34 WAS MARKED
23           FOR IDENTIFICATION)
24      And now I will hand you what's been
25  marked as Exhibit 34.  Have you ever seen that

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                    Page 34

1  document before?
2      A.  Yes.
3      Q.  And that is a letter from Darrell Page
4  to you?
5      A.  Yes.
6      Q.  Dated April -- thank you.  April 30th,
7  2007?
8      A.  Yes.
9      Q.  And he's notifying you that your
10  contract is not going to be renewed for the
11  2007/08 school year?
12      A.  Correct.
13      Q.  Now, how did you receive that letter?
14      A.  In his office, from him.
15      Q.  How did you -- did he call you to his
16  office?
17      A.  Kay Geisen told me to come to his
18  office.
19      Q.  Okay.
20      A.  If I'm not mistaken.
21      Q.  Was it on that date?
22      A.  No.
23      Q.  When was it, if you remember?
24      A.  I don't know.  Day -- next day or day
25  after that.

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                    Page 35

1  Probably a day or two after the date on
2  the letter?
3      A.  First, should have been the first of
4  May, I believe.
5      Q.  And Dr. Geisen told you to go see Dr.
6  Page?
7      A.  Yes.
8      Q.  Did she say anything else?
9      A.  No.
10      Q.  Was it in person?
11      A.  Yes.
12      Q.  Okay.  Had she called you into her
13  office?
14      A.  Yes.
15      Q.  Okay.  Did you ask her anything?
16      A.  No.
17      Q.  And you went to Dr. Page's office
18  immediately after talking to Dr. Geisen?
19      A.  Yes.
20      Q.  And what happened?
21      A.  He offered me a seat.  I sat down.  He
22  opened his drawer with glee and gave me a sheet to
23  read.  And I asked if that was all.  He said yes,
24  and I left.
25      Q.  Okay.  You say he opened his drawer with

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                    Page 36

1  glee?
2      A.  That's the way he appeared to me.
3      Q.  How was he showing glee, he was smiling?
4      A.  He had like a smirk.
5      Q.  A smirk?
6      A.  Yes.
7      Q.  Okay.  And you and Dr. Page had been
8  friends, right?
9      A.  I thought.
10      Q.  Okay.  And you hadn't had any problems
11  with him, apart from some of these issues that we
12  talked about last night, right?
13      A.  No.
14      Q.  Is that right?
15      A.  No.  That's not correct.
16      Q.  Okay.  You had had other issues with
17  him?
18      A.  Well, he stopped talking to me.  He
19  wouldn't speak.  He stopped talking to me.
20      Q.  When did he stop talking to you?
21      A.  Throughout the year after -- in January
22  of 2007.
23      Q.  Okay.  Did you go talk to him about
24  that?
25      A.  No.

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

## PAGE 37

Ophelia Munn-Goins Volume II                     Page 37

1    Q.  Okay.  You didn't ask him why?
2    A.  It was his issue, not mine.
3    Q.  So, had you had a conversation with him
4  between January of 2007 and the day he handed you
5  Exhibit 34?
6    A.  No.
7    Q.  Okay.  And so he was smirking and opened
8  his desk drawer and handed you the letter?
9    A.  Let me correct something.  Yes, I talked
10 to him about official business between that time
11 frame.
12   Q.  Okay.
13   A.  Because I went to him about the
14 educational leave and things like that, so you
15 mean March or May.
16   Q.  And have you testified about everything
17 about the educational leave discussions,
18 everything you remember?  Because we talked about
19 that at some length last night.
20   A.  Yes.
21   Q.  Okay.  You don't have anything to add to
22 that?
23   A.  I have a document with the information
24 you asked about the courses.  I have that
25 information.

## PAGE 38

Ophelia Munn-Goins Volume II                     Page 38

1    Q.  You do have a new document?
2    A.  Well, I'll just give you the courses.
3  It was Adult Learning ---
4    Q.  No.  I'd rather see the document.
5         MR. GRESHAM:  Let's see.  She was
6  going to copy that.
7         THE WITNESS:  I don't know where it
8  is.
9         MS. SHEA:  Actually, while we're
10 talking about that -- off the record right now.
11 (Brief recess)
12   Q.  (Ms. Shea)  Well, I tell you what, Ms.
13 Munn-Goins, I think I'll just go ahead and ask you
14 about these other faculty members.  These were
15 other people who allegedly had not complied with
16 the drop policy, right?  You had testified about
17 some of them last night and you didn't remember
18 all the names.
19   A.  Yes.
20   Q.  And they were not disciplined, right?
21   A.  As far as I ---
22   Q.  At least as far as you know?
23   A.  Yes.
24   Q.  And who are these new individuals?
25   A.  I need to correct that, what you're

## PAGE 39

Ophelia Munn-Goins Volume II                     Page 39

1  saying.  The ones I said who did not drop were
2  Doris Horne and Bruce Crocker.  Then I also said
3  yesterday about students who were allowed not to
4  come to class for several weeks and were told not
5  to be dropped.  That was out of Bruce Crocker's
6  class.  Cliff Tindall, Twyla Davis and, if I'm not
7  mistaken, Robert Herring.
8    Q.  So, Mr. -- I'm sorry, can I interrupt --
9  I just want to ask you a question.  So, Cliff
10 Tindall, Twyla Davis and Robert Herring were
11 students?
12   A.  Instructors who were told not to drop
13 students who were out for several weeks.
14   Q.  Okay.
15   A.  Or a few weeks, I should say.
16   Q.  And did you hear them being told that or
17 is this something they told you, or how did you
18 get this information?
19   A.  Kay Geisen said it in a meeting --
20 faculty meeting.
21   Q.  So, in the faculty meeting, Kay Geisen
22 actually told these individuals to leave their
23 students on ---
24   A.  She made ---
25   Q.  --- active status or not drop them?

## PAGE 40

Ophelia Munn-Goins Volume II                     Page 40

1    A.  She made a general comment and then
2  pointed out to those specific instructors.  And
3  she point -- first she said, "To Cliff Tindall and
4  the rest of you," and I think she said, Robert
5  Herring" and someone else, "if you have those" and
6  "I'll get with you."
7    Q.  Okay.
8    A.  Or "get with me."
9    Q.  What was the general comment Dr. Geisen
10 made?
11   A.  Oh, "For those students -- those high
12 school students who can't come to school, do not
13 drop them.  Just give them some work to do.  Don't
14 drop them."
15   Q.  Okay.  And that was a meeting when?
16   A.  Faculty meeting in January.
17   Q.  Of what year?
18   A.  Of 2007.
19   Q.  So, she said don't drop them, just give
20 them some work to do?
21   A.  Yes.  So, they didn't have to come to
22 class for approximately three weeks, or at least
23 over two weeks.  From the third of January to like
24 the 18th.
25   Q.  And then she said she would get with Mr.

SHEET 6  PAGE 41

Ophelia Munn-Goins Volume II                    Page 41

1   Tindall, Ms. Davis and Mr. Herring?
2       A.   No, that's not what she said.  She said,
3   "I'll get with you, those of you who have high
4   school students in your class."
5       Q.   Okay.  So, she said, "I'll get with
6   you," right?
7       A.   Yes.
8       Q.   Okay.
9       A.   But she didn't say Mr. Tindall -- she
10  didn't ---
11      Q.   Oh, I didn't mean that -- that was me
12  saying Mr. Tindall.
13      A.   Oh.
14      Q.   She told Mr. Tindall, Ms. Davis and Mr.
15  Herring, "I will get with you later to talk about
16  this some more."
17      A.   Words to that effect, yes.
18      Q.   Okay.  And have you now given me all the
19  names you're aware of ---
20      A.   Yes.
21      Q.   --- related to this drop issue?
22      A.   Yes, that I can think of.
23      Q.   And, you know, as long as your
24  deposition is taking place, you're free to add
25  names if you think of others, okay?

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

PAGE 42

Ophelia Munn-Goins Volume II                    Page 42

1       A.   Okay.
2                (DEPOSITION EXHIBIT
3                NUMBER 35 WAS MARKED
4                FOR IDENTIFICATION)
5       Q.   Now, I'm going to hand you what's been
6   marked as Exhibit 35.  And this is something that
7   your attorney just gave me a few minutes ago
8   during the break.  And I understand you got this
9   last night, is that right?  Got this from home
10  last night.
11      A.   I downloaded it from the computer last
12  night.
13      Q.   Can you tell me what that is?
14      A.   An unofficial transcript of Ophelia
15  Munn-Goins.
16      Q.   And it's for Fayetteville State?
17      A.   Yes.
18      Q.   And you had that saved on your computer?
19      A.   No.   I went to Fayetteville State's
20  website and downloaded it.
21      Q.   Okay.  Did you download it last night?
22      A.   Yes.
23      Q.   And that would be November 5th, 2008,
24  right?
25      A.   Correct.

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

PAGE 43

Ophelia Munn-Goins Volume II                    Page 43

1            MR. GRESHAM:  It bears the time and
2   date at the top.
3            MS. SHEA:  I saw that.  I saw that.
4       Q.   (Ms. Shea)  And can you tell me in your
5   own words what the significance of that document
6   is to this case?
7       A.   Yesterday, you implied or you stated
8   that -- in one of your exhibits, I can't find it,
9   that my doctorate had no bearing on my -- on the
10  courses that I taught at Bladen Community College.
11  Well, I beg to differ.  Because I feel that if you
12  are improving yourself, getting a higher degree,
13  it had to weigh something.
14      Q.   Okay.
15      A.   And at least have the ability to provide
16  something more to your students.  I also
17  indicated, because you made a comment that I was a
18  computer science instructor, that some of my
19  courses were computer -- in fact, computer
20  courses.  Not only that, there were other courses
21  that also contribute to my position as an
22  instructor at Bladen Community College.
23      Q.   Okay.  May I see that for a minute,
24  please?
25            MR. GRESHAM:  Here's a copy.

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

PAGE 44

Ophelia Munn-Goins Volume II                    Page 44

1            MS. SHEA:  Oh, thanks.  Okay.
2   That'll be better, because you can be looking
3   while I'm looking.
4       Q.   (Ms. Shea)  Okay.  And I think we talked
5   last night and I believe you testified that in
6   your opinion a doctorate in educational leadership
7   -- is that the right terminology?
8       A.   Yes.
9       Q.   Yes.  That that certainly, in your
10  opinion, would contribute to the well being of
11  Bladen Community College, right?
12      A.   Yes.
13      Q.   The -- okay.  Social work technology,
14  would that be a computer related course?
15      A.   Yes.
16      Q.   What exactly is that?
17      A.   Designing web pages.  It just so
18  happened to be under the Social Work Department.
19  Web pages, pamphlets, bulletins, technology, just
20  strictly technology.
21      Q.   Would it be, for example, designing a
22  website where people who might need social work
23  assistance ---
24      A.   Yes.
25      Q.   --- could go on the internet and find

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

---

Ophelia Munn-Goins Volume II                    Page 45

1   what they need?
2       A.  Yes.
3       Q.  Okay.  Is comp -- I'm sorry.  I should
4   be referring to pages so you can see what I'm
5   looking at.
6           On page four of Exhibit 35, the very
7   first -- I guess this is the very first course
8   listed EDAM698 Comp Usage for Edu Admin, do you
9   see that?
10      A.  Computer Usage for Educational
11  Administration, yes.
12      Q.  Okay.  And that is a computer course
13  also, right?
14      A.  Yes.
15      Q.  Okay.  And you took that during the
16  summer of 2007?
17      A.  Yes.
18      Q.  When is their second summer session at
19  Fayetteville State?
20      A.  July 2000.
21      Q.  Okay.  And when does it end?
22      A.  August.
23      Q.  Okay.  Right before the fall students
24  come back?
25      A.  Yes.

---

Ophelia Munn-Goins Volume II                    Page 47

1       A.  University and College Teaching talks
2   about college teaching at the community college
3   level, so I thought that was sufficient.
4       Q.  And an internship in educational
5   leadership, I guess?
6       A.  Yes, internship as well.  That's at the
7   North Carolina Community College System office.
8       Q.  Okay.
9       A.  As well as diversity -- Culture
10  Diversity in American Schools on page two.
11      Q.  I'll tell you what.  You're kind of
12  going off on your own and you're not following my
13  questions, so I ---
14          MR. GRESHAM:  Well, I'm going to
15  object.
16          MS. SHEA:  No ---
17          MR. GRESHAM:  Your question to
18  her ---
19          MS. SHEA:  You can object.
20          MR. GRESHAM:  --- was what courses
21  and she has ---
22          MS. SHEA:  Well, actually, I was
23  starting out asking about computer courses.  And
24  I'm not -- I don't have a problem with your
25  telling about these other ones.  But I think just

---

Ophelia Munn-Goins Volume II                    Page 46

1       Q.  Okay.
2       A.  The Adult Learner on page ---
3           MR. GRESHAM:  I think it's page
4   three ---
5           THE WITNESS:  Yeah, page three.
6           MR. GRESHAM:  --- got cut off at
7   the top.
8           THE WITNESS:  That's one of them.
9       Q.  (Ms. Shea)  Wait a minute.  Okay.  I
10  don't see that one, but you're saying there is
11  another one?
12          MR. GRESHAM:  It's right at the
13  bottom of the page.
14          THE WITNESS:  It's at the very
15  bottom of the page, yeah.
16      Q.  (Ms. Shea)  Oh, okay.  Bottom of page
17  three.  The Adult Learner is a computer course?
18      A.  No.  That's a course to teach adult
19  learners, which community college students are
20  adult learners.
21      Q.  Okay.  So, this is one, it's not
22  computer related, but you think it's helpful for
23  your work at Bladen Community College?
24      A.  Yes.
25      Q.  Okay.

---

Ophelia Munn-Goins Volume II                    Page 48

1   so we have a good transcript that makes sense, if
2   we can just go in order.  Okay?
3           THE WITNESS:  Okay.
4       Q.  (Ms. Shea)  We talked about two courses
5   that were computer related, right, on this
6   transcript?  Are there any other courses that you
7   consider to be computer related other than the ---
8       A.  No.
9       Q.  Okay.  So, just Social Work Technology
10  and Comp Usage for Educational Administrators?
11      A.  Courses, but then as well as the
12  internship.
13      Q.  And the internship is also computer
14  related?
15      A.  Has some computer relations, yes.
16      Q.  Okay.  Great.  Now, I will ask you,
17  which courses do you think were not necessarily
18  computer related but, in your opinion, are
19  beneficial to the school?  And I think that's
20  where we were going with this.
21      A.  Page one, Group Dynamics, Decision
22  Making, People Management; Page one, Seminar and
23  Educational Leadership.  Page two, Public policy
24  and Political Issues in Education; Page two at the
25  bottom, Cultural Diversity in American Schools.

---

Ophelia Munn-Goins Volume II                    Page 49
1   Qualitative Research could help as well.
2          Page three, Seminars in Legal Issue,
3   Professional Ethics; the internship, of course, in
4   educational leadership; University and College
5   Teaching; as well as the Adult Learner at the
6   bottom of page three.
7          Q.  Okay.  Thanks.  I just wanted to have it
8   to be a little more systematic in the transcript.
9          Let me just look at this a little bit
10  more, see if I have any other questions related to
11  it.
12         When does the first summer session at
13  Fayetteville State begin?
14         A.  May.  Second or third week of May.
15         Q.  Second or third week?
16         A.  Of May.
17         Q.  Okay.  So, I guess, in both cases with
18  summer session they kind of wait for the spring
19  students to get out before they start the summer
20  session?
21         A.  Yes, a week lapse.
22         Q.  And then they conclude the second summer
23  session in time to kind of do the transition for
24  the fall students to come back, right?
25         A.  Correct.

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                    Page 50
1          Q.  Okay.  And the last thing on here is
2   fall semester 2008.  You are currently working on
3   your dissertation?
4          A.  Yes.
5          Q.  Now, did you give -- well, I guess you
6   didn't give this document, did you give a document
7   like it to anyone at Bladen?
8          A.  Yes.
9          Q.  When?
10         A.  Each semester I received funding, I had
11  to give a copy of my transcript to get my money
12  January the 1st.
13         Q.  Did you give that to Lloyd Horne?
14         A.  I don't know if it went to Lynn King to
15  go to a committee.
16         Q.  Okay.
17         A.  I'm not sure how they process it ---
18         Q.  And ---
19         A.  --- but I turned it in.
20         Q.  And this -- I'm sorry.  I didn't mean to
21  cut you off.  This is to get the $200 or so that
22  you got each semester that you were in school?
23         A.  Yes.
24         Q.  Okay.  I think that's all I've got for
25  that one.

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                    Page 51
1          I saw you brought in a great, big
2   notebook when you came in the room.  Were there
3   any documents in that notebook that are pertinent
4   to this case that are not attorney/client
5   privileged?
6          A.  All of them are pertinent.  All of the,
7   to me, are attorney/client privileged.
8          Q.  Okay.
9          MR. GRESHAM:  We've -- a good
10  number of those are the documents that you have
11  received.
12         MS. SHEA:  Okay.
13         Q.  (Ms. Shea)  And there's nothing else in
14  there that wouldn't be just communications between
15  you and your attorney, right, or prepared for your
16  attorney?
17         MR. GRESHAM:  Or may not be ---
18         Q.  (Ms. Shea)  Or at his direction?
19         MR. GRESHAM:  --- relevant to this
20  -- to any of your discovery responses.
21         MS. SHEA:  Okay.
22         (DEPOSITION EXHIBIT
23         NUMBER 36 WAS MARKED
24         FOR IDENTIFICATION)
25         Q.  (Ms. Shea)  I am going to hand you

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                    Page 52
1   what's been marked as Exhibit 36.  And that is a
2   document your attorney gave me yesterday.  Do you
3   want to take a minute and look at that before I
4   ask you questions about it?
5          MR. GRESHAM:  Actually, this is the
6   one we gave you in discovery earlier.  You did get
7   a second one yesterday, but there are different
8   dates.
9          MS. SHEA:  Oh, okay.  I apologize.
10  Okay.
11         MR. GRESHAM:  Because this one has
12  the Munn-Goins ---
13         MS. SHEA:  Okay.
14         MR. GRESHAM:  --- number on the
15  bottom.
16         MS. SHEA:  You're right.  You're
17  right.  The -- yes.  I'm sorry.
18         Q.  (Ms. Shea)  Do you want to take a minute
19  and read that?
20         A.  I did.
21         Q.  You did already.
22         A.  Yes.
23         Q.  Okay.  And that appears to be a
24  classified ad page out of the Bladenboro
25  newspaper?

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                          Page 53

1    A.   No.  Ad out of the Bladen Journal.
2    Q.   The ---
3    A.   The Bladen Journal.
4    Q.   Okay.
5    A.   Elizabethtown.
6    Q.   Oh, that's the Elizabethtown newspaper?
7    A.   Yes.
8    Q.   Okay.  Is that kind of the county
9    newspaper?
10   A.   Yes.
11   Q.   Okay.  And you had apparently saved a
12   copy of that ad?
13   A.   No.  I gave it to my attorney.
14   Q.   And why did you consider that page from
15   the newspaper to be significant?
16   A.   There's an advertisement for employment
17   as a computer information technology instructor at
18   Bladen Community College.
19   Q.   Okay.
20   A.   The position that I previously held.
21   Q.   Your position is that was for your job?
22   A.   Yes.
23   Q.   That was an ad for your job.  And what's
24   the date on that document?
25   A.   June 22, 2007.

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                          Page 54

1    Q.   So, that would have been -- if your
2    contract ended May 31, 2007, that would have been
3    less than a month after your contract terminated,
4    right?
5    A.   Yes.
6    Q.   Okay.  And is there any other
7    significance beyond the fact that the college was
8    apparently hiring for your position after you
9    left, any other significance you see to this case?
10   A.   No.
11   Q.   Okay.  Did you apply for that job?
12   A.   No.
13   Q.   Why not?
14   A.   I didn't think to.
15   Q.   Okay.
16   A.   When I received it, it was kind of late.
17   I read it on the like 23rd or 24th.
18   Q.   Of June?
19   A.   Yes.
20   Q.   Do you know how long that ad ran?
21   A.   No.
22   Q.   I mean, did you think it was too late to
23   apply two or three days after the ad ran?
24   A.   Yes.  The date was the 25th.  Close out
25   was the 25th.

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                          Page 55

1    Q.   So, does that refresh your recollection
2    that maybe you saw it after the 25th?
3    A.   No.  I'm saying it came to my house
4    probably on the 23rd or the 24th.
5    Q.   Right.
6    A.   Whatever day, maybe the 24th.  So, if I
7    saw it, it was probably the 24th or the 25th.  I
8    don't know when I saw the newspaper.
9    Q.   Okay.
10   A.   I can't tell you that.
11   Q.   But are you saying that you didn't apply
12   for it because it was too late by the time you saw
13   it?  I thought that was what you had said.  Maybe
14   I misunderstood.
15   A.   Time to apply probably, the paperwork,
16   yes.
17   Q.   Did you call anybody at the school and
18   talk to them about it?
19   A.   No.
20   Q.   Did you talk to any of your fellow
21   faculty members about it?
22   A.   No.  Not that I remember.
23           (DEPOSITION EXHIBIT
24            NUMBER 37 WAS MARKED
25            FOR IDENTIFICATION)

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                          Page 56

1    Q.   Now, I'm going to hand you what's been
2    marked as Exhibit Nine, and I guess this one is
3    one -- Exhibit Nine, I'm sorry.  I was looking at
4    the date.  It's October 9th, isn't it?
5    A.   Yes.
6    Q.   Okay.  But it's Exhibit 37.  And that's
7    a page from the same newspaper, right?
8    A.   Yes.
9    Q.   And it's the classified ads again.
10   A.   From the Bladen Journal of
11   Elizabethtown.
12   Q.   Okay.  And there is an advertisement for
13   a computer IS instructor, right?
14   A.   Yes.
15   Q.   At Bladen Community College?
16   A.   IT, yes.
17   Q.   And why did you think that was
18   significant?
19   A.   Because I applied for it.
20   Q.   Okay.  So, this time you did apply?
21   A.   Yes.
22   Q.   Okay.  Do you know how long that ad ran?
23   A.   No.
24   Q.   Okay.  I'm going to ask you about your
25   application for it.  But in addition to submitting

11-06-08   Munn-Goins v. Board of Trustees\7:08CV21   COPY

Ophelia Munn-Goins Volume II                         Page 57

1  an application, did you talk to anybody at the
2  school about it?
3      A.  No, not that I remember.
4      Q.  Okay.  And was it your feeling that that
5  was your job?
6      A.  No, I don't claim a job.  I don't claim
7  a position.
8      Q.  Well, I mean that was your old job?
9      A.  Oh, yes.
10     Q.  They were hiring for your old job, in
11 other words.
12     A.  Yes.
13     Q.  Okay.
14     A.  Yes.
15     Q.  Do you remember what date you actually
16 submitted your application for that job?
17     A.  No.  No.
18     Q.  Okay.
19     A.  It was like the last day, I believe.
20     Q.  The last day?
21     A.  It was close.  I don't remember.
22     Q.  Okay.  And may I see that ad for just a
23 second, please?
24 (Witness complied)
25     Q.  Okay.  It says, "Applications must be

Ophelia Munn-Goins Volume II                         Page 58

1  received by October 26, 2007 at 3:00 p.m."
2      A.  But I don't know what day that was the
3  20th or 22nd.
4      Q.  Does it say that?  All I'm asking
5  you ---
6      A.  I don't know.
7      Q.  --- yes or no, does it say that?  You
8  can look at it again.
9      A.  Yes.
10     Q.  Okay.  And your recollection is that you
11 made your application close to the deadline,
12 right?
13     A.  Before the deadline.  I don't know if it
14 was close or not, but before the deadline.
15     Q.  Sometime before the deadline?
16     A.  Yes.
17     Q.  And that would be the deadline in this
18 advertisement?
19     A.  Yes.
20     Q.  Okay.
21              (DEPOSITION EXHIBIT
22               NUMBER 38 WAS MARKED
23               FOR IDENTIFICATION)
24          And now I'll hand you what's been marked
25 as Exhibit 38.  This was a document we received

Ophelia Munn-Goins Volume II                         Page 59

1  yesterday that appears to be a help wanted ad from
2  the same newspaper, right -- or classified ad page
3  from the same newspaper?
4      A.  Yes.
5      Q.  And the date of the newspaper is cut off
6  there, isn't it?
7      A.  Yes.
8      Q.  And there's some handwriting on that ---
9      A.  Yes.
10     Q.  --- advertisement.  Is that your
11 handwriting?
12     A.  It appears.
13     Q.  Okay.
14     A.  Looks like mine.
15     Q.  What does it mean?
16     A.  It means, "10-26-07."  It could mean I
17 cut off that date or it could mean I applied.  I
18 don't know what it means.
19     Q.  Okay.
20     A.  I can't tell you.
21     Q.  Okay.  But that was your handwriting
22 anyway?
23     A.  It looks like it.
24     Q.  And that page also has an advertisement
25 for a computer IS position, right?

Ophelia Munn-Goins Volume II                         Page 60

1      A.  Yes.
2      Q.  Is it possible that those are both from
3  the same classified ad page?
4          MR. GRESHAM:  I was just looking to
5  see that.  And it appears to be ---
6          MS. SHEA:  I'm not asking for your
7  testimony, Mr. Gresham.
8          MR. GRESHAM:  I ---
9          MS. SHEA:  I'm asking for your
10 client's testimony.
11         MR. GRESHAM:  I understand, but if
12 you want her to go through ---
13         MS. SHEA:  I do want her to go
14 through it.
15         MR. GRESHAM:  Okay.
16         MS. SHEA:  I don't want you to go
17 through it.  I want her to go through it.
18         MR. GRESHAM:  Okay.
19         THE WITNESS:  I'm up to.
20     Q.  (Ms. Shea)  So, go ahead and look at it
21 and tell me what you can about it.  If you don't
22 know, that's fine.
23 (Witness examined document)
24     A.  It appears to be the same.
25     Q.  Okay.

Ophelia Munn-Goins Volume II                    Page 61

```
 1      A.   Minus some of the date information.
 2      Q.   You don't know for a fact, do you?
 3      A.   No.
 4      Q.   Okay.  But it appears to be the same
 5 date -- page?
 6      A.   Yes.
 7      Q.   Okay.  Thank you.  I wasn't sure.  I
 8 just wanted to double check that.
 9              (DEPOSITION EXHIBIT
10               NUMBER 39 WAS MARKED
11               FOR IDENTIFICATION)
12           Now, I'm going to hand you what's been
13 marked as Exhibit 39.  And take a few minutes, if
14 you will, and look at that.
15 (Witness examined document)
16 (Off-record comments)
17      Q.   (Ms. Shea)  All right.  Have you had a
18 chance to look at Exhibit 39?
19      A.   Yes.
20      Q.   Is that the employment application you
21 filled out in response to the advertisements that
22 were Exhibits 37 and 38?
23      A.   I don't know.  I assume it was.
24      Q.   You assume so?
25      A.   I assume.
```

Ophelia Munn-Goins Volume II                    Page 62

```
 1      Q.   Okay.  And if you recall, the ads were
 2 run on October 9th and the date on your
 3 handwritten application is October 10th.
 4      A.   Yes.
 5      Q.   Does that help you refresh your
 6 recollection about that?
 7      A.   No.
 8      Q.   Okay.
 9      A.   But I assume it's okay.
10      Q.   And you see that it's stamped received
11 October 26 ---
12      A.   Yes.
13      Q.   --- 2007?
14      A.   Yes.
15      Q.   Do you recall -- and if you don't, it's
16 fine, but do you recall filling out an application
17 and then holding it for a couple of weeks before
18 submitting it?
19      A.   No.
20      Q.   Okay.  You do -- that is your
21 handwriting on that application form?
22      A.   Yeah.  I probably started an application
23 but didn't complete it.  I wouldn't just complete
24 one and hold it.  Didn't make sense.
25      Q.   Okay.  But you might have filled out
```

Ophelia Munn-Goins Volume II                    Page 63

```
 1 part of it at one time and then filled out more of
 2 it at a later date?
 3      A.   Right, because you need transcripts and
 4 everything to go with it.
 5      Q.   Okay.  Great.  I think that's all I had
 6 on that.
 7           MS. SHEA:  If we can just have a
 8 few minutes, I may be close to being done.
 9           MR. GRESHAM:  Sure.  We'll step
10 out. (Brief recess)
11      Q.   (Ms. Shea)  Ms. Munn-Goins, did you want
12 to change anything that you have testified to
13 previously?
14      A.   No.
15      Q.   Okay.  When your contract was non-
16 renewed in April or May of 2007, did you use the
17 college grievance procedure?
18      A.   Yes, as far as I thought I could.  Yes.
19      Q.   And in your opinion, what was that?
20      A.   To appeal to the president of the
21 college.
22      Q.   Okay.  The president of the college was
23 the one who notified you you were not going to be
24 renewed, right?
25      A.   Right.
```

Ophelia Munn-Goins Volume II                    Page 64

```
 1      Q.   And you appealed to him after that?
 2      A.   Well, I think I talked to him.  I don't
 3 know if I -- no, I didn't either.  I didn't talk
 4 to him.  So, no, I didn't talk to anyone about
 5 that.
 6      Q.   Okay.
 7      A.   It was the reprimand that I...
 8      Q.   The reprimand, you did go to the
 9 president about, but the non-renewal you did not.
10      A.   No.
11      Q.   Is that right?
12      A.   Uh-huh (yes).
13      Q.   Okay.  Now, you've also got a claim in
14 this lawsuit for emotional distress.
15      A.   Yes.
16      Q.   Can you tell me about that?
17      A.   Yes.  Lots of sleepless nights, anxiety,
18 went into depression.
19      Q.   And have you been seeing a psychologist?
20      A.   No.  My primary care treats me.
21      Q.   And do you know what kind of doctor your
22 primary care physician is?
23      A.   Internist.
24      Q.   And what is your doctor's name?
25      A.   I have two, Dr. Thomas Wortheimer and
```

Ophelia Munn-Goins Volume II                     Page 65

1    Dr. Deborah Carter.
2        Q.  Which one is treating you for
3    psychological -- please let me finish my question,
4    okay ---
5        A.  Uh-huh (yes).
6        Q.  --- so we have a transcript.  Okay.  The
7    -- which doctor is treating you for psychological
8    problems?
9        A.  I don't consider them psychological, but
10   if you do.  What do you consider psychological, my
11   depression?
12       Q.  Yes.
13       A.  Dr. Carter is now, Dr. Wortheimer
14   previously.  He's no longer with the practice.
15       Q.  Okay.  And it's Deborah Carter?
16       A.  Yes.
17       Q.  Where does Dr. Carter practice?
18       A.  In Wilmington.
19       Q.  And how long have you been seeing her?
20       A.  Almost a year.
21       Q.  So, you started around November of 2007?
22       A.  No.  I don't remember the exact date.
23   She's in the same practice.  Dr. Wortheimer had
24   left.  I just picked up with her in the practice.
25       Q.  Okay.  When did you start seeing Dr. ---

Ophelia Munn-Goins Volume II                     Page 67

1            MS. SHEA:  Yes.  I'd like the
2    actual medical records.
3            MR. GRESHAM:  Well, I understand
4    you want the actual -- but the names of the
5    doctors and the medications that she's on.
6            MS. SHEA:  Sure.  But we're going to
7    be getting those notes ---
8            MR. GRESHAM:  The full medical
9    records, yes.
10           MS. SHEA:  When?
11           MR. GRESHAM:  We have to do a --
12   I'm not sure, my secretary was out last week,
13   whether she's done the HIPPA release or not, which
14   I have to get to Ms. Munn-Goins, which Ms. Munn-
15   Goins has to get to the doctor.  Because she's in
16   ---
17           MS. SHEA:  Okay.
18           MR. GRESHAM:  --- with her being
19   out of town.  So, we were preparing that last
20   week.
21           MS. SHEA:  Okay.
22           MR. GRESHAM:  So, as soon as the
23   HIPPA release gets there, it will be up to how
24   long the doctor takes.
25           MS. SHEA:  All right.

Ophelia Munn-Goins Volume II                     Page 66

1        A.  I don't ---
2        Q.  Let me finish the question, okay?  When
3    did you start seeing Dr. Wortheimer?
4        A.  Oh, in -- he's been my primary care
5    since 2002.
6        Q.  Okay.
7        A.  Excuse me, correction; 2003.
8        Q.  And he was also in Wilmington, right?
9        A.  Yes.
10       Q.  When did you start being treated for
11   psychological problems with Dr. Wortheimer?
12       A.  Dr. Wortheimer began treating me for
13   anxiety and depression in May or June.  May, I
14   believe.  I saw him in May 2006.
15       Q.  And you know that we have requested your
16   medical records that related to your emotional
17   distress claim in this lawsuit?
18       A.  No.
19       Q.  Okay.
20           MR. GRESHAM:  We're going to get
21   those.  We ---
22           MS. SHEA:  We're going to be
23   getting those, right?
24           MR. GRESHAM:  We have provided you
25   the names of the -- in the interrogatory ---

Ophelia Munn-Goins Volume II                     Page 68

1        Q.  (Ms. Shea)  Was Dr. Wortheimer
2    counselling you?
3        A.  Well, he talked to me, if you call that
4    counselling.  He explained to me what I needed to
5    do and how to deal with it.  Yes.
6        Q.  Okay.  So, he gave you advice about how
7    to deal with your anxiety and depression?
8        A.  Yes, and medication.
9        Q.  And he gave you medication -- or
10   prescribed medication?
11       A.  Yes.
12       Q.  Okay.
13       A.  And he actually gave me samples of
14   medication, mostly samples.
15       Q.  Okay.
16       A.  I don't do a lot of -- he didn't give me
17   a lot of prescriptions, because the cost might not
18   work.  So, he's tried several.
19       Q.  And he is an internist, you said?
20       A.  Internal medicine.
21       Q.  Okay.  I think that's the same thing.
22       A.  Well, some people don't consider it.
23   So, that's going to be a yes.
24       Q.  He's not a GP or a ---
25       A.  No.

Ophelia Munn-Goins Volume II                    Page 69

1    Q.   --- family practitioner?
2    A.   He could be a family practitioner, but I
3    think he's internal medicine.
4    Q.   Okay.  He is not a psychologist or a
5    psychiatrist, is that right?
6    A.   Correct.
7    Q.   And so if you started seeing Dr.
8    Wortheimer for anxiety and depression in May or
9    June of 2006, does that help you remember when you
10   started seeing Dr. Carter for that?
11   A.   No.
12   Q.   Okay.
13   A.   Whenever Dr. Wortheimer left, Dr. Carter
14   became my primary care.  So, it was sometime last
15   year, I believe.  I can't tell you the date.
16   Q.   Okay.  I'm not asking for a date.  I'm
17   just -- you know.
18   A.   I can't give you a month.
19   Q.   You can't give me a time frame at all?
20   A.   No.
21   Q.   Okay.
22         MR. GRESHAM:  We think the records
23   are all in the same practice.  It's the same
24   practice, so you should get them all at the same
25   time.

---

Ophelia Munn-Goins Volume II                    Page 70

1    Q.   (Ms. Shea)  Did you -- I may have asked
2    you this.  And I apologize.  I may have asked you
3    this just a minute ago.  Did you ever see a
4    psychologist or psychiatrist for any kind of
5    emotional or psychological problems?
6    A.   Dealing with what?  With this?
7    Q.   Ever, for any reason.
8    A.   Yeah, I saw a psychologist, had to.
9    Q.   When.
10   A.   Following Desert Storm.
11   Q.   Okay.
12   A.   Transition, you have to go through that
13   phase.  Transition.
14   Q.   And that was a psychologist?
15   A.   Yes.
16   Q.   To your recollection?
17   A.   Yes.
18   Q.   Do you remember that person's name?
19   A.   No.
20   Q.   Was it somebody with the military?
21   A.   Yes.
22   Q.   Did you get medication as a result of
23   the Desert Storm ---
24   A.   No.
25   Q.   --- problem?  No?

---

Ophelia Munn-Goins Volume II                    Page 71

1    A.   No.
2    Q.   Was this counselling?
3    A.   No.  You have to do a phase out, like an
4    interrogation phase out.
5    Q.   Debriefing?
6    A.   Debrief like.  You have to go through
7    that.
8    Q.   Okay.  So, were you having problems as a
9    result of Desert Storm?
10   A.   No.
11   Q.   So, it was just kind of a preventative
12   debriefing by a psychologist?
13   A.   Yes.
14   Q.   Okay.
15   A.   And then I saw one when my dad died.  I
16   saw a grievance counsellor, a psychologist.
17   Q.   And was that truly a psychologist?
18   A.   A psychologist.
19   Q.   Okay.  And do you remember that person's
20   name?
21   A.   No.
22   Q.   Was it somebody in Elizabethtown?
23   A.   No, it was in the Army.
24   Q.   Oh, okay.
25   A.   Ten years ago, twelve years ago.

---

Ophelia Munn-Goins Volume II                    Page 72

1    Q.   You probably remember where you were
2    stationed when your father died, don't you?
3    A.   Yeah, Alexandria, Virginia.
4    Q.   So, was this counsellor in Alexandria?
5    A.   He was at Walter Reed.
6    Q.   And how long did you get counselling
7    over your father's death?
8    A.   About three months.
9    Q.   Were you ever prescribed medication at
10   that time?
11   A.   Sleep medicine, yes.
12   Q.   Did the counsellor ever refer you to a
13   psychiatrist or other practitioner ---
14   A.   No.
15   Q.   --- of any kind?
16   A.   No.
17   Q.   The counsellor wouldn't have been able
18   to give you medicine?
19   A.   Psychologist, yes.
20   Q.   Was it over the counter medicine?
21   A.   No, prescribed.
22   Q.   Did the counsellor tell you -- give you
23   any kind of a diagnosis?
24   A.   Grief.
25   Q.   Grieving?

Ophelia Munn-Goins Volume II                          Page 73

1    A.   Yes.
2        Q.   **Did the counsellor say you were**
3    **depressed?**
4    A.   No, he said I was grieving.
5        Q.   **Did the counsellor ever say you had**
6    **anxiety?**
7    A.   No.
8        Q.   **Do you have any family history of mental**
9    **illness?**
10   A.   No.
11       Q.   **What is Lexapro, if you know?**
12   A.   Antidepressant.
13       Q.   **And Cymbalta?**
14   A.   Antidepressant.
15       Q.   **And Zolpidem Tartrate?**
16   A.   Sleep medicine.
17       Q.   **And those were all prescribed by either**
18   **Dr. Wortheimer or Dr. Carter?**
19   A.   Yes.
20       Q.   **And you have been on those medications**
21   **since the spring of 2006 ---**
22   A.   No.
23       Q.   **--- or early summer?**
24   A.   No.
25       Q.   **Okay. When did you go on medication?**

Ophelia Munn-Goins Volume II                          Page 74

1    A.   May of 2006.
2        Q.   **Isn't that what I just asked you?**
3    A.   Yeah, but you asked me if I'd been on
4    them the whole -- I haven't been on them the whole
5    time, just for segments of time.
6        Q.   **Okay. Well, tell me each segment of**
7    **time since ---**
8    A.   I don't know. I can't tell you. I just
9    know that for a period of time, I did not take
10   them, and then Dr. Carter put me back on them.
11       Q.   **Okay. Well, give me approximately your**
12   **best estimate of the period of the break that you**
13   **were not on medication.**
14   A.   Probably -- I can't tell you.
15       Q.   **You have no earthly idea?**
16   A.   No.
17       Q.   **I'm going to call a break and let you**
18   **talk to your attorney and see whether you can**
19   **remember that a little better than you just have.**
20   A.   Okay.
21       MR. GRESHAM:  Well, we'll get you
22   the medical records.
23       THE WITNESS:  Yeah.
24       MR. GRESHAM:  And that ---
25       MS. SHEA:  Well, I've asked for the

Ophelia Munn-Goins Volume II                          Page 75

1    medical records in June.
2        MR. GRESHAM:  Okay. But I ---
3        MS. SHEA:  So ---
4        MR. GRESHAM:  I'm just ---
5        MS. SHEA:  I want you to ---
6        MR. GRESHAM:  Well, I ---
7        MS. SHEA:  --- take a break and try
8    to ---
9        THE WITNESS:  I don't remember.
10       MS. SHEA:  --- refresh your
11   recollection.
12       MR. GRESHAM:  No, I'm not taking a
13   break to refresh her recollection. She has one of
14   the best recollections of any client I've had.
15   She said she can't remember, so talking with me I
16   don't think will make any difference.
17       MS. SHEA:  Well, I want you all to
18   take a break anyway.
19       MR. GRESHAM:  Okay. We've taken a
20   break.
21       MS. SHEA:  No. I want you to
22   leave.
23       MR. GRESHAM:  No.
24       MS. SHEA:  Yes.
25       MR. GRESHAM:  I'm not leaving.

Ophelia Munn-Goins Volume II                          Page 76

1        MS. SHEA:  Yes.
2        MR. GRESHAM:  No.
3        MS. SHEA:  Yes.
4        MR. GRESHAM:  We're ready ---
5        MS. SHEA:  This is ridiculous. You
6    have not complied with discovery. These are
7    ridiculously tardy answers and your client can't
8    even answer basic questions about her medical
9    problems.
10       MR. GRESHAM:  She ---
11       MS. SHEA:  Even after having six
12   months to figure out what was what.
13       MR. GRESHAM:  That's fine. If you
14   feel we're ready to proceed.
15       Q.   **(Ms. Shea) You have no earthly idea**
16   **when you were off medication, is that correct?**
17   A.   That's correct.
18       Q.   **Okay. No idea in the world?**
19   A.   No idea in the world.
20       Q.   **Okay. You have no earthly idea in the**
21   **world when you were on medication?**
22   A.   Yes, I know when I was on medication. I
23   started in May of 2006, but I have also been on
24   them throughout the year off and on. Because I
25   can't tolerate, they had to treat me on one, I had

1   to come off.  They had to try something else, I
2   had to come off.
3        Q.  Okay.
4        A.  So, I can't tell you when ---
5        Q.  So, were you always on a medication?
6        A.  No.  At some point, I took a break
7   because I could not use the medication.  I could
8   not function.
9        Q.  You were off all medication at some --
10   for some period?
11        A.  For some period, yes, because I could
12   not function.
13        Q.  And ---
14        A.  But I can't tell you when.
15        Q.  Okay.  And we had asked for this
16   information in June of 2008, didn't we?
17        A.  I don't know.
18        Q.  You don't know about that?
19        A.  Not to me.  Not to me.  No one's ever
20   asked me about it.
21        Q.  Okay.  Nobody asked you about it until
22   this week?
23        A.  Until I got my letter.  I saw that and I
24   responded the way I could.
25        Q.  Okay.  We served your attorney in June

1   with the interrogatories asking various questions.
2   And I understand your testimony to be you didn't
3   know about these until the last week or so, is
4   that right?
5        A.  About that sheet.
6        Q.  You didn't know about any of these
7   questions we had sent to your attorney in June, is
8   that right?
9        A.  That's correct.
10        Q.  Okay.  But you've met with your attorney
11   this week and said that -- and answered one of our
12   questions that you have owned an IBM compatible
13   and a Dell computer, which are now inoperable.
14        A.  Yes.
15        Q.  Okay.  When did you own the IBM
16   compatible -- these are two different computers?
17        A.  Yes.
18        Q.  Okay.  When did you own the IBM
19   compatible?
20        A.  I bought it back in 2003, 2004.
21        Q.  When did you stop using it?
22        A.  2005, 2006.
23        Q.  Which?
24        A.  I don't know.
25        Q.  Okay.

1        A.  I bought a new one in 2006, I believe.
2        Q.  And that would be the Dell?
3        A.  The new Dell PC, the one I'm using now.
4        Q.  Okay.  You say you've owned both an IBM
5   compatible and a Dell, which are now inoperable.
6        A.  Correct.
7        Q.  When did you own the IBM compatible that
8   that answer refers to?
9        A.  2001.
10        Q.  Okay.
11        A.  That's what it asked, I think.
12        Q.  And you got rid of it in 2005?
13        A.  No, I got rid of that one long before.
14   I don't know.
15        Q.  Okay.  And then the Dell that you're
16   referring to in this particular answer is not one
17   you have anymore?
18        A.  No ---
19        Q.  Okay.  Where is it?
20        A.  My brother has it.
21        Q.  And which brother would that be?
22        A.  Horace Munn.
23        Q.  And when did you give it to your
24   brother?
25        A.  2004 maybe.  I don't know.

1        Q.  Is he still using that one?
2        A.  It's inoperable.
3        Q.  Does he still have it?
4        A.  I don't know.  Might be the same one.
5   (Off-record comments)
6             THE WITNESS:  Just talking to
7   myself.
8        Q.  (Ms. Shea)  Okay.  What did you say to
9   yourself?
10        A.  Might be the same one.  I'm not sure if
11   you're talking about the Dell or the IBM
12   compatible.
13        Q.  Okay.  Your brother has one of those?
14        A.  Had one of them, right.  And I'm not
15   sure ---
16        Q.  Or had one of them possibly?
17        A.  I'm not sure which one it is.
18        Q.  And you don't know whether he still has
19   either one of those?
20        A.  No, not quite sure.
21        Q.  He may or may not?
22        A.  Yes.
23        Q.  Okay.
24        A.  But I know it was inoperable, because I
25   used to work on them.  And it was inoperable, he

Ophelia Munn-Goins Volume II                    Page 81

1  quit using it.
2      Q.  And when you say inoperable, does that
3  mean it crashed?
4      A.  Hard drive crashed.
5      Q.  Hard drive crashed, okay.
6          And you owned a palm PDA, which was
7  lost?
8      A.  Yes.
9      Q.  Approximately what dates did you have
10  the palm PDA?
11      A.  2001 or 2000 until 2003.
12      Q.  And a ZIO PDA?
13      A.  Yeah, it was something else.  I can't
14  think of the name of it.  I got it in December of
15  2003, I believe.  And I don't know where it is
16  now.
17      Q.  Do you throw those away when they die?
18      A.  No.  I let the kids play with them
19  normally.
20      Q.  Okay.  Do you know if your kids have
21  either of these PDAs?
22      A.  Oh, the palm, no.  I know it was lost.
23      Q.  It was lost, so it's gone?
24      A.  It's gone.
25      Q.  Okay.

Ophelia Munn-Goins Volume II                    Page 83

1  some time.
2      Q.  Okay.  You didn't look for it in
3  response to ---
4      A.  No.
5      Q.  --- answering these interrogatories?
6      A.  No.
7      Q.  Okay.
8      A.  No.
9      Q.  And you currently have a Toshiba laptop?
10      A.  Yes.
11      Q.  And a Dell PC?
12      A.  Yes.
13      Q.  And how long have you had the Toshiba?
14      A.  August of 2006.
15      Q.  Okay.  And how long have you had the
16  Dell?
17      A.  No, the Toshiba, 2007 -- August 2007, I
18  mean.  And the Dell -- about three years, so 2005.
19      Q.  And you currently have both of those?
20      A.  I do.
21      Q.  Okay.  We have asked you to identify
22  witnesses, and you identified a number of people
23  in your initial disclosures, which is the one
24  pleading we did get from your attorney in July or
25  August.

Ophelia Munn-Goins Volume II                    Page 82

1      A.  And the other one, I don't know what
2  happened to it.
3      Q.  Is it possible that your kids have the
4  other one?
5      A.  No.  I haven't seen it.
6      Q.  So, that one's lost, too?
7      A.  It's gone.  I don't know if we threw it
8  away.  It's gone.
9      Q.  Okay.  Did you write the answers to this
10  interrogatory?
11      A.  Yes.
12      Q.  Okay.  You said it was inoperable.
13      A.  Right.
14      Q.  You didn't say it was lost.
15      A.  But I looked for it -- I didn't look for
16  it.  It stopped working.
17      Q.  Okay.
18      A.  So, I just left it.
19      Q.  Do you understand you have a duty to
20  look for these things when we ask for them?
21      A.  Yeah, but I hadn't been able to find it,
22  so I don't know where it is.
23      Q.  You just said you didn't look for it.
24      A.  No.  I didn't specifically go look for
25  it that day.  I just know I have not seen it in

Ophelia Munn-Goins Volume II                    Page 84

1      Your answers to interrogatories that I
2  received yesterday have some additional people
3  listed.  And one is you have listed Felisa
4  Williams as a witness and your summary of her
5  testimony is that "She is employed at BCC.  She
6  gave the salary information to Ella Jo Sellers."
7      A.  Yes.
8      Q.  Okay.  Have you already testified in
9  your deposition about everything you know about
10  what Felisa Williams knows?
11      A.  Yes.
12      Q.  Okay.  And then you also have listed
13  Wanda Daniels of Regal Wood.
14      A.  Yes.
15      Q.  And I believe she -- her name came up
16  yesterday as a board member on one of your
17  organizations?
18      A.  No -- oh, yeah -- it did, yes.
19      Q.  Okay.  And your answer says, "Ms.
20  Daniels is a student who was outside the office of
21  Naomi Miller, the director of the East Arcadia
22  satellite campus, when she heard the comment that
23  Dr. Geisen had stated that if she found out that
24  Ophelia Munn-Goins had anything to do with the pay
25  scales in the mailboxes she would fire her."

1    A.   Yes.
2    Q.   Okay.  Ms. Daniels is currently a
3  student at BCC?
4    A.   I don't know if she is now.
5    Q.   Okay.  Your answer says she "is a
6  student."
7    A.   She was a student.
8    Q.   Was a student ---
9    A.   She was a student.
10   Q.   --- would be better, right?
11   A.   Yes.
12   Q.   Okay.  And who is Naomi Miller?  I
13  believe we heard her name before.
14   A.   Director of the East Arcadia campus.
15   Q.   Okay.  And she was on the board of one
16  or more of your organizations?
17   A.   One, yes.
18   Q.   One organization, okay.  And you had
19  given her as an employment reference when you were
20  hired at BCC, hadn't you?
21   A.   Yes.
22   Q.   And you did not give her as a reference
23  later, right?
24   A.   Yeah.
25   Q.   On your October 2007 application.

1    A.   Correct.
2    Q.   Okay.  Now, are you saying in this
3  answer to interrogatory that Ms. Daniels heard Ms.
4  Miller make that comment?
5    A.   I'm not sure if it was Ms. Miller or Kay
6  Geisen.  I don't know who she was referring to.
7    Q.   You don't know who she was referring to?
8    A.   No.
9    Q.   She just heard a comment being made?
10   A.   I did not -- she said -- well, I asked
11  who.  She said, "I cannot tell you, but I'll tell
12  your attorney."  I said, "Fine, then you tell
13  him."
14   Q.   Okay.  So, she never did tell you who it
15  was?
16   A.   No.
17   Q.   To your knowledge, did she tell your
18  attorney?
19   A.   No.
20   Q.   She didn't?
21   A.   No.
22   Q.   Okay.
23        MR. GRESHAM:  So, she may or not be
24  a witness, but we disclosed her any how because
25  she -- it says potential.

1    Q.   (Ms. Shea)  But you have no idea who
2  made this alleged comment, right?
3    A.   No.
4    Q.   Okay.  Do you know when the alleged
5  comment was made?
6    A.   No, I don't.
7    Q.   Do you know anything about the alleged
8  comment other than what it is in your answer to
9  interrogatory number one?
10   A.   No.
11   Q.   Did you and Ms. Miller have a falling
12  out?
13   A.   No.
14   Q.   Had you ever accused Ms. Miller of wrong
15  doing?
16   A.   Yes.
17   Q.   When was that?
18   A.   I -- oh, in -- somewhere between 2003
19  and 2007.
20   Q.   That's four years.
21   A.   Well ---
22   Q.   Somewhere in a four year range?
23   A.   Yes, maybe 2006.
24   Q.   Is that the best you can do?
25   A.   Maybe 2006.

1    Q.   2006?
2    A.   Can't be exact.
3    Q.   What wrong doing did you accuse Ms.
4  Miller of?
5    A.   I was advised that she had changed the -
6  - some schedules where students were not attending
7  class at East Arcadia and said that the grades had
8  been changed.  That one of the teachers thought
9  the grades had been changed from Fs to Bs or As by
10  Naomi Miller.
11   Q.   And these were students who weren't
12  attending class at all?
13   A.   That's correct.
14   Q.   That's what you heard, right?
15   A.   That's what I was told.
16   Q.   And who told you that?
17   A.   Stephanie Henry.
18   Q.   Henry?
19   A.   Yeah.
20   Q.   And what is Ms. Henry's position?
21   A.   She was an instructor  -- part-time
22  instructor at the satellite campus.
23   Q.   East Arcadia?
24   A.   Yes.
25   Q.   Did you report that?

Ophelia Munn-Goins Volume II                           Page 89

1    A.   Yes, I did.
2    Q.   To whom?
3    A.   Dr. Geisen.  I think I mentioned it to
4  Dr. Page as well. I'm not sure.
5    Q.   Do you know whether Ms. Henry reported
6  it?
7    A.   I -- I'm almost certain she did not.
8    Q.   Is that because she told you she hadn't?
9    A.   No, because she was afraid to.
10   Q.   She told you she was afraid?
11   A.   Say she wouldn't be able to work if she
12 reported it.
13   Q.   She said that to you?
14   A.   Yes.
15   Q.   Do you know whether there was any
16 resolution of that?
17   A.   No.
18   Q.   You don't know?
19   A.   No.
20   Q.   Okay.  Were you ever called in for an
21 interview about it?
22   A.   No.
23   Q.   And Ms. Miller is still there, right?
24   A.   Yes.
25   Q.   So, apparently either nothing was done

Ophelia Munn-Goins Volume II                           Page 90

1  or she was cleared or do you know?
2    A.   I don't know.
3    Q.   You have no idea?
4    A.   (No audible response)
5    Q.   Was there also a controversy that you
6  had with Ms. Miller relating to the fire
7  department?
8    A.   Yes.
9    Q.   And can you tell me about that?
10   A.   I didn't really have one with her, I had
11 with her husband.
12   Q.   Okay.
13   A.   I didn't have one with her. My family -
14 - my brother had one and other fire department
15 members had an issue with her appropriating land
16 illegally.
17   Q.   When was that controversy approximately?
18   A.   2006.
19   Q.   Also ---
20   A.   No, 2005. Maybe 2005. I don't know.
21   Q.   Okay.  Can you just kind of walk me
22 through the story?
23   A.   Yes. The fire -- Naomi and her husband
24 were the fire chief and secretary -- I don't know
25 if she was the -- no, she wasn't a secretary. She

Ophelia Munn-Goins Volume II                           Page 91

1  was just a member of the board of the fire
2  department. And her sister-in-law was the -- no,
3  let's see, who was the treasurer? Her sister-in-
4  law was the secretary.  And one of the church
5  members was her friend, was the treasurer. Yeah,
6  the friend was the treasurer.
7         They appropriated -- bought some
8  property for a new fire department, and that
9  property was subsequently sold to Naomi's daughter
10 by Naomi and her husband, which came from a non-
11 profit organization.  And then the fire department
12 members petitioned it, went to the House of the
13 Representatives, went to Dr. Page, went to others
14 and said that it was done illegally and
15 unethically.  And eventually, the property was
16 given back to the fire department.
17        And there was an issue about BCC
18 receiving money from Project Reach, which is a
19 non-profit organization, saying that they paid the
20 fuel bill for the campus. Project Reach, which
21 Naomi Miller ran, was actually inside Bladen
22 Community College. It's kind of like -- they were
23 responsible for the building, I guess.  And it was
24 rumored, I don't know, that she paid the college
25 money for fuel. But no one could ever produce any

Ophelia Munn-Goins Volume II                           Page 92

1  receipts.
2    Q.   This sounds like a very tangled
3  situation.
4    A.   It was.
5    Q.   Okay.
6    A.   So...
7    Q.   I'm having a little trouble following
8  it.
9    A.   I did too.
10   Q.   Okay.  So, I understand that her husband
11 was the fire chief, she was on the board, her
12 sister-in-law was the secretary to the board.
13   A.   She was secretary on the board.
14   Q.   This the -- what fire department would
15 this be?
16   A.   East Arcadia Volunteer Fire Department,
17 which by the way I am a member of, which I forgot.
18 I am a member.
19   Q.   Of the board?
20   A.   Of the board of the fire department.
21   Q.   Okay.
22   A.   I am now. I wasn't then.
23   Q.   You weren't at the time, were you?
24   A.   No.
25   Q.   Okay.  And -- okay. So, there was this

Ophelia Munn-Goins Volume II                     Page 93

1  land.  Was this going to be  land -- is this land
2  owned by the volunteer fire department?
3      A.   Yes.
4      Q.   And they've had this land for a while?
5      A.   No.   They purchased the land  for a new
6  fire department.   They -- probably five acres.
7  They only needed one  acre to put the fire
8  department on.  Then an acre or two acres was then
9  sold to her daughter without board members -- or
10 without  the  members  of  the  fire  department
11 approving it.
12     Q.   Okay.  They needed only one or two
13 acres?
14     A.   They used  only one or two.   They still
15 have the other acres.
16     Q.   Okay.  So,  they bought five, they  used
17 one or two, right?
18     A.   Correct.
19     Q.   And that would leave one or two, right?
20     A.   Correct.
21     Q.   And so  they sold  the extra one  or two
22 back to the Millers' daughter?
23     A.   Not back to.  It was never hers ---
24     Q.   They sold it to her?
25     A.   Yes.

Ophelia Munn-Goins Volume II                     Page 95

1  became involved ---
2      Q.   Okay.  So,  your brother  was involved in
3  the controversy?
4      A.   He was the one who brought everything to
5  light,  found all the research -- did all the
6  research, found the documents  and found out  that
7  the land had been transferred away  from the fire
8  department to  their daughter's name --  to their
9  daughter.
10     Q.   Okay.  Was there -- but the records
11 showed that the land had been paid for, right?
12     A.   I don't know.
13     Q.   You don't know.  Okay.  And ---
14     A.   At least they claimed  they had paid for
15 it.  That they did say.
16     Q.   There was a claim that the land had been
17 sold  -- was the claim that the land had been sold
18 at fair market value?
19     A.   No.
20     Q.   Was the claim that the -- I mean did the
21 Millers claim that the land had been sold for fair
22 market value?
23     A.   No.   They just -- they  didn't claim
24 anything.  My  brother found  the documents  and
25 showed that  the land had been  transferred out of

Ophelia Munn-Goins Volume II                     Page 94

1      Q.   Okay.
2      A.   Supposedly.  Supposedly.  The deed was
3  transferred to her name.
4      Q.   Okay.
5      A.   So, I don't know if they sold it or gave
6  it.
7      Q.   Do you know -- so, you don't know
8  whether Naomi's daughter paid for the land, is
9  that right?
10     A.   No.  I know there were documents -- they
11 generated documents showing that she paid, but  no
12 one knew for -- for sure, no.
13     Q.   Okay.
14     A.   And it was rumored that not the daughter
15 but Naomi and her husband paid  for the land  and
16 put it in their daughter's name.
17     Q.   And how did you get involved in all
18 this?
19     A.   I  became  a  member  of  the  fire
20 department.  I wasn't getting involved in it.  I
21 was a member of the fire department.  It wasn't my
22 issue.
23     Q.   Okay.  Was there a controversy in the
24 media about it?
25     A.   Yes.  My brother,  I guess, that's how I

Ophelia Munn-Goins Volume II                     Page 96

1  the fire department's name  to their daughter.  At
2  that time,  they claimed  they paid for it.   Not
3  her, but Naomi and them said they paid for it.
4      Q.   Okay.
5      A..  And that's the ---
6      Q.   And that was the end of the story?
7      A.   No.  It became  a mess in the community,
8  but eventually  the land  was transferred  back to
9  the fire department.
10     Q.   And did Mr. Miller step down as fire
11 chief?
12     A.   Yes.  He was voted -- a new fire chief
13 was elected.
14     Q.   And who was that?
15     A.   Leon Graham, Jr.
16     Q.   And how long  was Mr. Grant fire chief,
17 if you know?
18     A.   Graham.
19     Q.   Graham.  Graham?
20     A.   Graham.
21     Q.   Sorry.
22     A.   I'm not sure.  Maybe two years.
23     Q.   And was he succeeded by anybody?
24     A.   Yes.
25     Q.   Who?

Ophelia Munn-Goins Volume II                          Page 97

```
 1        A.   Roger Daniels.
 2        Q.   And how long was Mr. Daniels fire chief?
 3        A.   He's been fire chief for a little over a
 4   year -- over a year.
 5        Q.   Anybody else?
 6        A.   No.
 7        Q.   So, he's currently the fire chief?
 8        A.   Yes.
 9             MS. SHEA:  All right.   Well, I
10   think I may really be done this time, if you guys
11   will give us five more minutes.
12             MR. GRESHAM:  Sure.
13   (Luncheon recess)
14             MS. SHEA:   I have  no  further
15   questions, Ms. Munn-Goins.  Thank you.
16             THE WITNESS:  You're welcome.
17             WHEREUPON,  at 01:32  o'clock p.m.,
18   the deposition was adjourned.
19
20
21
22
23
24
25
```

Ophelia Munn-Goins Volume II                          Page 98

CERTIFICATION

I, Dale L. Ring, Notary Public in and for the County of Forsyth, State of North Carolina at Large, do hereby certify:

That there appeared before me the foregoing witness at the time and place herein aforementioned;

That the said witness was sworn by me to state the truth, the whole truth, and nothing but the truth, in said cause;

That the testimony was taken before me and recorded by Stenomask, thereafter reduced to typewriting under my direct supervision, and the foregoing consecutively numbered pages are a complete and accurate record of all the testimony given by said witness;

That the undersigned is not of kin, nor in any wise associated with any of the parties to said cause of action, nor their counsel, and that I am not interested in the event(s) thereof.

Reading and signing of the testimony was waived.

IN WITNESS WHEREOF, I have hereunto set my hand this the 14th day of November, 2008.

Notary No. 19972300044

CHAPLIN & ASSOCIATES
P. O. Box 407
Kernersville, NC 27285-0407

EXHIBIT
30
PENGAD 800-631-6989

| | HRD % | OSED MONTH | ACTUAL ANNUAL FY-06 |
|---|---|---|---|
| SUBTOTAL | | 0 | 0 |
| Career Start | | | |
| Coleman, LaShunda | | 86.25 | 11,478.00 |
| Cox, Elizabeth | | 86.92 | 31,888.00 |
| SUBTOTAL | | 3,813 | 43,358 |
| Small Business Center | | | |
| McDonald, Hilda | | 88.84 | 9,102.48 |
| Welborn, Lynn | | 86.26 | 61,543.00 |
| SUBTOTAL | | 3,064 | 80,645 |
| Literacy & Comp Ed | | | |
| Johnson, Wanda G. | | 98.08 | 38,588.98 |
| Locklear, Cynthia | | 44.28 | 47,481.00 |
| Taylor, Jan>e 30 hr | | 5.80 | 27,310.84 |
| Jacobs, Gwen | | 98.05 | 25,308.67 |
| Clerical Support | | | |
| West, Gail | | 2.42 | 27,148.00 |
| SUBTOTAL | | .651 | 183,808 |
| Occupational Ext. 310 | | | |
| Buylon, Sondra | | 8.26 | 29,991.08 |
| Evening Director/PT | | 8.75 | 10,426.00 |
| Nielson, Tammie/d. | | 4.87 | 26,338.00 |
| Peterson, Mary 30Hr | | 1.84 | 17,779.62 |
| Smith, Hallie | | 8.42 | 23,717.00 |
| Bryan, Donald 310 | | 2.91 | 8,314.98 |
| SUBTOTAL | | .714 | 116,564 |
| Occupational Ext. Su | | | |
| Bryan, Donald 311 | | 8.03 | 19,512.40 |
| Buylon, Sondra | | 7.49 | 15,449.94 |
| SUBTOTAL | | .814 | 34,962 |
| OSED Projects | | | |
| Johnson, Wanda G. | | 2.34 | 10,708.04 |
| SUBTOTAL | | .882 | 10,708 |

*inequity is amazing!*

Present were Kay Geisen, Sondra Guyton, Barbara Singletary, and Carnelle Pait.

First person interviewed was **Ophelia Munn-Goins**. Dr. Geisen explained that "…we are trying to find out what happened…not accusing anyone of anything." Ms. Munn-Goins explained that she obtained the copy of Curriculum faculty salaries and Continuing Education salaries from Mr. Horne. This is something she does every year: requests this list and pays a small fee (this year $3.00) for the copy. Then she hands it out to a few faculty members who are aware that she gets this information. She obtained the copy of faculty salaries from Lloyd Horne in March. She later received a copy of Continuing Education salaries in an envelope which had been placed in her mailbox.

The spreadsheet Ms. Munn-Goins received was set up in such a manner that it was difficult to match the first column (containing names) with the last column (containing salary amounts) so she folded her landscape copy so that names and salaries were adjacent to each other and more easily read.

After the faculty meeting on April 25, 2006, Ms. Munn-Goins gave a copy of the "folded" version of the salary information to Felisa Williams, Ella Jo Sellers, and Kenneth Oxendine. She stated that she had given a copy in its original form to Lee Anne Bryan sometime earlier.

Ms. Munn Goins stated that she received a call on Thursday morning, April 27, 2006, informing her that copies of the salary information had been placed in mailboxes. She did not find one in her box. She said that, at the time of the Curriculum faculty/Con Ed meeting that Dr. Geisen set up for the afternoon of that same day (Thursday), Ms. Munn-Goins, along with some others, were not aware that words had been written on the salary information that had been distributed. She said that she was the one who put an asterisk beside a couple of names because she wanted to ask those particular faculty members about their work experience, etc. She also stated that there was a second page of faculty salaries that did not get distributed. (This page contained the remainder of the alphabetically arranged names that were not showing on the salary information that had been distributed.)

When asked why she wanted the salary information, Ms. Munn-Goins stated that she gets this report every year—by paying for it and that she had never heard anyone complain before. She said when someone in the public asks her about job availability at BCC, they want to know an estimated salary. Since we do not have a pay scale set up, she uses this information to answer them.

Ms. Munn-Goins stated that she could see that it was the writing ("Inequitable," "Unfair") on the copies that had been distributed that was the source of the problem. She apologized and said she



PENGAD 800-631-6989

EXHIBIT

31

never thought anyone would do this and that, had she known it would cause this major problem, she would have told the others to get their own copies from Mr. Horne and pay for them. She stated that most of the faculty will not ask for this information or ask questions because they are afraid of losing their jobs.

Sondra Guyton stated that Con Ed is very upset—this information should not have been put out. She said, even if you know your salary is less than some others, you accept it and live with it. But, when something like this happens and your salary is compared publicly, it is very hurtful.

Dr. Geisen emphasized that it is not about salaries—it's about disharmony and mistrust. She said the situation is volatile. She re-emphasized that the purpose of this inquiry is not about pointing fingers but trying to find out how it had gotten to this level. She said that it has caused big problems.


The next person interviewed was **Ella Jo Sellers**. Dr. Geisen explained that this is not an accusatory thing, but rather an inquiry simply trying to establish the flow of how the salary information spread.

Ms. Sellers stated that she had gotten the two sheets from Ophelia. She did not have the second page that contained the last alphabetical names from "T" through "Z." She did not ask for the copy she received. "Someone" asked her if she wanted a copy and she said she did. Her copy did not have any handwriting on it. No one asked her for a copy and she did not share the copy with anyone. However, she had left it lying on her desk in her office.

Ms. Sellers said she had not heard anyone complain. She said faculty members do not feel secure in their jobs. One of the reasons she mentioned was that no reason has to be given if a contract is not renewed. She thinks that is why they are afraid to ask questions or complain.

Dr. Geisen asked if Ms. Sellers had any idea who might have been so upset they would have distributed the salary information. Ms. Sellers could not think of anyone.


**Kenneth Oxendine** was interviewed next. Dr. Geisen explained that this was just an inquiry—trying to determine what had happened—how the salary information had gotten reproduced and distributed.

Mr. Oxendine explained that, when he came out of the faculty meeting on Tuesday, April 25th, Felisa Williams and Ella Jo Sellers were outside Ms. Munn-Goins' office discussing the Workload Policy. Later, after seeing that Ms. Williams and Ms. Sellers had copies of the salary information, he asked Ms. Munn-Goins for a copy. He does not think that anyone but Ms. Munn-Goins knew he had received the chart. He did not show it to anyone. He stated that, when he first came to work at BCC in 1998 and was cleaning out the desk, he found a salary scale with names on it. He didn't really think anything about it and just discarded it.

Mr. Oxendine said that what he received from Ms. Munn-Goins was just the two sheets (same as Ms. Sellers) but he did not try to read it immediately because he couldn't see. He needed to have something done as far as his glasses. He had a doctor's appointment that day to get his eyes checked. He took the paper home with him to look at later. The reason he wanted the information was because he is working on his bachelor's degree and wanted to have an idea of what salary to expect after he is finished with his degree. He did receive another copy in his box but threw it into the trash.

Dr. Geisen asked him if he knew of anyone who would be so upset that they would do something like this. He did not. He said that his conversation is limited to those in his department. He also said that he had heard more about the Workload Policy than about the salary scale.

The next person interviewed was **Felisa Williams**. Dr. Geisen explained to Ms. Williams that this inquiry is not about pointing fingers but just trying to establish a paper trail.

Dr. Geisen showed Ms. Williams her copy of the distributed salary information and asked her if the copy she had received looked like this one—front and back. Ms. Williams replied that hers did not have any markings on it. She didn't remember bout the asterisks. She had not been able to locate her copy. When Dr. Geisen asked if she thought someone had taken it, she said she did not know but would look in her desk again. She said she had been trying to find it but had not located it so far. There were three other places she planned to look.

Dr. Geisen asked Ms. Williams if she had shared the information with anyone. Ms. Williams said that she had not, but that she and Ms. Sellers had talked about it.

In response to the question of how she ended up getting a copy, Ms. Williams said "we" were in a conversation discussing it and Ms. Munn-Goins asked if we wanted to see it. Ms. Munn-Goins then gave her a copy. Ms. Williams said the reason she wanted a copy was to see if her salary was correct on the salary sheet. She discovered that her name was not there.

Dr. Geisen asked if Ms. Williams thought that this incident is a result of someone being upset over the workload policy—so upset that they would have copied and distributed the salary information. Ms. Williams said she did not know of anyone that would have maliciously done this. No one asked her for a copy. Ms. Williams did not get one in her box.

Sondra Guyton asked Ms. Williams what she would think had she seen the words that were written on the copy that was distributed. Ms. Williams replied, "They made a statement—a big statement." She felt very bad for those in Con Ed who have been hurt by this. She feels very bad that actual names were published with salaries. She said she just wished she had never seen it.

**Lee Anne Bryan** was the final person interviewed. Dr. Geisen explained the purpose of the meeting—not to point fingers but to try to establish the paper trail.

Ms. Bryan explained that, on Thursday before Spring Break, Ms. Munn-Goins gave her a copy of faculty salaries. Ms. Bryan brought the copy with her to the inquiry. Her copy was different than those of Ms. Sellers, Ms. Williams, and Mr. Oxendine. It was in the original (unfolded) format and did not have Con Ed salaries on it.

Ms. Bryan stated that she had not made any copies nor has she shown it to anyone. She said it has been at home since she got it (until today). No one besides Ms. Munn-Goins knew she had it. Ms. Munn-Goins gives her a copy every year.

Dr. Geisen asked if Ms. Bryan knew of anyone who was so upset they would copy and distribute this information. Ms. Bryan said she did not know of anyone who would do this.

# FERGUSON STEIN CHAMBERS

**CHARLOTTE:**
James E. Ferguson, II
Julius L. Chambers
John W. Gresham
Geraldine Sumter
Henderson Hill
C. Margaret Errington
S. Luke Largess
Jacob H. Sussman
Brandon M. Lofton

OF COUNSEL:
Jonathan Wallas*
*Certified Mediator

FERGUSON STEIN CHAMBERS GRESHAM & SUMTER, P.A.
ATTORNEYS AT LAW
741 Kenilworth Ave. – Suite 300 • Charlotte, NC 28204
Telephone: (704) 375-8461 • Facsimile: (704) 334-5654
Mailing Address: P.O. Box 36486 • Charlotte, NC 28236-6486

IN CHAPEL HILL:
William Simpson, Jr.

OF COUNSEL:
Adam Stein

312 West Franklin Street
Chapel Hill, NC 27516
Telephone: (919) 933-5300
Facsimile: (919) 933-6182

December 14, 2006

Dr. Kay Geisen
Bladen Community College
Post Office Box 266
Dublin, NC 28332

RE: **Ms. Ophelia Munn-Goins**

Dear Dr. Geisen:

I have been retained by Ms. Munn-Goins to represent her in matters arising out of her employment at Bladen Community College, specifically the adverse actions taken by you regarding the purported release of salary information by my client.

As a result of the reprimand contained in your letter, Ms. Munn-Goins has suffered a loss of income for the 2006-07 school year and has a reprimand in her file.

My investigation indicates the following:

1) The information obtained by Ms. Munn-Goins was public information;

2) Ms. Munn-Goins had a constitutionally protected right to disseminate the information;

3) Ms. Munn-Goins provided the information to other faculty members who either requested it or with whom she had shared the information in past years. I have e-mails from other faculty members confirming their interest in obtaining the information; and

4) Your decision to claim that Ms. Munn-Goins "boasted" about the availability of the information suggests a deliberate effort to chill the dissemination of public information. Ms. Munn-Goins had every right to advise others of the lawful availability of the salary information. While some faculty members and others may be upset that the salary information is public, as you note the college is "compelled by law to provide the information upon request." To suggest that Ms. Munn-Goins' distribution of the salary information to other faculty members has created a "hostile work environment" again indicates a specific interest to violate Ms. Munn-Goins' protected rights.



EXHIBIT
32

The damages that my client has suffered to date include the loss of the 6% raise, the loss of her 2% incentive – superior performance bonus, and her merit pay. Additionally, my client has an unwarranted written reprimand in her file and to date has not received a copy of the current faculty and staff pay information for which she has paid $3 to receive.

My client would prefer to resolve this matter without recourse to litigation. I would appreciate it if you or the college attorney would advise if the college is prepared to redress the damages suffered by my client in this matter including the removal and return of the reprimand to Ms. Munn-Goins. I look forward to your reply.

Sincerely yours,

John Gresham

JWG/naa

pc:    Ms. Ophelia Munn-Goins

# FERGUSON STEIN CHAMBERS

FERGUSON STEIN CHAMBERS GRESHAM & SUMTER, P.A.
ATTORNEYS AT LAW
741 Kenilworth Ave. — Suite 300 • Charlotte, NC 28204
Telephone: (704) 375-8461 • Facsimile: (704) 334-5654
Mailing Address: P.O. Box 36486 • Charlotte, NC 28236-6486

CHARLOTTE:
James E. Ferguson, II
Julius L. Chambers
John W. Gresham
Geraldine Sumter
Henderson Hill
C. Margaret Errington
S. Luke Largess
Jacob H. Sussman
Brandon M. Lofton

OF COUNSEL:
Jonathan Wallas*
*Certified Mediator

IN CHAPEL HILL:
William Simpson, Jr.

OF COUNSEL:
Adam Stein

312 West Franklin Street
Chapel Hill, NC 27516
Telephone: (919) 933-5300
Facsimile: (919) 933-0182

March 23, 2007

## VIA FACSIMILE AND REGULAR MAIL

Mr. Philip R. Dixon
Dixon, Conner, Allen & Garcia, PLLC
110 E. Arlington Boulevard
Greenville, North Carolina 27858

   **Re:**   *Ophelia Munn-Goins/Bladen Community College (BCC)*

Dear Phil:

By sheer happenstance, I received your letter just before my scheduled call with Ms. Munn-Goins to review the latest retaliation at the hands of BCC administrators.

The following has occurred since last I wrote and we spoke:

1.   **The Warning:** On February 13, 2007, my client received a warning from Dr. Geissen for failure to drop students in a timely manner. (Attachment A) This warning came in spite of the exchange of e-mails set out in Attachment B. You will note that one student was having medical problems and had advised Ms. Munn-Goins that she wished to continue the course but would drop if she could not return. Ms. Munn-Goins had advised the student that because of the fact that the student had notified her of her medical condition and worked to complete the course, she would work with her. Also, while the e-mail does not go into greater detail (Ms. Munn-Goins was not anticipating the warning which dropped like a thunderbolt almost two months later)[1] the fact is that Ms. Munn-Goins did not know that the student was not going to return to class until she failed to appear for the exam. Likewise, the two week absence period for the male student ended on the day of the final exam.

   I have always understood, as has my client, that the obligations of a faculty member at a community college is to work to help students complete course work.

---

[1]   While dated February 2, 2007, the letter was presented to my client on February 13, 2007. (an early valentine?)

EXHIBIT

33

Additionally, I have a question about whether the practice of dropping students at exam time comports with federal regulations and guidelines.

While the information set out above deals with the factual and technical issues regarding Dr. Geissen's February, 2007 warning, the more serious issue deals with the fact that while Ms. Munn-Goins received a warning, other faculty members who engaged in the same practice did not receive a warning. Once again retaliation rears its ugly head.

2.   **The Request for Educational Leave** – I have attached, as Attachment C, the BCC policy regarding educational leave. You will note that it applies to a person employed on a 9, 10, 11 or 12 month basis. Ms. Munn-Goins is a 10 month employee. She is working to obtain her doctorate and had the opportunity to take two graduate courses and study for her comprehensive exams beginning shortly after the end of the spring term (May 10, 2007). She then requested educational leave from May 10th-May 31, 2007. On or around December 1, 2006, Ms. Munn-Goins had made her request for the educational leave (Attachment D) and had spoken with Dr. Geissen soon thereafter. At that point, which you will note was shortly before I wrote you on behalf of Ms. Munn-Goins, Dr. Geissen indicated that she saw no problem with the educational leave. However, after learning that Ms. Munn-Goins was contesting the earlier retaliatory actions by BCC, Dr. Geissen's position changed and Dr. Geissen then decided the leave, although BCC policy states that the decision is to be made by her with the President and the Board of Trustees. (Attachment E - Geissen letter)

Ms. Munn-Goins then met with Dr. Page and Dr. Geissen, and corrected a number of erroneous statements about the length of her contract, her previous conversation with Dr. Geissen, etc. Dr. Page then agreed to review the matter. In a subsequent meeting where new excuses arose, Dr. Page upheld Dr. Geissen's disapproval of the leave.[2] Ms. Munn-Goins has decided to register for one of the two courses she was planning to take, and will await your response to my request that she be granted educational leave.

Finally, I note that your client's continued efforts to create a version of the events surrounding the salary materials which were at the heart of the original disputes. Your client's "beliefs" are incorrect. First of all, another employee advised Dr. Geissen that it was she, not my client, who put the information in some of the faculty mailboxes. The assertion of the "nefarious fold" is ever more startling and shows a desire on behalf of the administrators to ignore the facts for a series of unfounded "beliefs".

Given these facts, I have some doubt that we can resolve this matter, but, being an optimist, I make the following proposal:

---

[2]   I note that at its most recent meeting, the Board of Trustees approved two other educational leaves.

March 23, 2007
Page 3
_____

     (1)    The original reprimand and the reprimand dated February 2, 2007 be removed from my client's file and destroyed. A copy of the documents may be sealed and maintained in your file.

     (2)    My client receive (a) a 6% raise, effective August 1, 2006; (b) a 2% incentive-superior performance Bonus (consistent with her 05-06 evaluation); and (c) merit pay of $1,500.00.

     (3)    My client receives a copy of the pay/salary scale for which she paid $3.00 earlier this year;

     (4)    My client is granted educational leave from May 10-May 31, 2007.

     (5)    That her pay and bonuses for the 2007-2008 school year be consistent with that of other faculty members with her same length of service, professional credentials, and excellent evaluations.

Since Ms. Munn Goins has some reasonable doubts about the possibility of continued collegial relationships with the administration at BCC, she has advised me that, if we can reach a resolution of this matter, she will resign from BCC at the end of the fall/winter 2007 term upon our working out a suitable recommendation, settlement agreement and release.

If we can resolve these issues as set out herein, our clients will be able to go their separate ways and continue their educational and professional pursuits. I hope that you will be able to convince your clients of the benefit of such an approach.

                   Yours truly,

                   John W. Gresham

JWG:cfd
Enclosure



# BLADEN COMMUNITY COLLEGE

Post Office Box 266
Dublin, North Carolina  28332

April 30, 2007

Ms. Ophelia Munn-Goins
PO Box 265
Riegelwood, NC 28456

Dear Ms. Munn-Goins:

This is official notification that your employment contract will not be renewed for school year 2007-2008 and that your services will not be needed after May 31, 2007.

Thank you for your service to Bladen Community College.  We wish you the best of success in your future endeavors.

Sincerely,

Darrell Page
President

c: Personnel File
  Payroll File
  Dr. Kay Geisen

PENGAD 800-631-6989

EXHIBIT

34

# Display Transcript

*i* This is NOT an official transcript. Courses which are in progress may also be included on this transcript.

Institution Credit    Transcript Totals    Courses in Progress

*Transcript Data*

**STUDENT INFORMATION**

**Birth Date:** Oct 09, 1957
**Student Type:** Continuing
**Curriculum Information**

**Current Program**
Doctor of Education
**Program:** Doc. Educational Leadership
**College:** School of Education
**Major and Department:** Educational Leadership, Educational Leadership

***Transcript type:UNOF is NOT Official ***

**DEGREES AWARDED**

**Sought:** Doctor of Education    **Degree Date:**
**Curriculum Information**

**Primary Degree**
**Major:** Educational Leadership

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| **Institution:** | 12.000 | 12.000 | 12.000 | 12.000 | 48.000 | 4.000 |

**INSTITUTION CREDIT    -Top-**

Fall Semester 2005
**Student Type:** First Time Graduate
**Academic Standing:** Good Standing

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---|---|---|---|---|---|---|---|---|---|
| EDLE | 700 | Main | D | Group Dyn, Dec Making Peo Mgmt | A | 3.000 | 12.000 | | |
| EDLE | 706 | Main | D | Seminar in Educ Leadership | A | 3.000 | 12.000 | | |
| EDLE | 721 | Main | D | Research, Design & Eval Method | A | 3.000 | 12.000 | | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| **Current Term:** | 9.000 | 9.000 | 9.000 | 9.000 | 36.000 | 4.000 |
| **Cumulative:** | 9.000 | 9.000 | 9.000 | 9.000 | 36.000 | 4.000 |



PEN/GUID 800-831-6988    EXHIBIT

35

## Unofficial Transcript

Spring Semester 2006

**Student Type:** Continuing
**Academic Standing:** Good Standing

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---------|--------|--------|-------|-------|-------|--------------|----------------|---------------------|---|
| EDLE | 704 | Main | D | Curriculum & Instru Leadership | B | 3.000 | 9.000 | | |
| EDLE | 708 | Main | D | Organ Theory and Admin Beh | A | 3.000 | 12.000 | | |
| EDLE | 720 | Main | D | Educational Statistics | A | 3.000 | 12.000 | | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---------------|--------------|--------------|-----------|----------------|-----|
| **Current Term:** | 9.000 | 9.000 | 9.000 | 9.000 | 33.000 | 3.667 |
| **Cumulative:** | 18.000 | 18.000 | 18.000 | 18.000 | 69.000 | 3.833 |

## Unofficial Transcript

Summer Session 1 2006

**Student Type:** Continuing
**Academic Standing:**

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---------|--------|--------|-------|-------|-------|--------------|----------------|---------------------|---|
| EDLE | 703 | Main | D | Public Pol & Pol Issues in Edu | A | 3.000 | 12.000 | | |
| EDLE | 705 | Main | D | The Plan & Finc of Educ Organ | A | 3.000 | 12.000 | | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---------------|--------------|--------------|-----------|----------------|-----|
| **Current Term:** | 6.000 | 6.000 | 6.000 | 6.000 | 24.000 | 4.000 |
| **Cumulative:** | 24.000 | 24.000 | 24.000 | 24.000 | 93.000 | 3.875 |

## Unofficial Transcript

Summer Session II 2006

**Student Type:** Continuing
**Academic Standing:**

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---------|--------|--------|-------|-------|-------|--------------|----------------|---------------------|---|
| EDLE | 701 | Main | D | Cul Diversity in Amer Schools | A | 3.000 | 12.000 | | |
| EDLE | 722 | Main | D | Qualitative Res, Theory & Appl | B | 3.000 | 9.000 | | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---------------|--------------|--------------|-----------|----------------|-----|
| **Current Term:** | 6.000 | 6.000 | 6.000 | 6.000 | 21.000 | 3.500 |
| **Cumulative:** | 30.000 | 30.000 | 30.000 | 30.000 | 114.000 | 3.800 |

## Unofficial Transcript

Fall Semester 2006

| Student Type: | Continuing |
| Academic Standing: | Good Standing |

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---|---|---|---|---|---|---|---|---|---|
| EDLE | 707 | Main | D | Sem in Leg Issues/Prof Ethics | B | 3.000 | 9.000 | | |
| EDLE | 723 | Main | D | Quantitative Res, Appl & Meth | A | 3.000 | 12.000 | | |
| EDLE | 730 | Main | D | Internship in Educ Leadership | S | 3.000 | 0.000 | | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 9.000 | 9.000 | 9.000 | 6.000 | 21.000 | 3.500 |
| Cumulative: | 39.000 | 39.000 | 39.000 | 36.000 | 135.000 | 3.750 |

Unofficial Transcript

Spring Semester 2007

| College: | School of Education |
| Major: | Educational Leadership |
| Student Type: | Continuing |
| Academic Standing: | Good Standing |

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---|---|---|---|---|---|---|---|---|---|
| EDLE | 709 | Main | G | University and College Teachin | A | 3.000 | 12.000 | | |
| EDLE | 730 | Main | D | Internship in Educ Leadership | S | 3.000 | 0.000 | | |
| SWRK | 605 | Main | G | Social Work Technology | A | 3.000 | 12.000 | | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 3.000 | 3.000 | 3.000 | 0.000 | 0.000 | 0.000 |
| Cumulative: | 42.000 | 42.000 | 42.000 | 36.000 | 135.000 | 3.750 |

**Term Totals (Graduate)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 6.000 | 6.000 | 6.000 | 6.000 | 24.000 | 4.000 |
| Cumulative: | 6.000 | 6.000 | 6.000 | 6.000 | 24.000 | 4.000 |

Unofficial Transcript

Summer Session I 2007

| College: | School of Education |
| Major: | Educational Leadership |
| Student Type: | Continuing |
| Academic Standing: | |

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---|---|---|---|---|---|---|---|---|---|
| EDLE | 710 | Main | G | The Adult Learner | A | 3.000 | 12.000 | | |

**Term Totals (Graduate)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 3.000 | 3.000 | 3.000 | 3.000 | 12.000 | 4.000 |
| Cumulative: | 9.000 | 9.000 | 9.000 | 9.000 | 36.000 | 4.000 |

## Unofficial Transcript

Summer Session II 2007

| | |
|---|---|
| **College:** | School of Education |
| **Major:** | Educational Leadership |
| **Student Type:** | Continuing |
| **Academic Standing:** | |

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start R and End Dates |
|---|---|---|---|---|---|---|---|---|
| EDAM | 698 | Main | G | Comp Usage for Educ Admin | A | 3.000 | 12.000 | |

**Term Totals (Graduate)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 3.000 | 3.000 | 3.000 | 3.000 | 12.000 | 4.000 |
| Cumulative: | 12.000 | 12.000 | 12.000 | 12.000 | 48.000 | 4.000 |

## Unofficial Transcript

Fall Semester 2007

| | |
|---|---|
| **Student Type:** | Continuing |
| **Academic Standing:** | Good Standing |

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start R and End Dates |
|---|---|---|---|---|---|---|---|---|
| EDLE | 740 | Main | D | Dissertation in Educ Leadershp | P | 3.000 | 0.000 | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 3.000 | 3.000 | 3.000 | 0.000 | 0.000 | 0.000 |
| Cumulative: | 45.000 | 45.000 | 45.000 | 36.000 | 135.000 | 3.750 |

## Unofficial Transcript

Spring Semester 2008

| | |
|---|---|
| **Student Type:** | Continuing |
| **Academic Standing:** | Good Standing |

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start R and End Dates |
|---|---|---|---|---|---|---|---|---|
| EDLE | 740 | Continuing Education | D | Dissertation in Educ Leadershp | IP | 3.000 | 0.000 | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 3.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Cumulative: | 48.000 | 45.000 | 45.000 | 36.000 | 135.000 | 3.750 |

Unofficial Transcript

**TRANSCRIPT TOTALS (DOCTORAL)** -Top-

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Total Institution: | 48.000 | 45.000 | 45.000 | 36.000 | 135.000 | 3.750 |
| Total Transfer: | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Overall: | 48.000 | 45.000 | 45.000 | 36.000 | 135.000 | 3.750 |

Unofficial Transcript

**TRANSCRIPT TOTALS (GRADUATE)** -Top-

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Total Institution: | 12.000 | 12.000 | 12.000 | 12.000 | 48.000 | 4.000 |
| Total Transfer: | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Overall: | 12.000 | 12.000 | 12.000 | 12.000 | 48.000 | 4.000 |

Unofficial Transcript

**COURSES IN PROGRESS** -Top-

Fall Semester 2008

**College:** School of Education
**Major:** Educational Leadership
**Student Type:** Continuing

| Subject | Course | Campus | Level | Title | Credit Hours | Start and End Dates |
|---|---|---|---|---|---|---|
| EDUC | 999 | Main | G | Dissertation Non-Credit | 0.000 | |

**RELEASE: 7.2**

## 931 Construction

**ROOFERS WANTED** 3+ years experience. Drivers lic./tools/transportation required Call 800-581-6354.

## 937 Education

**COMPUTER INFORMATION TECHNOLOGY Instructor**

Bladen Community College is now accepting applications for a full-time (9 month) Computer Information Technology Instructor.

Applicants must have a Master's degree or higher in Computer Science, Information Systems, Health Information Technology (preferred) or a related field with 18 graduate hours in Computer Science. Community College teaching experience is desirable and the ability to teach medical courses as offered in the Office Systems Technology Program. The teaching schedule may include a combination of day and evening classes as well as on and off campus classes.

Duties include teaching computer technology, preparing course materials, organizing classes and labs, keeping records, advising students, assisting with school activities, and performing all related duties.

Inquiries may be made by contacting Bladen Community College, PO Box 266, Dublin, NC 28332, or telephone (910) 879-5556. Applicants must complete a Bladen Community College application; submit copies of college and/or university transcripts (unofficial copies will suffice; if hired, official copies will be required).

Applications must be received by June 25, 2007, at 6:30 p.m.
EOE/AA

## ROBESON COMMUNITY COLLEGE

**Part-Time Professional Tutors**

Bachelors Degree in Math, English, Science or Reading from an ac-

## 950 Management/ Supervisory

**CHIEF EXECUTIVE OFFICER**

A BS degree in Business Administration, Management, Information Technology or Marketing required. A minimum of five years of progressive responsibility in the management of technology preferred, including a minimum of three years management responsibility at the department level. Should have a comprehensive knowledge of the total operation of a sales environment. Must have a working knowledge of the practices used in daily work of a broadband internet service environment. Must be capable of meeting established goals through development and implementation of SUD policies, practices and procedures. Must have the ability to organize, research and follow through on assigned projects. Should have working knowledge of MS Word, Excel, in addition to Inventory, Internet and project management software. A valid NC driver's license is required.

Qualified applicants only. Employment is contingent upon successful completion of a criminal background investigation and drug test. Interested candidates should forward resumes along with a cover letter to the Manager of Human Resources by means of:

Fax to: (910)843-2079
Mail to: Manager of Human Resources
P.O. Box 830
Red Springs, NC 28377
E m a i l :
SUD@lumbeeriver.com
Southeastern Utilities Development, Inc. is an Equal Opportunity Employer.

**EXPERIENCED WAREHOUSE** Supervisor. Must be open to flexible hours. Apply @ 3060 West 5th Street. No Phone Calls Please

## 955 Medical

**ALLERGY NURSE** or Allergy Tech needed for busy medical office. Knowledge of allergy testing, allergy injections and other medical duties required Please

## 955 Medical

**BLADENBORO ASSISTED LIVING** is now taking applications for CNA's and Med Techs for all shifts.

Apply In person at 714 E. Bladen Street M-F, 9am-4pm.

**CARDINAL CLINIC, LLC,** is accepting applications for new and currently licensed therapeutic parents interested in contracting with Cardinal Therapeutic Home Services, Inc. We are recruiting therapeutic parents for the following counties: Lee, Randolph, Richmond, Robeson, and Scotland.

Request an application by calling 910-692-9904, ext.110. Cardinal Clinic, LLC, and Cardinal Therapeutic Home Services, Inc., are Equal Opportunity Employers.

**CASE MANAGER RN**
Fort Bragg
Fayetteville, NC

Full Time
Immediate Openings
1 Year Experience
Any State License, BLS

Contact: Julie Coutrois
1-800-325-3982
extension: 4167
jcourtois@
spectrumhealth.com
shrusa.com EOE/AA/D

**ER RN**
Fort Bragg
Fayetteville, NC

Full Time, Short Term
Assignment

1 Year Critical Care
Experience
Any State License
BLS, ACLS

Contact: Julie Courtois
1-800-325-3982.
extension: 4167
jcourtois@
spectrumhealth.com
shrusa.com EOE/AA/D

**LIBERTY CARES**
With Compassion
At Liberty Hospice we understand the unique needs of our patients and families facing terminal illness That is why Liberty Hospice provides our hospice patients with state of the art care and pain management services, delivered by our spe-

## 955 Medical

sources, 2334 South 41st Street, Wilmington, NC 28403 Fax: 910-815-4356.
Email: lhmhr@liberty-homecare.com.
Call 800-438-1115.
Visit
w w w . l i b e r t y h o m e-
care.com
for more information. Background checks/drug-free workplace..

**EOE**

**QUALIFIED PROFESSIONALS &** RN's needed, Send Resumes to: White Alternatives Services @ 1603 Godwin Avenue. Or Apply in person

**LIBERTY COMMONS NURSING & Rehab** Center is looking for dedicated, caring professionals! Are you looking for a change? We are accepting applications for LPNs. Excellent **NEW** Pay Scale!! Apply in person at Liberty Commons Nursing & Rehab Center, 1402 Pinckny Street Whiteville, NC 28472 (910)642-4245

**LPNS/ RNSI ASSISTEDCARE** is currently hiring exceptional LPNs and RNs to work with clients in the Columbus County area. NEW SHIFTS, shift differential, weekly pay, ongoing educational in-services and great support. Join a team of dedicated and talented professionals. Complete an application at 115 West Main Street, Whiteville, call Robin at (910) 642-4960, FAX resume to her at (910) 642-7739 or email resume to careers@assistedcare.net

**RNS & LPNs needed by MAXIM HEALTH-CARE SERVICES** for new homecare cases in Robeson and all surrounding counties. Flexible shifts, benefits, competitive pay, direct deposit & weekly paychecks.

Call 910-485-2255 for more info.

**SOUTHEASTERN BEHAVIORAL Healthcare and Home Care** is seeking a Licensed Registered Nurse for our Healthcare and Home Care Services

## 960 Miscellaneous

**SILVESTRY CHEVROLET**
Looking to add some horsepower to our service department due to continuing growth. Service writers and Mechanics please call Janice or Jose (910)276-1821 Monday - Friday closed 5:30 pm. Also closed Saturdays.

**CERTIFIED DENTAL ASSISTANT** needed in Elizabethtown area. Experience required. Excellent benefits. Please submit resume to:
Dental Assistant
PO Box 604
Elizabethtown, NC 28337

**HVAC TECHNICIANS for Bladen County** Area. Experience required, pay based on experience. Insurance/uniforms provided. Call for Applications @ (910)739-3333 or (910)862-2401

**ROBESON COMMUNITY COLLEGE Cosmetology Instructor**

**Qualifications:** A diploma in Cosmetology from a regionally accredited institution and a current NC State Board of Cosmetic Art Teacher,s License as required. Two years of teaching experience in a community college setting in addition to minimum qualifications is preferred

All applicants must submit a RCC application. For a listing of duties and an application, visit www.robeson.cc.nc.us or contact Personnel Services at 910.272.3531.
Closing date: Wednesday, June 27, 2007 at 5:00 p.m.

**AN EQUAL OPPORTUNITY EMPLOYER**

**\*\*\*\*\*\*\*\*\*\*\*\***
**WINNER**

**Jenny Hall**
**Ballpark Rd**
**Bladenboro**

EXHIBIT
36
PENGAD 800-631-6989

Munn-Goins - 23

## 401 Pets

**CUTE FEMALE ORKIE** Pupp for sale. arents are champions rom known ennels.Healthy,lots of rinkies, big head and ig chest. A guarantee f health. Champion loodlines from CA. rendarhnd@yahoo.ca

## 415 Animal Supplies

**LL NEW HAPPY** jack ennel dip II: kills, leas, ticks & MANGE ites without steroids. rovides mosquito protection. MCDOUGALD, NC (647-2241) www.happyjackinc.co )

## 505 Antiques

**OR SALE NTIQUE** Oak Washtand, high back with eveled mirror and roll op. $400. Large solid ood desk (maple color) $175. All in very ood condition. Call 62-3279.

## 545 Miscellaneous

**006 HOT TUB** for ale. Jacuzzi brand. 5500. CD player, 2 peakers, lights change o 6 colors, seats 5. reat condition! Call shley 910-850-3267.

**THIS COULD BE YOUR SPOT, CALL Carrie TODAY AT 862-416**



EXHIBIT 37

PENGAD 800-631-6989

## 555 Yard/ Garage Sale

**BLADEN CRISIS** Assistance Thrift Store, New & Used Clothing Open Tue-Fri 10-3:30, Sat. 8-2:30 in BCA Building behind Bo's

**YOUR AD COULD BE HERE**

**BLADEN CRISIS ASSISTANCE** Thrift Shop, New & Used Clothing. Open Tues-Thurs 10-3:30, Fri. 10-5, Sat. 9-3:30, Across from Red & White on MLK Drive.

## 665 Instruction

**DO YOU NEED MATH** TUTORING? CALL 910-876-7357

## 670 Music/ Dance/Drama

**WANT YOUR OLD** Vinyl Records or cassettes converted to cds? $5 per cd less for more. Call 648-4144

## 760 Cars

**1994 WRECKED HONDA** Accord Ex for sale! Motor in great condition. Damage to body only. Call 910-258-8934

**FOR SALE: 1986** Monte Carlo ss. Good condition. 910-648-4133.

## 805 Wanted to Buy

**WANTED:** 100 ACRES+ land in Southeastern NC in rural setting. To be used for construction of a faith based Drug and Alcohol Rehabilitation facility, Respond to PO Box 2023 Elizabethtown, NC 28337

## 810 Real Estate For Sale

**FOR SALE: BEAUTIFUL** 3 bdr home, 2 bath master suite with whirlpool tub, spacious open floor plan on 1+acre. To call for an appointment: 718-701-0962 ask for Debbie.

## 828 Manufactured Homes/Lots

**2 BR, 1BA,** $350. 3BR DW, $450. Bladenboro. No pets. No sect.8. Call Lori 8am-6pm 910-866-5969.

**2BR, $375, 3BR,** $450. Elizabethtown, No Pets, No Sect 8, Call Lori 8am-6pm. 910-866-5969.

**SINGLEWIDE, DOUBLEWIDE** and custom built modulars, land & home packages. First Time Buyers. Oakwood Homes Chadbourn 910-654-4128.

## 832 Apartments/ Townhouses

**WHITE LAKE WATERFRONT,** Townhouse, 3 bds, 2+1/2 Bths., $900 a month, 874-4705

## 835 Rent or Lease

**3 BDR. FOR** rent. approx. 10 miles from E-town, near Bladen College. $475. Call Charles Taylor @ 862-3897

## 880 Manufactured Homes For Sale

**NEW 4 BEDROOM** 2 bath, 2 x 6 sidewalls, extra insulation, 8' ceilings, thermopanes, Must see! Includes setup, A/C, underpinning & steps $49,500.00 Call now, New Castle Homes 1-888-821-2416/ 910-770-1203

**FOR SALE USED** single wides and double wides, 910-232-4507

**2007 FLEETWOOD** 3 bedroom 2 Full baths for $26,000. Call Dennis Guyton at 910-863-4393 or 876-5570.

## 915 Administrative/Prof

**IRS JOBS** $18.46– $32.60/hour, Now Hiring. Paid Training is provided. For application & free government job information, call American Association of Labor. 1-913-599-8244, 24 hours. employment service.

## 931 Construction

**ROOFERS WANTED** 3+ years experience. Drivers lic./tools/transportation required. Call 800-581-6354.

EOE/AA

## 937 Education

**COMPUTER INFORMATION TECHNOLOGY** Instructor

Bladen Community College is now accepting applications for a full-time (9 month) Computer Information Technology Instructor. Applicants must have a Master's degree or higher in Computer Science, Information Systems, Health Information Technology (preferred) or a related field with 18 graduate hours in Computer Science. Community College teaching experience is desirable and the ability to teach medical courses offered in the Office Systems Technology Program. The teaching schedule may include a combination of day and evening classes as well as on and off campus classes.

Duties include teaching computer technology, preparing course materials, organizing classes and labs, keeping records, advising students, assisting with school activities, and performing all related duties.

Inquiries may be made by contacting Bladen Community College,

## 937 Education

PO Box 266, Dublin, NC 28332, or telephone (910) 879-5556. Applicants must complete a Bladen Community College application; submit copies of college and/or university transcripts (unofficial copies will suffice; if hired, official copies will be required). Applications must be received by October 26, 2007, at 3:00 pm.

EOE/AA

## 940 Employment/ Services

**BLADEN COUNTY HEALTH DEPARTMENT** has a Social Worker II position opening in the Child Service Coordination Program. The primary purpose of the position is to collaborate and cooperate with families of infant/children age 0-5 to assure identification of and access to preventive, specialized and support service for themselves and their children.

Bachelor's degree from an accredited school of social work and one year of social work or counseling experience

Make state application along with college transcript to Diuana Register, P.O. Box 189, Elizabethtown, NC. 28337 or call (910) 872-6209. Application deadline is open until filled

**JOB TITLE: RAISING** a Reader Community Coordinator (20-30 hours per week)
Job Purpose: to manage and administer the Bladen Smart Start "Raising A Reader" grant
Key Responsibilities:
-Attend the national training in California to learn the "Let's Read Together" parent curriculum
-Engage Bladen County 3 and 4 star licensed child care services cen-

## 940 Employment Services

ters in the "Raising Reader" project
-Train early childhood teachers to delive "Let's Read Tog curriculum to pare 3-5 year olds in th spective centers
-Offer a minimum parent workshop 26-week series
-Monitor the earl teachers in the d of the curriculum
-Adhere to the lished guidelines garding targeted lation and servi quirements
-Coordinate with library staff to tra number of family to library.
-Submit periodic as determined by utive Director.
-Communicate an vide information den Smart Start of Directors, Nor olina Partnersh Children, and ot instructed by Ex Director.
-Must make a tv commitment t project (2007-20 -Perform other as directed

Skills and Abilitie -Adept in the us sic computer pr including Publis Excel
-Comfortable co cating with ea professionals a rents
-Ability to e timelines and r to meet grant ments
-Capable of wo dependently
-Some knowle early childhood and/or literacy

Credentials & ence
-BA or BS d Human Service ly Childhood E -At least (1) related exper Human Servic Early Childhoo tion

## 401 Pets

**CUTE FEMALE [Y]ORKIE** Pupp for sale. [P]arents are champions [f]rom known [k]ennels. Healthy, lots of [w]rinkles, big head and [b]ig chest. A guarantee [o]f health. Champion [b]loodlines from CA. rendarhnd@yahoo.ca

## 415 Animal Supplies

**[A]LL NEW HAPPY** jack [k]ennel dip II: kills, [f]leas, ticks & MANGE [m]ites without steroids. [p]rovides mosquito pro- [t]ection. MCDOUGALD, NC (647-2241) www.happyjackinc.co[m]

## 505 Antiques

**[F]OR SALE [A]NTIQUE** Oak Wash- [s]tand, high back with [b]eveled mirror and roll [t]op. $400. Large solid [w]ood desk (maple col- [o]r) $175. All in very [g]ood condition. Call [862]-32379.

## 545 Miscellaneous

**[2]006 HOT TUB** for [s]ale. Jacuzzi brand. [$]5500. CD player, 2 [s]peakers, lights change [t]o 6 colors, seats 5. [G]reat condition! Call [A]shley 910-850-3267.



**THIS COULD BE YOUR SPOT, CALL Carrie TODAY AT 862-4163**

## 555 Yard/Garage Sale

**BLADEN CRISIS** Assistance Thrift Store, New & Used Clothing Open Tue-Fri 10-3:30, Sat. 8-2:30 in BCA Building behind Bo's

**YOUR AD COULD BE HERE**

**BLADEN CRISIS AS-SISTANCE** Thrift Shop, New & Used Clothing. Open Tues-Thurs 10-3:30, Fri. 10-5, Sat. 9-3:30, Across from Red & White on MLK Drive.

## 665 Instruction

**DO YOU NEED MATH** TUTORING? CALL 910-876-7357

## 670 Music/Dance/Drama

**WANT YOUR OLD** Vi- nyl Records or cas- settes converted to cds? $5 per cd less. for more Call 648-4144

## 760 Cars

**1994 WRECKED HON-DA** Accord Ex for sale! Motor in great condi- tion. Damage to body only. Call 910-258-8934

**FOR SALE: 1986** Monte Carlo ss. Good condition. 910-648-4183.

## 805 Wanted to Buy

**WANTED: 100 ACRES+** land in South- eastern NC in rural set- ting. To be used for construction of a faith based Drug and Alco- hol Rehabilitation facility. Respond to PO Box 2023 Elizabethtown, NC 28337

## 810 Real Estate For Sale

**FOR SALE: BEAUTI-FUL** 3 bdr home, 2 bath master suite with whirl- pool tub, spacious open floor plan on 1+acre. To call for an appointment: 718-701-0962 ask for Debbie.

## 828 Manufactured Homes/Lots

**2 BR, 1BA,** $350. 3BR DW, $450. Bladenboro. No pets. No sect.8. Call Lori 8am-6pm 910-866-5969.

**2BR, $375, 3BR,** $450. Elizabethtown, No Pets. No Sect 8, Call Lori 8am-6pm. 910-866-5969.

**SINGLEWIDE, DOU-BLEWIDE** and custom built modulars, land & home packages. First Time Buyers. Oakwood Homes Chadbourn 910-654-4128.

## 832 Apartments/Townhouses

**WHITE LAKE WATER-FRONT**, Townhouse, 3 bds, 2+1/2 Bths., $900 a month, 874-4705

## 835 Rent or Lease

**3' BDR. FOR** rent. ap- prox. 10 miles from E- town, near Bladen Col- lege. $475. Call Charles Taylor @ 862-3897

## 880 Manufactured Homes For Sale

**NEW 4 BEDROOM** 2 bath, 2 x 6 sidewalls, extra insulation, 8' ceil- ings, thermopanes, Must see! Includes set- up, A/C, underpinning & steps $49,500.00 Call now, New Castle Homes 1-888-821-2416/ 910-770-1203

**FOR SALE USED** sin- gle wides and double wides, 910-232-4507

**2007 FLEETWOOD** 3 bedroom 2 Full baths for $26,000. Call Den- nis Guyton at 910-863-4393 or 876-5570.

## 915 Administrative/Prof

**IRS JOBS** **$18.46-** $32.60/hour, Now Hiring. Paid Train- ing is provided. For ap- plication & free govern- ment job information, call American Associa- tion of Labor. 1-913-599-8244, 24 hours. employment service.

## 931 Construction

**ROOFERS WANTED** 3+ years experience. Driver's lic./tools/trans- portation required. Call 800-581-6354.

## 937 Education

**COMPUTER INFOR-MATION TECHNOLO-GY** Instructor

Bladen Community Col- lege is now accepting applications for a full- time (9 month) Computer In- formation Technology Instructor. Applicants must have a Master's degree or higher in Computer Science, Information Systems, Health Infor- mation Technology (preferred) or a related field with 18 graduate hours in Computer Science. Community College teaching experience is desirable and the ability to teach medical courses offered in the Office Systems Technology Program. The teaching schedule may include a combination of day and evening classes as well as on and off campus classes.

Duties include teaching computer technology, preparing course materials, organizing classes and labs, keep- ing records, advising students, assisting with school activities, and performing all related duties.

Inquiries may be made by contacting Bladen Community College,

*(handwritten: 10/26/07 BCC)*

EXHIBIT 38

PENGAD 800-631-6989

# EMPLOYMENT APPLICATION

## Bladen Community College

7418 NC HWY 41 WEST • PO BOX 266 DUBLIN, NORTH CAROLINA 28332
PHONE (910 )879-5500 • FAX (910) 879-5564 • website http://www.bladen.cc.nc.us

DATE 10/10/07

RECEIVED OCT 26 2007 BCC PERSONNEL DEPARTMENT

SPECIFIC TITLE OF
POSITION APPLIED FOR **Computer Information Technology Specialist**

(A **SEPARATE** APPLICATION FORM MUST BE COMPLETED FOR **EACH** POSITION FOR WHICH YOU ARE APPLYING.)

Are you available to work
☑ FULL-TIME ☐ PART-TIME          ☑ 9 MONTHS ☐ 12 MONTHS
(for teaching positions only)

## 2. PERSONAL DATA

NAME  Munn-Goins          Ophelia
_____LAST_____          _____FIRST_____          _____MIDDLE_____

PREFERRED NAME  Ophelia          EMAIL ADDRESS _____

ADDRESS  927 Graham Road      Riegelwood      nc      28456
_____STREET NUMBER OR PO BOX_____    _____CITY_____    _____STATE_____    _____ZIP_____

TELEPHONE:  HOME( 910 ) 655-1611          WORK( )

**HAVE YOU EVER BEEN CONVICTED OF AN OFFENSE AGAINST THE LAW OTHER THAN A MINOR TRAFFIC VIOLATION?**
(If yes, explain fully on an additional sheet.)  (A conviction does not mean you cannot be hired.  The offense and
how recently you were convicted will be evaluated in relation to the job for which you are applying.)

☐ YES ☑ NO

Have you filled out an application here before? ☑ YES ☐ NO      Have you worked here before? ☑ YES ☐ NO
WHEN Jun 02 POSITION Inf. Systems      WHEN 2002-2007 POSITION Information Sys.

Are you legally eligible to work in the United States? ☑ YES ☐ NO      Are you at least 18 years of age? ☑ YES ☐ NO

List names and relationships of any family members who work here.

Name  N/A          Relationship _____
Name  N/A          Relationship _____

## 3. EDUCATION

A copy of transcripts, licensure or certification as applicable is required before this application can be processed.

Circle Highest grade completed:  1 2 3 4 5 6 7 8 9 10 11 12      GED      College 1 2 3 4      Graduate School 1 2 3 ④

| Schools | Name and Location | Graduate | Major/Minor Course Work | Type of Degree Received | DO NOT COMPLETE C.L.S |
|---|---|---|---|---|---|
| High School | East Bladen High Elizabethtown, nc | (Yes) No | General | Diploma | |
| Technical School/College | | Yes No | | | |
| College(s) University(ies) | Winston-Salem State Winston-Salem, nc | (Yes) No | Psychology | B.A | |
| Graduate or Professional | Univ. of Pittsburgh Pittsburgh, PA | (Yes) No | Health Info. Systems | M.L.S. | |
| Other Education | Fayetteville State Univ Fayetteville, nc | Yes (No) | Educational Leadership | | |

(rev 2006)

EXHIBIT
39
PENGAD 800-631-6989

Licenses and Certifications. Give dates and sources of issuance. CNE, American College of Health care Executives 95
AHIA - American Health Information Management Association - 1993.

## 4. EMPLOYMENT EXPERIENCE  A resume may not be used as a substitute but may be attached.

For each position, indicate number of people you supervised if any and type of supervision (ex. Line, functional, technical). In listing prior work experience, include military and volunteer service. Use additional paper if more space is needed.

Present or Last Employer **BCC**          Job Title **Instructor**

Employer's Address **P.O. Bx 266 Dublin, NC**   Supervisor **Cynthia McKoy**  Telephone **879-5639**

Dates Worked:  From **Aug 02**  to **May 07**          ☒ Full-time  **5**
                      month / year       month / year                    Total Number Years / Months

Starting Salary **42,500**   Ending Salary **50,000+**    ☐ Part-time  _____
                                                                       Total Number Years / Months

Duties: **Academic advisor, instruct computer**          **30**
**Science, information technology and Medical/health related**   Number of hours per week
**Courses.**

Reason for Leaving: **Contract non-renewal**

If currently working here, may we contact this employer for a reference?  ☐ YES   ☐ NO

---

Next Employer **US Army**          Job Title **Executive Officer**

Employer's Address **ACO-Arlington, VA**   Supervisor **Mary Dixon**  Telephone _____

Dates Worked:  From **Jan 99**  to **Nov 2001**        ☒ Full-time  **2/11**
                      month / year       month / year                    Total Number Years / Months

Starting Salary **80,000**   Ending Salary **96,000**    ☐ Part-time  _____
                                                                       Total Number Years / Months

Duties: **Monitored, coordinated and participated**          **40-60**
**in the oversight activities related to the evaluation, deployment**   Number of hours per week
**and funding for smart card technology; in support of the Dept of Defense.**

Reason for Leaving: **Retired**

---

Next Employer **US Army**          Job Title **Executive Officer**

Employer's Address **Fort Benning, GA elsewhere**  Supervisor **Col Markelze**  Telephone **706 -**

Dates Worked:  From **Jul 81**  to **Dec 98**        ☒ Full-time  **17**
                      month / year       month / year                    Total Number Years / Months

Starting Salary **20,000**   Ending Salary **88,000**    ☐ Part-time  _____
                                                                       Total Number Years / Months

Duties: **Director, Health Information Management,**          **40-50**
**(HIM) and Utilization Management, Health Administration**   Number of hours per week
**Consultant, Information Systems Officer, Security Officer**

Reason for Leaving: **relocation.**

## Background Investigation

I, *Ophelia Munn-Goins* do hereby grant by signature below, Bladen Community College the authority to conduct a Criminal Background Investigation for purpose of employment. I am providing the identifying information as listed in this authorization to conduct this investigation.

**Name** Ophelia Munn-Goins

**Address** 927 Graham Road, Riegelwood, NC 28456

**Social Security Number** 238 04 2312

**Date of Birth** 10/09/1957

**Signature** Ophelia Munn-Goins

**Date** 10/10/07

### Please List Three Professional References

**Name:** Dr. Jack Freeman
**Address:** 1200 Murchison Road, Fayetteville, NC 28301
Telephone (910) 672-1797 Fax ( )

**Name:** Dr. Delores Parker
**Address:** 5016 Mail Service, 200 W. Jones St, Raleigh, NC 27603-1379
Telephone (919) 807-7096 Fax ( )

**Name:** Ms. Wanda Daniels
**Address:** 770 East Arcadia Road, Riegelwood, NC 28456
Telephone (910) 655-2711 Fax ( )

Have you ever been dismissed or forced to resign from a prior job?  ☑ YES  ☐ NO   If yes, explain in detail (Use an additional sheet of paper if necessary):

My Contract at BCC was not renewed; reasons unknown.

## 5. OTHER QUALIFICATIONS AND TRAINING

Describe other special qualifications; skills with tools, machines, and equipment; and courses, workshops, or other training which relate to the position for which you are applying.

As a Registered Health Information Administrator (RHIA), I possess skills in the collection, interpretation, and analysis of patient data and medical information. Experience, and knowledge in a broad range of settings that span the continuum of healthcare clinic to hospitals.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Bladen Community College does not pay for interview travel costs and/or relocation.

Applicants for faculty positions who accept an interview will be asked to demonstrate proficiency in oral and written communications in the language in which the assigned courses will be taught.

Applicants for positions which require a specific degree, certification, or license will be required to have **official transcripts** or documentation on file with the College prior to their hire date.

Security checks are required for all applicants who accept regular employment and for applicants who accept certain part-time employment.

Proof of citizenship or immigration status will be required of all applicants upon employment.

### A SEPARATE APPLICATION IS REQUIRED FOR EACH POSITION FOR WHICH YOU APPLY

### AGREEMENT

By signing my name below, I (1) certify that all statements made by me on this application are true and complete to the best of my knowledge and that I understand that misrepresentations or omissions may be cause for rejection or may be cause for subsequent dismissal if I am hired, and (2) understand that nothing contained in this application or in the interview process is intended to create an employment contract between the college and me, and (3) authorize the college to contact and obtain information from all references, employers, public agencies and others to verify the accuracy of all information provided in this application.  I hereby waive all rights and claims I may have regarding the college for seeking, obtaining, and using truthful information in the employment process and all other persons, corporations, or organizations for furnishing such information about me.  If this application results in my employment, I understand I have a right to terminate my employment at any time and for any reason and the college retains a similar right, not withstanding any contractual agreement between the employee and the college.  I understand this entire statement applies to the period prior to or after I may be employed.

Ophelia Munn-Goins
SIGNATURE

10/10/07
DATE

Bladen Community College is an affirmative action/equal opportunity employer, making selections on the basis of knowledge, skills and abilities without regard to race, color, religion, national origin, sex, age or other non-relevant factors.

# EQUAL OPPORTUNITY INFORMATION

The information requested below is to help us determine how well our recruiting efforts are reaching all segments of the population. It will in no way affect you as an applicant. **SUBMISSION IS VOLUNTARY.**

DATE OF BIRTH __10__ __09__ __1957__
                 Month      Day      Year

**SEX**   ☐ Male   ☑ Female

**ETHNIC GROUP**
- ☐ White (Caucasian, non-Hispanic)
- ☑ African-American
- ☐ American Indian (including Alaskan native)
- ☐ Hispanic (Mexican, Puerto Rican, Cuban, Central or South American, other Spanish origin regardless of race)
- ☐ Asian (including Pacific Islander)

**HANDICAP:** A handicap is any impairment which substantially limits a major life function. This information is optional. Failure to provide it will not subject you to any adverse treatment. It will be maintained confidentially.
- ☐ Visual impairment/ Blindness
- ☐ Hearing impairment/ Deafness
- ☐ Cardiovascular disorder
- ☐ Emotional/ Mental disorder
- ☐ Nervous System/ neurological disorder (ex. Epilepsy)
- ☐ Respiratory impairment
- ☐ Loss or impairment of upper or lower limbs
- ☐ Disabling diseases (arthritis, diabetes, etc.)
- ☐ Other (explain) _____

**Please indicate your referral source:**
- ☐ Job Posting/Employee at BCC
- ☐ NC Employment Security Commission
- ☐ Job Posting at other College/University

- ☑ Newspaper – Name _Bladen_
- ☐ Internet – Which site_____
- ☐ Other_____


RECEIVED

OCT 2 6 2007

BCC PERSONNEL DEPARTMENT

How I will contribute to the mission/purpose of Bladen Community College.

I believe education is the key to success for all and the foundation for securing our nation's future as an academic advisor and instructor, it is my goal to motivate students in discovering their inner strengths and abilities as well as realizing what truly inspires them to succeed. My objective is to provide a stimulating and communicative learning environment, which encourages student retention, and ultimately graduation.

I respect and understand multiculturalism in and out of the classroom. I will assign tasks that allow students to demonstrate their ability to think critically, reason analytically, and extrapolate accurately to enhance their communication

Name Munn, OPhelia

Student Number

38-04-2312

Home Address Route 1 Box 280-A
City Riegelwood
State N.C.
Date of Birth 10/9/57   Place of Birth Wilmington, N.C.
H. S. and date of Graduation East Bladen High   1975
City and State Elizabethtown   County Bladen
Parent or Guardian   Rank
Address   Charles Munn Jr
Route 1, Box 280-A
Riegelwood, N.C.

| Course No. | Course Title | GR. | S.H. | Gr. Points | Average |
|---|---|---|---|---|---|
| | FALL SEM 1975    238042312 | | | | |
| 1102 | FUND OF P E | A | 1 | 4 | PED |
| 1301 | ENG GR AND COMP | B | 3 | 9 | ENG |
| 1301 | WORLD CIVILIZATION 1 | B | 3 | 9 | HIS |
| 2311 | ANAT AND PHYS | C | 3 | 6 | BIO |
| 2211 | COMMUNITY HYGIENE | C | 2 | 4 | HED |
| 4 | RDG AND STUD SKILLS | P1 | 0 | 0 | EDU |
| 1301 | TOPICS OF MATH | BDF | 3 | 90 | MAT |
| 1103 | FRE ORIENTATION | P | 1 | 0 | ORI |
| | | | 16 | #132 | |
| | SPR SEM 1976    238042312 | | | | |
| 1301 | INTRO TO ART | A | 3 | 12 | ART |
| 112 | FIRST YR BASIC | A | 1 | 4 | MSC |
| 2105 | BEGIN AND INT SWIMMIN | A | 1 | 4 | PED |
| 1302 | WORLD CIVILIZATION 11 | B | 3 | 9 | HIS |
| 2301 | GENERAL SOCIOLOGY | B | 3 | 9 | SOC |
| 2312 | ANAT AND PHYS 11 | C | 3 | 6 | BIO |
| 1302 | WRITG ABOUT LIT | C | 3 | 6 | ENG |
| | | | 17 | 50 | |
| | FALL SEM. 76    238042312 | | | | |
| 2301 | GENERAL PSYCHOLOGY | D | 3 | 3 | PSY |
| 2411 | GENERAL CHEMISTRY 1 | CX | 4 | 8 0 | CHE |
| 2811 | NURSING 1 | C | 8 | 16 | NUR |
| 2301 | WORLD LITERATURE 1 | C | 3 | 6 | ENG |
| 151 | 2ND YEAR BASIC | B | 2 | 6 | MSC |
| | | | 20 | 3931 | |
| | SPR SEM 77    238042312 | | | | |
| 152 | 2ND YR BASIC | A | 2 | 8 | MSC |
| 2341 | FUND OF SPEECH | B | 3 | 9 | ENG |
| 2812 | NURSING 11 | C | 8 | 16 | NUR |
| 2412 | GENERAL CHEMISTRY | B | 4 | 12 | CHE |
| | | | 17 | 45 | |
| | FALL SEM 77    238042312 | | | | |
| 211 | 1ST YR ADVANCED | A | 3 | 12 | MSC |
| 3336 | DEVELOPMENTAL PSY | B | 3 | 9 | PSY |
| 1301 | INTRO TO MUS | C | 3 | 6 | MUS |
| 3813 | NURSING III | C | 8 | 16 | NUR |
| 4 | READING & STUDY SKILL | P | 0 | 0 | EDU |
| | | | 17 | 43 | |
| | SPR SEM 78    238042312 | | | | |
| 212 | 1ST YR ADVANCED | A | 3 | 12 | MSC |
| 4336 | FIRST AID | B | 3 | 9 | HED |
| 3814 | NURSING IV | C | 8 | 16 | NUR |
| 3306 | CHILD WELFARE | C | 3 | 6 | SOC |
| | | | 17 | 43 | |
| | FALL SEM 78    238042312 | | | | |
| 251 | 2ND YR ADV | B | 3 | 9 | MSC |
| 4367 | NURSING SEMINAR | C | 3 | 6 | NUR |

RECORD OF COURSES

| Subjects | Units | Subjects | Units |
|---|---|---|---|
| English | | Civics | |
| Latin | | Gen. Sci. | |
| French | | Biol. | |
| History | | Chem. | |
| Algebra | | Physics | |
| Geometry | | Home Econ. | |

Date MAY 17, 1981
Degree B.A.
Major PSYCHOLOGY
Minor/Area of Conc. SOCIOLOGY
Graduation
Status
Date of Wthdrl.

TRANSCRIPT ISSUED

Registrar



# Boston University Transcript

Boston University
University Registrar
881 Commonwealth Avenue
Boston, Massachusetts 02215

| STUDENT NAME | IDENTIFICATION NUMBER | DATE OF BIRTH | SEX |
|---|---|---|---|
| Munn, Ophelia | 238 04 2312 | 10/09/1957 | F |

**DEGREE AWARDED**

Master of Education
  Major: Human Services and Human Resource
         Education
  May 17, 1987

**BASIS OF ADMISSION**

Winston Salem St U
Winston Sal, NC
  Bachelor of Arts

| COURSES | TITLE | CREDIT | GRADE | HONOR POINTS | GPA SEM CUM |
|---|---|---|---|---|---|
| | **SPRING    1985** | | | | |
| ADMITTED TO SCHOOL OF EDUCATION | | | | | |
| Non Degree | | | | | |
| SED EL592H | MANAGE & LEADER | 4.0 | A- | 14.8 | 3.70 |
| | | | | | 3.70 |
| | **SUMMER2   1985** | | | | |
| SED EL785H | SYSPLAN:NA&DNMK | 4.0 | A- | 14.8 | |
| SED EM730H | COMPU TCH LRN | 4.0 | B+ | 13.2 | 3.50 |
| | | | | | 3.57 |
| | **FALL     1985** | | | | |
| ADMITTED TO SCHOOL OF EDUCATION | | | | | |
| Master of Education | | | | | |
| SED EL653H | RESEARCH METHOD | 4.0 | B | 12.0 | 3.00 |
| | | | | | 3.43 |
| | **SPRING    1986** | | | | |
| ADMITTED TO SCHOOL OF EDUCATION | | | | | |
| Non Degree | | | | | |
| SED EL792H | PRACT ADMINTECH | 4.0 | A | 16.0 | 4.00 |
| | | | | | 3.54 |
| | **SUMMER2   1986** | | | | |
| SED HR725H | SEM HUM RES ED | 4.0 | B | 12.0 | 3.00 |
| | | | | | 3.45 |
| | **SPRING    1987** | | | | |
| ADMITTED TO SCHOOL OF EDUCATION | | | | | |
| Master of Education | | | | | |
| SED CC707H | MOT&PART AD LEA | 4.0 | B+ | 13.2 | |
| SED CE741H | PER CRSS CLT CN | 4.0 | A- | 14.8 | 3.50 |
| | | | | | 3.46 |

------------------------------------------
Cumulative Credits Earned    :   32.0
Cumulative Grade Point Average:    3.46
------------------------------------------

**End of Transcript**

*Florence Bergeron*
Florence Bergeron
University Registrar

Current Name: *Munn-Goins*

**Issued in a signed and sealed envelope**

1974 Family Educational Rights and Privacy Act Information

The information contained on this transcript is not subject to redis-
closure to any other party without the expressed written consent
of the student or his/her legal representative. It is understood this
information will be used only by the officers, employees and agents
of your institution in the normal performance of their duties. When

Not valid as a transcript without the authorized signature,
the seal of the University, and the background pattern.
Unless otherwise stated, this student is in good standing.

Shelia Munn

| STUDENT ID NUMBER |
| --- |
| 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 |

## ACADEMIC GOAL(S) AT DATE OF LAST ATTENDANCE

| | |
| --- | --- |
| GREE | Master of Science |
| JOR | Health and Rehabilitation Scs |
| AD CNTR | Sch Hlth & Rehabilitation Scs |
| MPUS | Pittsburgh |

## IVERSITY OF PITTSBURGH CREDITS

### Term 1992-1993

| RSE TITLE | COURSE | | CREDIT | GRADE | SPECIAL NOTATION |
| --- | --- | --- | --- | --- | --- |
| ALTH RECORDS SYS IN COMMUNITY | HRA | 1475 | 3.0 | A | |
| A CLINICAL EDUCATION 3 | HRA | 1480 | 2.0 | A | |
| IAL ASPECTS OF HEALTH CARE | HRA | 1482 | 2.0 | A | |
| STEMS ANALYSIS IN HLTH CARE | HRA | 1485 | 3.0 | B | |
| RO HEALTH INFORMATION SYSTEMS | HRP | 2420 | 3.0 | A | |
| ORMATION TECH IN HEALTH SYS | HRP | 2423 | 3.0 | A | |
| UES IN THE HEALTH SYSTEM | HRP | 2903 | 2.0 | A | |

### ing Term 1992-1993

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| ANCIAL MANAGEMENT FOR HIM | HIM | 1486 | 2.0 | A | |
| M & HIS) RESEARCH SEMINAR | HRS | 2400 | 1.0 | S | |
| TA BASE MANAGEMENT HLTH CARE | HRS | 2424 | 3.0 | A | |
| MAN RESOURCE MGT/LABOR RELTN | HRS | 2445 | 3.0 | A | |
| ADUATE RESEARCH | HRS | 2925 | 3.0 | I | |
| .COM/NETWORKS OVERVIEW | INFSCI | 2058 | 3.0 | B | |

## GREES AWARDED FROM OTHER INSTITUTIONS

iston-Salem State University    1981

**"END OF DOCUMENT. NO ENTRIES BELOW THIS LINE"**

UNOFFICIAL ISSUED TO STUDENT

Send to:
Unofficial Transcript
Issued to Student

# UNIVERSITY OF PITTSBURGH

at Pittsburgh, PA 15260

**...helia Munn**

| | STUDENT ID NUMBER |
|---|---|
| | 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 |

## ...ADEMIC PROGRESS AT DATE OF LAST ATTENDANCE

| ...REE | Bachelor of Science |
|---|---|
| ...IOR | Health Records Administration |
| ...D CNTR | Sch Hlth & Rehabilitation Scs |
| ...MPUS | Pittsburgh |

| ...ADEMIC PROGRESS AT DATE OF LAST ATTENDANCE | |
|---|---|
| CREDITS EARNED | 43.0 |
| DEGREE CREDITS | 43.0 |
| DEGREE QUALITY POINTS | 160.00 |
| CUMULATIVE QPA | 3.72 |

### ADVANCED STANDING CREDITS

| | | Credits |
|---|---|---|
| Evaluated By Sch Hlth & Rehabilitation Scs 1975-1980 | Winston Salem State University | 56.0 |
| Evaluated By Sch Hlth & Rehabilitation Scs 1984-1987 | Boston University | |

### DEGREES AWARDED FROM OTHER INSTITUTIONS

| | | | Credits |
|---|---|---|---|
| BA | Winston-Salem State University | 1981 | 4.0 |

## ...VERSITY OF PITTSBURGH CREDITS

| RHSE Title | COURSE | | CREDIT | GRADE | SPECIAL NOTATION |
|---|---|---|---|---|---|

**Term 1991-1992**

| | | | | | |
|---|---|---|---|---|---|
| ...TO MEDICAL TERMINOLOGY | HRA | 1405 | 3.0 | A | |
| ...ICAL TERMINOLOGY/COMPUTER LAB | HRA | 1406 | 0.0 | S | |
| ...TO HEALTH RECORDS & HLTH CARE | HRA | 1415 | 3.0 | A | |
| ...TO HEALTH RECORDS LAB 1 | HRA | 1416 | 1.0 | A | |
| ...ANIZATIONAL THEORY & CONCEPTS | HRA | 1420 | 3.0 | A | |
| ...TO ANATOMY AND PHYSIOLOGY | HRP | 1020 | 3.0 | A | |
| ...TOMY & PHYSIOLOGY LABORATORY | HRP | 1021 | 1.0 | A | |
| ...Y PATHOPHYSIOLOGY | HRP | 1027 | 4.0 | B | |

**ing Term 1991-1992**

| | | | | | |
|---|---|---|---|---|---|
| ...SSIFICATION SYSTEMS | HRA | 1435 | 3.0 | A | |
| ...SSIFICATION SYSTEMS LAB 2 | HRA | 1436 | 1.0 | A | |
| ...DOR REGISTRY THEORY & LAB | HRA | 1438 | 2.0 | A | |
| ...CLINICAL EDUCATION 1 | HRA | 1440 | 2.0 | A | |
| ...TISTICAL UNDERSTANDING | HRA | 1442 | 2.0 | B | |
| ...LITY CARE ASSESSMENT | HRA | 1455 | 2.0 | A | |
| ...LITY CARE ASSESSMENT LAB 3 | HRA | 1456 | 1.0 | A | |

**nmer Term 1991-1992**

| | | | | | |
|---|---|---|---|---|---|
| ...VAN RELATIONS IN HLTH CARE | HRA | 1445 | 2.0 | A | |
| ...A CLINICAL EDUCATION 2 | HRA | 1460 | 1.0 | A | |
| ...DEMIOLOGY | HRA | 1462 | 2.0 | A | |
| ...RO TO RESEARCH METHODOLOGY | HRP | 2901 | 3.0 | A | |
| ...TISTICAL METHODS 2 | PSYED | 2015 | 3.0 | B | |

***CONTINUED ON NEXT COLUMN***

***END OF DOCUMENT. NO ENTRIES BELOW THIS LINE***

UNOFFICIAL ISSUED TO STUDENT

**Send to:**
Unofficial Transcript
Issued to Student

# Display Transcript

830029366 Ophelia Munn-Goins
Aug 07, 2007 04:27 pm

i. This is NOT an official transcript. Courses which are in progress may also be included on this transcript.

Institution Credit    Transcript Totals

*Transcript Data*

## STUDENT INFORMATION

**Birth Date:**       Oct 09, 1957
**Student Type:**     Continuing
**Curriculum Information**

**Current Program**
**College:**          School of Education
**Major and Department:**  Educational Leadership,
                          Educational Leadership

***Transcript type:UNOF is NOT Official ***

## DEGREES AWARDED

**Sought:** Doctor of Education        **Degree Date:**
**Curriculum Information**

**Primary Degree**
**Major:**                    Educational Leadership

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Institution: | 12.000 | 12.000 | 12.000 | 12.000 | 48.000 | 4.000 |

## INSTITUTION CREDIT    -Top-

**Student Type:**              First Time Graduate
**Academic Standing:**         Good Standing

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---|---|---|---|---|---|---|---|---|---|
| EDLE | 700 | Main | D | Group Dyn, Dec Making Peo Mgmt | A | 3.000 | 12.000 | | |
| EDLE | 706 | Main | D | Seminar in Educ Leadership | A | 3.000 | 12.000 | | |
| EDLE | 721 | Main | D | Research, Design & Eval Method | A | 3.000 | 12.000 | | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 9.000 | 9.000 | 9.000 | 9.000 | 36.000 | 4.000 |
| Cumulative: | 9.000 | 9.000 | 9.000 | 9.000 | 36.000 | 4.000 |

Unofficial Transcript

| Student Type: | | | | Continuing | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Academic Standing: | | | | Good Standing | | | | | |
| **Subject Course Campus Level** | | | | **Title** | **Grade** | **Credit Hours** | **Quality Points** | **Start and End Dates** | **R** |
| EDLE | 704 | Main | D | Curriculum & Instru Leadership | B | 3.000 | 9.000 | | |
| EDLE | 708 | Main | D | Organ Theory and Admin Beh | A | 3.000 | 12.000 | | |
| EDLE | 720 | Main | D | Educational Statistics | A | 3.000 | 12.000 | | |

**Term Totals (Doctoral)**

| | **Attempt Hours** | **Passed Hours** | **Earned Hours** | **GPA Hours** | **Quality Points** | **GPA** |
|---|---|---|---|---|---|---|
| Current Term: | 9.000 | 9.000 | 9.000 | 9.000 | 33.000 | 3.667 |
| Cumulative: | 18.000 | 18.000 | 18.000 | 18.000 | 69.000 | 3.833 |

Unofficial Transcript

| Student Type: | | | | Continuing | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Academic Standing: | | | | | | | | | |
| **Subject Course Campus Level** | | | | **Title** | **Grade** | **Credit Hours** | **Quality Points** | **Start and End Dates** | **R** |
| EDLE | 703 | Main | D | Public Pol & Pol Issues in Edu | A | 3.000 | 12.000 | | |
| EDLE | 705 | Main | D | The Plan & Finc of Educ Organ | A | 3.000 | 12.000 | | |

**Term Totals (Doctoral)**

| | **Attempt Hours** | **Passed Hours** | **Earned Hours** | **GPA Hours** | **Quality Points** | **GPA** |
|---|---|---|---|---|---|---|
| Current Term: | 6.000 | 6.000 | 6.000 | 6.000 | 24.000 | 4.000 |
| Cumulative: | 24.000 | 24.000 | 24.000 | 24.000 | 93.000 | 3.875 |

Unofficial Transcript

| Student Type: | | | | Continuing | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Academic Standing: | | | | | | | | | |
| **Subject Course Campus Level** | | | | **Title** | **Grade** | **Credit Hours** | **Quality Points** | **Start and End Dates** | **R** |
| EDLE | 701 | Main | D | Cul Diversity in Amer Schools | A | 3.000 | 12.000 | | |
| EDLE | 722 | Main | D | Qualitative Res, Theory & Appl | B | 3.000 | 9.000 | | |

**Term Totals (Doctoral)**

| | **Attempt Hours** | **Passed Hours** | **Earned Hours** | **GPA Hours** | **Quality Points** | **GPA** |
|---|---|---|---|---|---|---|
| Current Term: | 6.000 | 6.000 | 6.000 | 6.000 | 21.000 | 3.500 |
| Cumulative: | 30.000 | 30.000 | 30.000 | 30.000 | 114.000 | 3.800 |

Unofficial Transcript

| Student Type: | | | | Continuing |
|---|---|---|---|---|

**Academic Standing:**          Good Standing

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---------|--------|--------|-------|-------|-------|--------------|----------------|--------------------|---|
| EDLE | 707 | Main | D | Sem in Leg Issues/Prof Ethics | B | 3.000 | 9.000 | | |
| EDLE | 723 | Main | D | Quantitative Res, Appl & Meth | A | 3.000 | 12.000 | | |
| EDLE | 730 | Main | D | Internship in Educ Leadership | S | 3.000 | 0.000 | | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 9.000 | 9.000 | 9.000 | 6.000 | 21.000 | 3.500 |
| Cumulative: | 39.000 | 39.000 | 39.000 | 36.000 | 135.000 | 3.750 |

Unofficial Transcript

**College:**          School of Education
**Major:**          Educational Leadership
**Student Type:**          Continuing
**Academic Standing:**          Good Standing

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---------|--------|--------|-------|-------|-------|--------------|----------------|--------------------|---|
| EDLE | 709 | Main | G | University and College Teachin | A | 3.000 | 12.000 | | |
| EDLE | 730 | Main | D | Internship in Educ Leadership | S | 3.000 | 0.000 | | |
| SWRK | 605 | Main | G | Social Work Technology | A | 3.000 | 12.000 | | |

**Term Totals (Doctoral)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 3.000 | 3.000 | 3.000 | 0.000 | 0.000 | 0.000 |
| Cumulative: | 42.000 | 42.000 | 42.000 | 36.000 | 135.000 | 3.750 |

**Term Totals (Graduate)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 6.000 | 6.000 | 6.000 | 6.000 | 24.000 | 4.000 |
| Cumulative: | 6.000 | 6.000 | 6.000 | 6.000 | 24.000 | 4.000 |

Unofficial Transcript

**College:**          School of Education
**Major:**          Educational Leadership
**Student Type:**          Continuing
**Academic Standing:**

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---------|--------|--------|-------|-------|-------|--------------|----------------|--------------------|---|
| EDLE | 710 | Main | G | The Adult Learner | A | 3.000 | 12.000 | | |

**Term Totals (Graduate)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 3.000 | 3.000 | 3.000 | 3.000 | 12.000 | 4.000 |
| Cumulative: | 9.000 | 9.000 | 9.000 | 9.000 | 36.000 | 4.000 |

Unofficial Transcript

| | |
|---|---|
| **College:** | School of Education |
| **Major:** | Educational Leadership |
| **Student Type:** | Continuing |
| **Academic Standing:** | |

| Subject | Course | Campus | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---|---|---|---|---|---|---|---|---|---|
| EDAM | 698 | Main | G | Comp Usage for Educ Admin | A | 3.000 | 12.000 | | |

**Term Totals (Graduate)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 3.000 | 3.000 | 3.000 | 3.000 | 12.000 | 4.000 |
| Cumulative: | 12.000 | 12.000 | 12.000 | 12.000 | 48.000 | 4.000 |

Unofficial Transcript

**TRANSCRIPT TOTALS (DOCTORAL)**   ~Top~

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| **Total Institution:** | 42.000 | 42.000 | 42.000 | 36.000 | 135.000 | 3.750 |
| **Total Transfer:** | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| **Overall:** | 42.000 | 42.000 | 42.000 | 36.000 | 135.000 | 3.750 |

Unofficial Transcript

**TRANSCRIPT TOTALS (GRADUATE)**   ~Top~

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| **Total Institution:** | 12.000 | 12.000 | 12.000 | 12.000 | 48.000 | 4.000 |
| **Total Transfer:** | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| **Overall:** | 12.000 | 12.000 | 12.000 | 12.000 | 48.000 | 4.000 |

Unofficial Transcript

**RELEASE: 7.2**